**PUT AGREEMENT**

**BY AND BETWEEN**

**LINCOLN NATIONAL REINSURANCE COMPANY (BARBADOS) LIMITED**

**AND**

**SWISS RE LIFE & HEALTH AMERICA INC.**

**July 27, 2001**

WO 30719.4

## TABLE OF CONTENTS

ARTICLE I TRANSFER AND ACQUISITION OF PUT SHARES........................................ 1
    1.01    Put Right.............................................................................................................. 1
    1.02    Put Closing ........................................................................................................ 2
    1.03    Payment and Delivery at Put Closing ................................................................ 2

ARTICLE II REPRESENTATIONS AND WARRANTIES OF LINCOLN BARBADOS .. 2
    2.01    Incorporation and Standing ............................................................................... 2
    2.02    Authorization...................................................................................................... 2
    2.03    No Conflict or Violation .................................................................................... 3
    2.04    Consents and Approvals..................................................................................... 3
    2.05    Actions Pending ................................................................................................ 3
    2.06    Capitalization ..................................................................................................... 3
    2.07    Licenses and Permits ......................................................................................... 4
    2.08    Contracts............................................................................................................ 4
    2.09    Compliance........................................................................................................ 4
    2.10    Financial Statements. ......................................................................................... 4
    2.11    No Brokers ......................................................................................................... 4

ARTICLE III REPRESENTATIONS AND WARRANTIES OF PURCHASER................... 5
    3.01    Incorporation and Standing ............................................................................... 5
    3.02    Authorization...................................................................................................... 5
    3.03    No Conflict or Violation .................................................................................... 6
    3.04    Consents and Approvals..................................................................................... 6
    3.05    Actions Pending ................................................................................................ 6
    3.06    No Brokers ......................................................................................................... 6
    3.07    Investment Intent of Purchaser.......................................................................... 6
    3.08    Financing............................................................................................................ 7
    3.09    Retention of Business........................................................................................ 7

ARTICLE IV COVENANTS............................................................................................... 7
    4.01    Conduct of Business.......................................................................................... 7
    4.02    Access; Certain Communications ..................................................................... 7
    4.03    Further Assurances ............................................................................................ 7
    4.04    Maintenance and Transfer of Records ............................................................. 8
    4.05    Intercompany Balances ..................................................................................... 8
    4.06    Post-Closing Transactions................................................................................. 8
    4.07    Regulatory Matters ........................................................................................... 8
    4.08    Guaranty ............................................................................................................ 9

ARTICLE V CONDITIONS PRECEDENT TO THE PUT CLOSING ............................. 10
    5.01    Conditions to Purchaser's Obligations............................................................ 10
    5.02    Conditions to Lincoln Barbados's Obligations ............................................... 11

i

**ARTICLE VI SURVIVAL; INDEMNIFICATION; TERMINATION**.................................. 12
   6.01    Survival of Representations and Warranties ...................................................... 12

**ARTICLE VII DEFINITIONS** ................................................................................ 14
   7.01    Definitions .................................................................................................. 14

**ARTICLE VIII MISCELLANEOUS**.......................................................................... 16
   8.01    Publicity ..................................................................................................... 16
   8.02    Notices........................................................................................................ 17
   8.03    Entire Agreement ........................................................................................ 18
   8.04    Waivers and Amendments; Preservation of Remedies ..................................... 18
   8.05    Governing Law............................................................................................ 18
   8.06    Dispute Resolution ...................................................................................... 18
   8.07    Jurisdiction ................................................................................................. 19
   8.08    Binding Effect; No Assignment ..................................................................... 19
   8.09    No Third Party Beneficiaries.......................................................................... 19
   8.10    Expenses .................................................................................................... 20
   8.11    Counterparts ............................................................................................... 20
   8.12    Headings .................................................................................................... 20
   8.13    Severability.................................................................................................. 20
   8.14    Waiver of Jury Trial .................................................................................... 20

<u>LIST OF SCHEDULES</u>

| | |
|---|---|
| Schedule 2.04 | Consents and Approvals |
| Schedule 2.07 | Material Permits |
| Schedule 2.08 | Contracts |
| Schedule 3.04 | Consents and Approvals |
| Schedule 5.01(f) | Retrocession Transaction |
| Schedule 7.01(a) | Lincoln Barbados's Knowledge People |
| Schedule 7.01(b) | Reference Balance Sheet |

## LIST OF EXHIBITS

Exhibit A        Form of Retrocession Treaty

# PUT AGREEMENT

**THIS PUT AGREEMENT**, dated as of July 27, 2001 (this "Agreement"), has been made and entered into by and between Lincoln National Reinsurance Company (Barbados) Limited, a Barbadian insurance company ("Lincoln Barbados") and Swiss Re Life & Health America Inc., a Connecticut corporation ("Purchaser"). Capitalized terms used herein but not defined in the text shall have the meanings ascribed to them in Article VII of this Agreement.

## WITNESSETH:

**WHEREAS**, Lincoln Barbados is the owner of all of the outstanding shares (the "Put Shares") of capital stock of Lincoln Re (Ireland), an insurance company incorporated under the laws of the Republic of Ireland ("Lincoln Ireland");

**WHEREAS**, Lincoln Barbados wishes to have the right to sell the Put Shares, and Purchaser wishes to purchase the Put Shares if Lincoln Barbados elects to sell such shares, upon the terms and subject to the conditions set forth herein; and

**WHEREAS**, Purchaser and Lincoln Barbados have determined, based on actuarial studies and other information, that the anticipated fair market value of the Put Shares at the time of any Put Closing during the Put Period (each as defined below) will be approximately $10,000,000;

**NOW, THEREFORE**, in consideration of the premises and the covenants and conditions contained herein, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## TRANSFER AND ACQUISITION OF PUT SHARES

**1.01    Put Right**. Lincoln Barbados shall have the right (but not the obligation), in its sole discretion, at any time after April 30, 2002 but prior to June 1, 2002 (the "Put Period"), upon delivery to Purchaser of written notice of exercise (the "Put Notice"), to require Purchaser to purchase all, but not less than all, of the Put Shares owned by Lincoln Barbados at the Put Closing on the terms and subject to the conditions set forth in this Agreement (the "Put Right"). Prior to the Put Period, Purchaser shall assign its rights and obligations under this Agreement to, and such rights and obligations shall be assumed by, an Affiliate of Purchaser that (i) shall not be a "United States person" (within the meaning of section 7701(a)(30) of the Code) or a "controlled foreign corporation" (within the meaning of section 957(a) of the Code) and (ii) shall have a Standard & Poor's Corporation financial strength rating of at least AA at the time of such assignment and assumption. Following such assignment and assumption, such Affiliate shall be deemed for all purposes to be the Purchaser under this Agreement; provided, that Purchaser may assign its obligations under Section 4.08 to an Affiliate of Purchaser different from the Affiliate

to which it assigns its rights and obligations under the other provisions of this Agreement so long as such Affiliate satisfies the requirements of clause (ii) of the preceding sentence.

     **1.02**   <u>Put Closing</u>. The closing (the "<u>Put Closing</u>") of the transactions contemplated hereby will take place at the offices of Sutherland Asbill & Brennan LLP, 1275 Pennsylvania Avenue, N.W., Washington, D.C., at 10:00 a.m., Eastern Time, on (a) the day five (5) Business Days after the date on which the last of the conditions set forth in Article V is satisfied or waived by the party or parties entitled to waive the same or (b) such other date as Lincoln Barbados and Purchaser shall mutually agree. The day on which the Put Closing takes place is referred to herein as the "<u>Put Closing Date</u>." The Put Closing shall be deemed for all purposes to have occurred at 12:01 a.m., Eastern Time, on the Put Closing Date.

     **1.03**   <u>Payment and Delivery at Put Closing</u>. Upon the terms and subject to the conditions set forth in this Agreement, Purchaser shall, on the Put Closing Date, by wire transfer of immediately available funds to the account(s) designated to Purchaser by Lincoln Barbados in writing at least three (3) Business Days prior to the Put Closing Date, pay to Lincoln Barbados $10,000,000 (the "Put Purchase Price").

**ARTICLE II**
**REPRESENTATIONS AND WARRANTIES**
**OF LINCOLN BARBADOS**

     Lincoln Barbados hereby represents and warrants to Purchaser as follows:

     **2.01**   <u>Incorporation and Standing</u>. Each of Lincoln Barbados and Lincoln Ireland (a) is duly incorporated and is validly existing as a corporation under the laws of its respective jurisdiction of incorporation; (b) has full corporate power and authority to carry on its business as it is now being conducted and to own, lease and operate its properties and assets; and (c) is duly qualified or licensed to do business as a foreign corporation in good standing in each jurisdiction in which the conduct of its business or the ownership, leasing or operation of its properties or assets or the nature of the business conducted by it makes such qualification necessary.

     **2.02**   <u>Authorization</u>. Lincoln Barbados has the full corporate power and authority to enter into this Agreement and to perform its obligations hereunder. The execution and delivery of this Agreement and the performance by Lincoln Barbados of its obligations under this Agreement have been duly and validly authorized and approved by all requisite corporate action of Lincoln Barbados, and no other acts or proceedings on its part are necessary to authorize the execution, delivery and performance of this Agreement or the transactions contemplated hereby. Assuming the due authorization and execution of this Agreement by Purchaser, this Agreement constitutes the legal, valid and binding obligation of Lincoln Barbados, and this Agreement is and will be enforceable in accordance with its terms except (a) as the same may be limited by applicable bankruptcy, insolvency, rehabilitation, moratorium or similar laws of general application relating to or affecting creditors' rights or of application to insurance companies

WO 30719.4                                       2

relating to or affecting policyholders' and creditors' rights, including, without limitation, the effect of statutory or other laws regarding fraudulent conveyances and preferential transfers, and (b) for the limitations imposed by general principles of equity. The foregoing exceptions set forth in clauses (a) and (b) of this Section 2.02 are hereinafter referred to as the "Enforceability Exceptions."

2.03    No Conflict or Violation. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby by Lincoln Barbados, in accordance with the respective terms and conditions hereof, will not (i) violate any provision of its or Lincoln Ireland's (a) articles of incorporation, (b) by-laws or (c) other charter or organizational document; (ii) result in the creation of any Lien (other than a Permitted Lien) on any of Lincoln Ireland's assets or properties; (iii) violate, conflict with or result in the breach of any of the terms of, result in any modification of, accelerate or permit the acceleration of the performance required by, otherwise give any other contracting party the right to terminate, or constitute (with notice or lapse of time, or both) a default under, or give rise to the loss of any benefit under, any agreement to which Lincoln Ireland is a party or by or to which Lincoln Ireland or any of its assets or properties may be subject; (iv) violate any order, judgment, injunction, award or decree of any court, arbitrator or governmental or regulatory body against, or binding upon, or any agreement with, or condition imposed by, any Governmental Entity; or (v) violate any statute, law or regulation of any jurisdiction.

2.04    Consents and Approvals. Except as set forth in Schedule 2.04, no consent, approval, authorization, ruling, order of, notice to, or registration with, any Governmental Entity or other Person is required on the part of Lincoln Barbados or Lincoln Ireland in connection with the execution and delivery of this Agreement or the consummation by Lincoln Barbados of the transactions contemplated hereby.

2.05    Actions Pending. There are no outstanding orders, judgments, injunctions, awards or decrees against or involving Lincoln Ireland or any properties, rights or privileges of Lincoln Ireland, by or before any court, arbitrator or administrative or governmental body. As of the date of this Agreement there is no claim, action, suit, litigation, legal, administrative or arbitration proceeding, whether formal or informal (including, without limitation, any inquiry, claim or notice of intent to institute any matter), which is pending or, to the knowledge of Lincoln Barbados, threatened in writing against or involving Lincoln Ireland or any properties, rights or privileges of Lincoln Ireland.

2.06    Capitalization. (a)    Lincoln Barbados is the holder of record and beneficial owner of all of the outstanding shares of capital stock of Lincoln Ireland, free and clear of any Lien.

(b)    Neither Lincoln Barbados nor Lincoln Ireland is a party to any option, warrant, purchase right or other contract or commitment that could (i) require the sale, transfer or other disposition of any of the Put Shares (other than this Agreement), or (ii) require the issuance of any securities by Lincoln Ireland. Neither Lincoln Barbados nor Lincoln Ireland is a party to any

voting trust, proxy or other agreement or understanding with respect to the voting of any of the Put Shares.

**2.07     Licenses and Permits.** Schedule 2.07 contains a true and complete list of all material Permits issued to Lincoln Ireland as of the date of this Agreement. Except as set forth in Schedule 2.07, Lincoln Ireland, has all material Permits required by Applicable Law. Except as set forth in Schedule 2.07, Lincoln Ireland is in material compliance with the terms of the Permits. Except as set forth in Schedule 2.07, as of the date of this Agreement, there is no suit, proceeding or investigation with respect to revocation, cancellation, suspension or nonrenewal of any Permit, which is pending or, to the knowledge of Lincoln Barbados, threatened in writing.

**2.08     Contracts.** Schedule 2.08 lists all of the contracts (written or oral) to which Lincoln Ireland is a party as of the date hereof. Neither Lincoln Ireland, nor, to the knowledge of Lincoln Barbados, any other party is in breach of or default under any contract identified on Schedule 2.08 or any of the contracts to be retroceded by Lincoln Barbados to Lincoln Ireland pursuant to the Retrocession Transaction. Each such contract is in full force and effect and is valid and enforceable in accordance with its terms. Except as set forth in Schedule 2.08, neither Lincoln Ireland, Lincoln Barbados nor the other party has given notice of termination (provisional or otherwise) in respect of any such contract currently in force. Except as set forth in Schedule 2.08, none of such contracts contains any provision providing that any party may terminate such agreement by reason of the transactions contemplated by this Agreement. Lincoln Barbados has made available to Purchaser a copy of each such contract.

**2.09     Compliance.** Lincoln Ireland is in compliance in all material respects with all Applicable Laws. Lincoln Ireland has filed all material reports, statements, documents, registrations, filings or submissions required to be filed with any Governmental Entity. All such registrations, filings and submissions were in compliance in all material respects with Applicable Law when filed or as amended or supplemented, and no material deficiencies that remain unsatisfied have been asserted in writing by any Governmental Entity with respect to such registrations, filings or submissions.

**2.10     Financial Statements.**

(a)     Lincoln Barbados has previously made available to Purchaser the unaudited balance sheet as of June 30, 2001 of Lincoln Ireland (the "Lincoln Ireland Balance Sheet").

(b)     The Lincoln Ireland Balance Sheet presents fairly, in all material respects, the financial condition of Lincoln Ireland and was prepared (i) in accordance with Irish generally accepted accounting principles ("Irish GAAP") as of the date thereof except as expressly set forth within the Lincoln Ireland Balance Sheet, including the notes thereto and (ii) consistent with the methodologies utilized in preparing the Reference Balance Sheet.

**2.11     No Brokers.** Other than Goldman, Sachs & Co., the fees of which will be paid by Lincoln Barbados, no broker or finder has acted directly or indirectly for Lincoln Barbados, nor

WO 30719.4                                    4

has Lincoln Barbados incurred any obligation to pay any brokerage or finder's fee or other commission, in connection with the transactions contemplated by this Agreement.

      2.12   **Employees**. As of the date hereof, Lincoln Ireland has no employees and has no (i) obligations under any employee benefit plan or program, (ii) claims against or involving Lincoln Ireland arising under any federal, state or local employment statute or (iii) policy, agreement, understanding or promise with respect to any former employee.

      2.13   **Taxes**. (a) Lincoln Ireland has timely filed all Tax Returns that it was required to file under applicable law and all such Tax Returns were complete and correct in all material respects. Lincoln Ireland has, within the time and in the manner prescribed by law, paid all Taxes that are currently due and payable except for those contested in good faith and for which adequate reserves have been taken.

      (b) Lincoln Ireland has not requested any extension of time within which to file any Tax Return, which Tax Return has not since been filed.

      (c) Lincoln Ireland has established on its books and records adequate reserves for all Taxes and for any liability for deferred income taxes in accordance with Irish GAAP.

      (d) There are no Tax liens upon any of the assets of Lincoln Ireland except liens for Taxes not yet due and payable.

      (e) No disputes, claims, audits or other administrative proceedings or court proceedings are presently pending or threatened with regard to any Taxes or Tax Returns of Lincoln Ireland (other than those being contested in good faith and for which adequate reserves have been established) and no issues have been raised in writing by any Tax authority in connection with any Tax or Tax Return.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

      Purchaser hereby represents and warrants to Lincoln Barbados as follows:

      3.01   **Incorporation and Standing**. Purchaser is duly incorporated, validly existing and in good standing under the laws of its jurisdiction of incorporation.

      3.02   **Authorization**. Purchaser has full corporate power and authority to enter into this Agreement, and to perform its obligations hereunder. The execution and delivery of this Agreement and the performance by Purchaser of its obligations under this Agreement have been duly and validly authorized and approved by all requisite corporate action of Purchaser, and no other acts or proceedings on the part of Purchaser are necessary to authorize the execution, delivery and performance of this Agreement or the transactions contemplated hereby. Assuming

the due authorization by Lincoln Barbados, this Agreement constitutes the legal, valid and binding obligation of Purchaser, enforceable in accordance with its terms, subject to the Enforceability Exceptions.

3.03    **No Conflict or Violation**. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby by Purchaser in accordance with the respective terms and conditions hereof will not (i) violate any provision of Purchaser's (a) articles of incorporation, (b) by-laws or (c) other charter or organizational document; (ii) except as would not impair Purchaser's ability to perform its obligations under this Agreement, violate, conflict with or result in the breach of any of the terms of, result in any modification of, accelerate or permit the acceleration of the performance required by, otherwise give any other contracting party the right to terminate, or constitute (or with notice or lapse of time, or both) a default under, any agreement to which Purchaser is a party or by or to which it or any of its assets or properties may be subject; (iii) violate any order, judgment, injunction, award or decree of any court, arbitrator or governmental or regulatory body against, or binding upon, or any agreement with, or condition imposed by, any Governmental Entity, binding upon Purchaser, or upon the assets or business of Purchaser; or (iv) violate any statute, law or regulation of any jurisdiction as each statute, law or regulation relates to Purchaser or to the assets or business of Purchaser.

3.04    **Consents and Approvals**. Except as set forth in Schedule 3.04, no consent, approval, authorization, ruling, order of, notice to, or registration with any Governmental Entity is required on the part of Purchaser in connection with the execution and delivery of this Agreement or the consummation by Purchaser of the transactions contemplated hereby.

3.05    **Actions Pending**. There is no action, suit, investigation or proceeding pending or, to the knowledge of Purchaser, threatened against Purchaser, or any properties or rights of Purchaser, by or before any court, arbitrator or administrative or governmental body, which action, suit, investigation or proceeding, if adversely determined, would materially impair the ability of Purchaser to perform its obligations under this Agreement.

3.06    **No Brokers**. Other than Morgan Stanley & Co., Incorporated, the fees of which will be paid by Purchaser, no broker or finder has acted directly or indirectly for Purchaser, nor has the Purchaser incurred any obligation to pay any brokerage or finder's fee or other commission, in connection with the transactions contemplated by this Agreement.

3.07    **Investment Intent of Purchaser**. If the Put Right is exercised by Lincoln Barbados, the Put Shares will be acquired by Purchaser for its own account and not for the purpose of a distribution. Purchaser will refrain from transferring or otherwise disposing of any of the Put Shares acquired by it, or any interest therein, in such manner as to violate any registration provision of the Securities Act of 1933, as amended, or any applicable state securities law regulating the disposition thereof. Purchaser agrees that the certificates representing the Put Shares may bear legends to the effect that the Put Shares have not been registered under the Securities Act, or such other state securities laws, and that no interest therein may be transferred or otherwise disposed of in violation of the provisions thereof.

**3.08**   **Financing**.  Purchaser has or will have available at the Put Closing (if the Put Right is exercised by Lincoln Barbados), sufficient cash to consummate the transactions contemplated by this Agreement and to pay all related fees and expenses required to be paid by Purchaser hereunder.

**3.09**   **Retention of Business**.  Purchaser has no plan or intention following the Put Closing to cause or permit Lincoln Ireland to sell, exchange, distribute, transfer, or otherwise dispose of any of the assets or business of Lincoln Ireland (except for dispositions in the ordinary course of Lincoln Ireland's business), or to liquidate or merge Lincoln Ireland into another entity.

# ARTICLE IV
# COVENANTS

**4.01**   **Conduct of Business**.  Except as otherwise expressly provided in this Agreement, prior to the Put Closing, Lincoln Barbados (a) will cause Lincoln Ireland to limit its business activity to the management of the business retroceded to it prior to the date hereof and the business retroceded to it in the Retrocession Transaction, (b) will cause Lincoln Ireland not to retrocede or otherwise transfer such business, (c) will not make any contribution to the capital of Lincoln Ireland and (d) will cause Lincoln Ireland not to pay any dividend or make any distribution to Lincoln Barbados.

**4.02**   **Access; Certain Communications**.  Between the date of this Agreement and the Put Closing Date, subject to Applicable Laws relating to antitrust, Lincoln Barbados shall cause Lincoln Ireland to afford to Purchaser and its authorized agents and representatives access, upon reasonable notice and during normal business hours, to all contracts, documents and information of or relating to the assets, liabilities, business, operations and other aspects of the business of Lincoln Ireland.  Lincoln Barbados shall cause Lincoln Ireland to provide reasonable assistance to Purchaser in Purchaser's investigation of matters relating to the transactions contemplated hereby; *provided*, *however*, that Purchaser's investigation shall be conducted in a manner which does not interfere with Lincoln Ireland's normal operations, customers and employee relations. Without limiting any of the terms thereof, the terms of the Confidentiality Agreement shall govern Purchaser's and its agents' and representatives' obligations with respect to all confidential information with respect to Lincoln Ireland which has been provided or made available to them at any time, including during the period between the date of this Agreement and the Put Closing Date.

**4.03**   **Further Assurances**.  Each of the parties hereto shall execute such documents and other papers and perform such further acts as may be reasonably required to carry out the provisions hereof and the transactions contemplated hereby.  Each such party shall, at or prior to the Put Closing Date, use its commercially reasonable efforts to fulfill or obtain the fulfillment of the conditions precedent to the consummation of the transactions contemplated hereby, including

the execution and delivery of any documents, certificates, instruments or other papers that are reasonably required for the consummation of the transactions contemplated hereby.

**4.04    Maintenance and Transfer of Records.**  Through the Put Closing Date, Lincoln Barbados shall cause Lincoln Ireland to maintain the Books and Records in all material respects in the same manner and with the same care that such Books and Records have been maintained prior to the execution of this Agreement.  From and after the Put Closing Date, each of the parties hereto shall permit any other party hereto reasonable access to any applicable Books and Records in its possession, to the extent that the requesting party has a reasonable business purpose for requesting such access.  Notwithstanding any other provision of this Section 4.04, access to any Books and Records may be denied to the requesting party if the other party is required under Applicable Law relating to antitrust, to deny such access.

**4.05    Intercompany Balances.**  Prior to the Put Closing Date, Lincoln Barbados will cause all accounts receivable and accounts payable (including the principal amount and interest, if any, due thereon but excluding any accounts receivable and payable pursuant to any reinsurance treaties) between Lincoln Ireland, on the one hand, and Lincoln Barbados or any of its Affiliates, on the other hand, to be settled in full.

**4.06    Post-Closing Transactions.**  For a period of two (2) years following the Put Closing, Purchaser shall not, and shall not permit Lincoln Ireland to, (i) liquidate or merge Lincoln Ireland into another entity, or (ii) sell, exchange, distribute, transfer, or otherwise dispose of any of the assets or business of Lincoln Ireland (except for dispositions in the ordinary course of Lincoln Ireland's business).

**4.07    Regulatory Matters; Third Party Consents.**  Lincoln Barbados and Purchaser shall cooperate and use commercially reasonable efforts to obtain all consents, approvals and agreements of, and to give and make all notices and filings with, any Governmental Entity or other Person necessary to authorize, approve or permit the consummation of the transactions contemplated by this Agreement and any other agreements contemplated hereby or thereby, including, without limitation, as set forth on Schedule 2.04 and Schedule 3.04.  Purchaser and Lincoln Barbados will provide each other and their counsel the opportunity to review in advance and comment on all such filings with any Governmental Entity.  Purchaser and Lincoln Barbados will keep each other informed of the status of matters relating to obtaining the regulatory approvals specified in Schedule 2.04 and Schedule 3.04.  It is expressly understood by the parties hereto that each party hereto shall use commercially reasonable efforts to ensure that representatives of both Purchaser and Lincoln Barbados shall have the right to attend and participate in any hearing, proceeding, meeting, conference or similar event before or with a Governmental Entity or other organization relating to this Agreement.  In furtherance of the foregoing, Purchaser and Lincoln Barbados shall provide each other reasonable advance notice of any such hearing, proceeding, meeting, conference or similar event.  The notice required to be given under this Section 4.07 shall be given to representatives of Lincoln Barbados or Purchaser entitled to receive notices hereunder.

**4.08** **Guaranty.** Purchaser hereby unconditionally guarantees the prompt performance when due of all obligations of Lincoln Ireland under the Retrocession Transaction and the contracts listed on Schedule 2.08 (the "Guaranteed Obligations") following the Put Closing. None of the other parties to such contracts shall be required to make any demand upon, or deliver any notice to, Lincoln Ireland in order for such parties to enforce their rights against Purchaser under this Section 4.08. Purchaser's liability under this Section 4.08 shall be subject to any applicable defense of Lincoln Ireland with respect to the Guaranteed Obligations. Purchaser's obligations under this Section 4.08 shall continue in full force and effect subject to, but notwithstanding, any amendment or waiver of any provision of this Agreement.

**4.09** **Indemnity.** (a) Lincoln Barbados and its Affiliates hereby unconditionally agree to indemnify, defend and hold harmless Purchaser and its Affiliates (including Lincoln Ireland) and their respective officers, directors, employees and agents (collectively, the "Purchaser Indemnified Parties") from and against any and all Losses (as defined in Section 6.02 and including, for this purpose, any Tax) imposed on, sustained, incurred or suffered by any Purchaser Indemnified Party, directly or indirectly, by reason of or resulting from the creation, organization, structuring or activities of Lincoln Ireland for all periods, or portion thereof, through and including the Put Closing Date; provided, that any such Loss incurred by Lincoln Ireland from the business reinsured under the treaties identified on Schedule 2.08 and those to be reinsured pursuant to the Retrocession Transaction shall not be indemnifiable under this provision.

(b) All amounts payable or to be paid to Purchaser under this Section 4.09 ("Indemnity Payments") shall be paid in immediately available funds within ten (10) business days after the receipt of a written request from Purchaser which demonstrates to the reasonable satisfaction of Lincoln Barbados that Purchaser is entitled to such amount that is the subject of the Indemnity Payment by Purchaser. All such Indemnity Payments shall be made to the accounts and in the manner specified in such written notice.

(c) All amounts paid by Lincoln Ireland to Purchaser pursuant to this Section 4.09 shall be treated as adjustments to the Put Purchase Price for all Tax purposes.

**4.10** **Transfer and Similar Taxes.** All sales (including, without limitation, bulk sales), use, transfer, recording, ad valorem, privilege, documentary, gross receipts, registration, conveyance, excise, license, gains, stamp, duties or similar taxes and fees, together with any interest, additions, or penalties with respect thereto and any interest in respect of such additions or penalties (collectively the "Transfer Taxes"), arising out of, in connection with or attributable to the transactions effected pursuant to this Agreement shall be borne and paid one-half by Purchaser and one-half by Lincoln Barbados, except for any excise Tax imposed by section 4371 of the Code upon any reinsurance transactions entered into by Lincoln Ireland prior to the Put Closing, which shall be borne solely by Lincoln Barbados. The party which has primary legal responsibility for the payment of any particular Transfer Tax (the "Payor") shall prepare and timely file all relevant Tax Returns required to be filed in respect of such Transfer Tax, pay the Transfer Tax shown on such Tax Return, and notify the other parties in writing of the Transfer

Tax shown on such Tax Return and how such Transfer Tax was calculated. The other party shall reimburse the Payor for the amount of such Transfer Tax in immediately available funds within ten (10) business days of receipt of such notice.

4.11    **Tax Status**. Prior to the Put Closing Date, neither Lincoln Ireland nor Lincoln Barbados on behalf of Lincoln Ireland shall (i) make a request for a Tax ruling from any taxing authority or enter into a closing agreement, (ii) settle or compromise any material claim, action, litigation, proceeding, arbitration, investigation, audit, or controversy relating to Taxes or (iii) change in any material respect any of its methods of reporting income, deductions or accounting for Tax purposes, except as may be required by Applicable Law.

4.12    **Notification of Certain Matters**.

(a)    Each party shall give prompt notice to the other party of (i) the occurrence, or failure to occur, of any event or the existence of any condition, fact, state of circumstances, development, action or omission that (A) could materially and adversely effect the benefits which Purchaser could reasonably expect to derive from consummation of the transactions contemplated hereby, or (B) has caused or could reasonably be expected to cause any of its representations or warranties contained in this Agreement to be untrue or inaccurate in any material respect at any time after the date of this Agreement, up to and including the Put Closing Date (except to the extent such representations and warranties are given as of a particular date or period and relate solely to such particular date or period), and (ii) any failure on its part to comply with or satisfy, in any material respect, any covenant, condition or agreement to be complied with or satisfied by it under this Agreement.

Each party shall use commercially reasonable efforts to cause the conditions forth in Article V (other than Section 5.01(g)) to be satisfied.

## ARTICLE V
## CONDITIONS PRECEDENT TO THE PUT CLOSING

5.01    **Conditions to Purchaser's Obligations**. Purchaser's obligation to consummate the Put Closing is subject to the fulfillment on or prior to the Put Closing Date of the following conditions, any one or more of which may be waived by Purchaser:

(a)    **Covenants**. Lincoln Barbados shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by Lincoln Barbados on or prior to the Put Closing Date. On the Put Closing Date, Lincoln Barbados shall have delivered to Purchaser a certificate dated as of the Put Closing Date, and signed by a senior officer of Lincoln Barbados, to the effect contemplated by this Section 5.01(a).

WO 30719:4                                         10

(b)    Secretary's Certificates.  Lincoln Barbados shall have delivered to Purchaser a certificate of its secretary or assistant secretary, dated as of the Put Closing Date, as to the resolutions of the Board of Directors of Lincoln Barbados authorizing the execution, delivery and performance of this Agreement, as to the status and signature of each of its officers who executed and delivered this Agreement and any other document delivered by it in connection with the transactions contemplated by this Agreement and, as to Lincoln Ireland, a certificate of the secretary or assistant secretary of Lincoln Ireland as to its charter and by-laws (or equivalent documents) (certified, in the case of such charter, by the applicable Governmental Entity) and as to its due organization, existence and good standing.

(c)    Resignations.  Purchaser shall have received, to the extent requested in writing by Purchaser, written resignations of each of the directors and officers of Lincoln Ireland.

(d)    Approvals and Consents.  The approvals of Governmental Entities identified on Schedules 2.04 and 3.04 shall have been received or deemed received in each case without any material conditions, restrictions or limitations.

(e)    Injunction and Litigation.  There shall be in effect no injunction, writ, preliminary restraining order or other order issued by any court of competent jurisdiction directing that the transactions contemplated by this Agreement not be consummated as herein provided.

(f)    Retrocession Transaction.  Lincoln Barbados shall have retroceded to Lincoln Ireland, and Lincoln Ireland shall have assumed, the business identified on Schedule 5.01(f) pursuant to the retrocession treaty set forth as Exhibit A hereto as further described in Schedule 5.01(f) (the "Retrocession Transaction").

(g)    Exercise of Put Right.  A Put Notice shall have been delivered to Purchaser during the Put Period.

5.02    Conditions to Lincoln Barbados's Obligations.  Lincoln Barbados's obligation to consummate the Put Closing is subject to the fulfillment on or prior to the Put Closing Date of the following conditions, any one or more of which may be waived by Lincoln Barbados:

(a)    Covenants.  Purchaser shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Put Closing Date.  On the Put Closing Date, Purchaser shall have delivered to Lincoln Barbados a certificate dated as of the Put Closing Date, and signed by a senior officer of Purchaser, to the effect contemplated by this Section 5.02(a).

(b)    Secretaries' Certificates.  Purchaser shall have delivered to Lincoln Barbados a certificate of its secretary or assistant secretary, dated as of the Put Closing Date, as to the resolutions of the Board of Directors (or other similar governing body) of Purchaser authorizing the execution, delivery and performance of this Agreement, as to the status and signature of each of its officers who executed and delivered this Agreement and any other document delivered by

it in connection with the transactions contemplated by this Agreement and as to its due incorporation, existence and good standing.

(c)     Approvals and Consents. The approvals of Governmental Entities identified on Schedule 2.04 and Schedule 3.04 shall have been received or deemed received in each case without any material conditions, restrictions or limitations.

(d)     Injunction and Litigation. There shall be in effect no injunction, writ, preliminary restraining order or any order of any nature directing that the transactions contemplated by this Agreement not be consummated as herein provided.

**ARTICLE VI**
**SURVIVAL; INDEMNIFICATION; TERMINATION**

**6.01     Survival of Representations and Warranties.** The representations and warranties and covenants and agreements of Lincoln Barbados and Purchaser contained in this Agreement shall not survive the Put Closing (in the case of covenants and agreements, to the extent such covenants and agreements are to be performed prior to the Put Closing), except that the representations and warranties in Sections 2.02 and 2.06 and the obligations in Section 4.09 shall survive the Put Closing forever and shall not terminate. Unless a specified period is set forth in this Agreement (in which event such specified period will control), covenants and agreements to be performed following the Put Closing will survive the Put Closing and remain in effect indefinitely to the extent such covenants and agreements are to be performed following the Put Closing. This Agreement shall terminate and be of no further force or effect upon the expiration of the Put Period if Lincoln Barbados has not provided a Put Notice to Purchaser prior to the expiration of the Put Period.

**6.02     Indemnification by Lincoln Barbados.** In addition to the indemnification pursuant to Section 4.09, Lincoln Barbados shall indemnify Purchaser and its Affiliates and their respective representatives against and hold them harmless from any loss, liability, damage, demand, claim, cost, suit, action or cause of action, judgment, award, assessment, interest, penalty or expense (including, without limitation, reasonable expenses of investigation and reasonable attorneys' and consultants' fees) (any of the foregoing being hereinafter referred to individually as a "Loss" and collectively as "Losses") suffered or incurred by any such indemnified person for or on account of or arising from or in connection with (a) any breach of any representation or warranty of Lincoln Barbados in Sections 2.02 or 2.06, or (b) any breach of any covenant or agreement of Lincoln Barbados in this Agreement to the extent such breach relates to obligations to be performed following the Put Closing. The maximum aggregate liability of Lincoln Barbados for indemnification for all losses subject to indemnification under this Article VI shall be the Put Purchase Price. For the avoidance of doubt, the limitation set forth in the preceding sentence will not apply to the indemnification obligations of Lincoln Barbados and its Affiliates under Article IV.

**6.03**    **Indemnification by Purchaser.**  Purchaser shall indemnify Lincoln Barbados and its Affiliates and their respective representatives against, and hold them harmless from, any Losses suffered or incurred by any such indemnified person for or on account of or arising from or in connection with (a) any breach of any representation or warranty of Purchaser in Section 3.02, or (b) any breach of any covenant or agreement of Purchaser in this Agreement to the extent such breach relates to obligations to be performed following the Put Closing.

**6.04**    **Procedures Relating to Indemnification.**

(a)    An indemnified person under Sections 6.02 or 6.03, (the "Indemnified Party") shall give prompt written notice to an indemnifying party (the "Indemnifying Party") of any Loss in respect of which such Indemnifying Party has a duty to indemnify such Indemnified Party under Sections 6.02 or 6.03 (a "Claim"), specifying in reasonable detail the nature of loss, liability, damage, claim, suit, judgment or expense for which indemnification is sought, the section or sections of this Agreement to which the claim relates, and, if practicable, the amount of such claim, except that any delay or failure so to notify the Indemnifying Party shall only relieve the Indemnifying Party of its obligations hereunder to the extent, if at all, that it is prejudiced by reason of such delay or failure.

(b)    If a Claim is brought or asserted by a third party (a "Third Party Claim"), the Indemnifying Party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all expenses. The Indemnified Party shall have the right to employ separate counsel in such Third Party Claim and participate in such defense thereof, but the fees and expenses of such counsel shall be at the expense of the Indemnified Party.  In the event that the Indemnifying Party, within a reasonable time after notice of any Third Party Claim fails to assume the defense thereof, the Indemnified Party shall have the right to undertake the defense, compromise or settlement of such Third Party Claim for the account of the Indemnifying Party, subject to the right of the Indemnifying Party to assume the defense of such Third Party Claim with counsel reasonably satisfactory to the Indemnified Party at any time prior to the compromise, settlement or final determination thereof. Anything in this Section 6.04 to the contrary notwithstanding, the Indemnifying Party shall not, without the Indemnified Party's prior written consent, settle or compromise any Third Party Claim or consent to the entry of any judgment with respect to any Third Party Claim which would have an adverse effect on the Indemnified Party.  The Indemnifying Party may, without the Indemnified Party's prior written consent, compromise or settle any such Third Party Claim or consent to entry of any judgment with respect to any Third Party Claim which requires solely money damages paid by the Indemnifying Party, and which includes as an unconditional term thereof the release by the claimant or the plaintiff of the Indemnified Party from all liability in respect of such Third Party Claim.

(c)    With respect to any Claim other than a Third Party Claim, the Indemnifying Party shall have twenty (20) days from receipt of notice from the Indemnified Party of such claim within which to respond thereto.  If the Indemnified Party does not respond within such twenty-day period, the Indemnifying Party shall be deemed to have accepted responsibility to make

payment and shall have no further right to contest the validity of such Claim. If the Indemnifying Party notifies the Indemnified Party within such twenty-day period that it rejects such Claim in whole or in part, the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party under applicable law.

## ARTICLE VII
## DEFINITIONS

**7.01    Definitions**. The following terms shall have the respective meanings set forth below throughout this Agreement:

"Affiliate" means, with respect to any Person, at the time in question, any other Person controlling, controlled by or under common control with such Person.

"Agreement" has the meaning set forth in the preamble.

"Applicable Law" means any federal, state, local or foreign law (including common law), statute, ordinance, rule, regulation, order, writ, injunction, judgment, permit, governmental agreement or decree applicable to a Person or any such Person's subsidiaries, properties, assets, or to such Person's officers, directors, managing directors, employees or agents in their capacity as such.

"Books and Records" means all records and all other data and information (in whatever form maintained) in the possession or control of Lincoln Ireland or any Affiliate of Lincoln Ireland (to the extent relating to Lincoln Ireland) and relating to its business as currently conducted.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in Ireland, Barbados or New York are required or authorized by law to be closed.

"Confidentiality Agreement" means that certain agreement dated May 3, 2001, between Purchaser and LNC with respect to the confidentiality of information about Lincoln Ireland and other companies and business, as such agreement may be amended pursuant to its terms from time to time.

"Code" means the Internal Revenue Code of 1986, as amended.

"Dispute Officer" has the meaning set forth in Section 8.06.

"Enforceability Exceptions" has the meaning set forth in Section 2.02.

"Governmental Entity" means any foreign, federal, state, local, municipal, county or other governmental, quasi-governmental, administrative or regulatory authority, body, agency, court, tribunal, commission or other similar entity (including any branch, department, agency or political subdivision thereof).

"Guaranteed Obligations" has the meaning set forth in Section 4.08.

"Knowledge" or "knowledge of Lincoln Barbados" or similar words or phrases means the actual knowledge, without independent investigation, of those individuals listed on Schedule 7.01(a).

"Lien" means any lien mortgage, pledge, security interest, encumbrance, easement, claim, charge or defect of title of any kind.

"Lincoln Barbados" has the meaning set forth in the preamble.

"Lincoln Ireland" has the meaning set forth in the preamble.

"Lincoln Ireland Balance Sheet" has the meaning set forth in Section 2.10(a).

"LNC" means Lincoln National Corporation, an Indiana corporation.

"Material Adverse Effect" has the meaning set forth in the Stock and Asset Purchase Agreement.

"Permits" means all licenses, permits, orders, approvals, registrations, authorizations, qualifications and filings with and under all federal, state, local or foreign laws and governmental or regulatory bodies.

"Permitted Liens", as to any asset, means each of the following: (i) Liens for taxes, assessments and governmental charges or levies not yet due and payable or which are being contested in good faith; (ii) Liens imposed by law, including without limitation materialmen's, mechanics', carriers', workmen's and repairmen's liens and other similar liens arising in the ordinary course of business; (iii) pledges or deposits to secure obligations under workers' compensation laws or similar legislation or to secure public or statutory obligations; (iv) Liens related to deposits to secure policyholders' obligations as required by the insurance departments of the various jurisdictions; (v) Liens that do not in the aggregate materially detract from the value or materially interfere with the present or reasonably contemplated use of the relevant asset in Lincoln Ireland's business; (vi) minor survey exceptions, reciprocal easement agreements and other customary encumbrances on title to real property; and (vii) Liens existing on the date hereof securing the obligations contained in the contracts identified on Schedule 2.08.

"Person" means any individual, corporation, limited liability company, partnership, limited partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, governmental, judicial or regulatory body or other entity.

"Purchaser" has the meaning set forth in the preamble.

"Put Closing" has the meaning set forth in Section 1.02.

"Put Closing Statements" has the meaning set forth in Section 1.03(a).

"Put Closing Date" has the meaning set forth in Section 1.02.

"Put Notice" has the meaning set forth in Section 1.01.

"Put Period" has the meaning set forth in Section 1.01.

"Put Purchase Price" has the meaning set forth in Section 1.03(b).

"Put Right" has the meaning set forth in Section 1.01.

"Reference Balance Sheet" means the balance sheet of Lincoln Ireland included in Schedule 7.01(b).

"Put Shares" has the meaning set forth in the preamble.

"Retrocession Transaction" has the meaning set forth in Section 5.01(f).

"Stock and Asset Purchase Agreement" means that certain agreement, dated as of the date hereof, by and among LNC, The Lincoln National Life Insurance Company, Lincoln Barbados and Purchaser.

"Subsidiary" means any Person more than 50% of the ownership interest or voting interest of which is owned or controlled, directly or indirectly, by another Person.

"Taxes" (or "Tax" as the context may require) means all federal, state, county, local, foreign and other taxes or withholding (including, without limitation, income, payroll and employee withholding, unemployment insurance, social security, premium, excise, sales, use, gross receipts, franchise, ad valorem, severance, capital and property taxes, and other governmental charges and assessments), and includes interest, additions to Tax and penalties with respect thereto.

## ARTICLE VIII
## MISCELLANEOUS

**8.01   Publicity.**   Except as may otherwise be required by law (including, without limitation, the filing of periodic and other reports with the Securities and Exchange Commission concerning the transactions contemplated by this Agreement and the filing as exhibits thereto of this Agreement) or the rules of any applicable stock exchange, no release or announcement concerning this Agreement or the transactions contemplated hereby shall be made without advance written approval thereof by Lincoln Barbados and Purchaser, which approval shall not

WO 30719.4                                   16

be unreasonably conditioned, delayed or withheld. Both parties shall cooperate with each other in making any release or announcement.

    **8.02**   **Notices**. Any notice or other communication required or permitted hereunder shall be in writing and shall be delivered personally, sent by facsimile transmission (and immediately after transmission confirmed by telephone) or sent by certified, registered or express mail, postage prepaid. Any such notice shall be deemed given when so delivered personally or sent by facsimile transmission (and immediately after transmission confirmed by telephone) or, if mailed, on the date shown on the receipt therefor, as follows:

    (i)    If to Lincoln Barbados to:

        Corporate Manager (Barbados) Ltd.
        1st Floor Trident House
        Lower Broad Street
        Bridgetown, Barbados

        With a copy to:

        Lincoln National Reinsurance Company (Barbados) Limited
        c/o  Ken Clark
        1700 Magnavox Way
        P. O. Box 7808
        Fort Wayne, Indiana  46801-7808

        and

        Lincoln National Corporation
        Centre Square-West Tower
        1500 Market Street, Suite 3900
        Philadelphia, Pennsylvania  19102
        Attn: General Counsel
        Fax No.: 215-448-3218

        and

        Sutherland Asbill & Brennan LLP
        1275 Pennsylvania Ave., N.W.
        Washington, D.C.  20004
        Attn: David A. Massey
        Fax No.: (202) 637-3593

    (ii)    If to Purchaser to:

WO 30719.4

Swiss Re Life & Health America Inc.
969 High Ridge Road
Stamford, Connecticut 06905
Attn:  W. Weldon Wilson
Fax No.: 203-968-0920

With a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
One Beacon Street
Boston, Massachusetts 02108
Attn: David T. Brewster
Fax No.: (617) 573-4822

Any party may, by notice given in accordance with this Section 8.02 to the other parties, designate another address or person for receipt of notices hereunder.

   **8.03    Entire Agreement**.  This Agreement contains the entire agreement between Purchaser and Lincoln Barbados with respect to the transfer of the Put Shares by Lincoln Barbados to Purchaser and supersedes all prior agreements, written or oral, with respect thereto except that the Confidentiality Agreement shall remain in full force and effect in accordance with its terms as provided in Section 4.02.

   **8.04    Waivers and Amendments; Preservation of Remedies**.  This Agreement may be amended, superseded, canceled, renewed or extended, and the terms hereof may be waived, only by a written instrument signed by all of the parties or, in the case of a waiver, by the party waiving compliance.  No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right, power, remedy or privilege, nor any single or partial exercise of any such right, power, remedy or privilege, preclude any further exercise thereof or the exercise of any other such right, remedy, power or privilege.  The rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies that any party may otherwise have at law or in equity.

   **8.05    Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to the principles of conflicts of laws thereof.

   **8.06    Dispute Resolution**.  This Section establishes a procedure for (i) internal review of disputes between Lincoln Barbados and Purchaser under this Agreement, and (ii) a procedure for review and discussion of disputes by Lincoln Barbados and Purchase prior to initiating any litigation or arbitration with respect thereto.  The parties agree that a failure to follow the procedures described in this Section 8.06 will constitute a breach of this Agreement and of the standard of good faith applicable to this Agreement.  Lincoln Barbados and Purchaser agree to

WO 30719.4                                    18

establish procedures within their respective corporate organizations intended to result in the prompt internal reporting of disputes by all levels of the respective organizations. Lincoln Barbados and Purchaser each agrees to designate a single point of contact within each of their respective corporate organizations to give and receive notices of disputes under this Agreement (the "Dispute Officer"), who shall be acceptable to the other party and shall be a senior manager who either reports directly to the Chief Executive Officer or a person who reports to a person who reports directly to the Chief Executive Officer. The dispute resolution procedures so established will require Lincoln Barbados's and Purchaser's employees and representatives to report the existence of a dispute with the other party promptly to the Dispute Officer for such employee's or representative's organization. Lincoln Barbados and Purchaser agree that prior to initiating litigation or arbitration of any dispute under this Agreement, notice of the dispute and a statement of the basis therefor will be provided to the other party by the Dispute Officers for each organization to discuss and explain their positions with respect to the dispute. Notice of disputes will be given under this provision promptly after the existence of the dispute becomes known to either Lincoln Barbados or Purchaser. Any notice of a dispute by any person other than the Dispute Officer will be ineffective to initiate the dispute review process under this Section.

8.07    **Jurisdiction**. Each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of any state or federal court sitting in New York, New York, in any action or proceeding arising out of or relating to this Agreement, agrees that all claims in respect of the action or proceeding may be heard and determined in any such court and agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court. In any such action, suit or other proceeding, each of the parties hereto irrevocably and unconditionally waives and agrees not to assert by way of motion, as a defense or otherwise any claims that it is not subject to the jurisdiction of the above court, that such action or suit is brought in an inconvenient forum or that the venue of such action, suit or other proceeding is improper. Each of the parties hereto also agrees that any final and unappealable judgment against a party hereto in connection with any action, suit or other proceeding shall be conclusive and binding on such party and that such award or judgment may be enforced in any court of competent jurisdiction, either within or outside of the United States. A certified or exemplified copy of such award or judgment shall be conclusive evidence of the fact and amount of such award or judgment. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 8.02 shall be deemed effective service of process on such party.

8.08    **Binding Effect; No Assignment**. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, assigns and legal representatives, whether by merger, consolidation or otherwise. This Agreement may not be assigned by any party without the prior written consent of the other party hereto, except as otherwise provided by this Agreement.

8.09    **No Third Party Beneficiaries**. Except as otherwise expressly set forth in any provision of this Agreement, nothing in this Agreement is intended or shall be construed to give

any Person, other than the parties hereto, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.

    8.10    <u>Expenses</u>. Regardless of whether any or all of the transactions contemplated by this Agreement are consummated, and except as otherwise provided herein, the parties hereto shall each bear their respective expenses incurred in connection with the negotiation, preparation, execution, and performance of this Agreement and the transactions contemplated hereby, including, without limitation, all fees and expenses of agents, representatives, investment bankers, counsel, actuaries and accountants.

    8.11    <u>Counterparts</u>. This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument. Each counterpart may consist of a number of copies hereof each signed by less than all, but together signed by all of the parties hereto. Each counterpart may be delivered by facsimile transmission, which transmission shall be deemed delivery of an originally executed document.

    8.12    <u>Headings</u>. The headings in this Agreement are for reference only, and shall not affect the interpretation of this Agreement.

    8.13    <u>Severability</u>. Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. If any provision of this Agreement is so broad as to be unenforceable, that provision shall be interpreted to be only so broad as is enforceable.

    8.14    <u>Waiver of Jury Trial</u>. Each of the parties hereto irrevocably waives any and all right to trial by jury in any legal proceedings arising out of or related to this Agreement or the transactions contemplated hereby.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.


LINCOLN NATIONAL INSURANCE COMPANY (BARBADOS) LIMITED

By:  _____
      Name: William K. Tyler
      Title: Senior Vice President


SWISS RE LIFE AND HEALTH AMERICA INC.

By:  _____
      Name: Chris C. Stroup
      Title: President and Chief Executive Officer

WO 37682.1                          21

Exhibit A

Exhibit A       Form of Retrocession Treaty



# INDEMNITY REINSURANCE AGREEMENT

Effective as of _____,

between

## LINCOLN NATIONAL REINSURANCE COMPANY (BARBADOS) LIMITED
### of
### Bridgetown, Barbados,

referred to as the "Ceding Company,"

and

## LINCOLN RE (IRELAND) LIMITED
### of
### Dublin, Ireland,

referred to as the "Reinsurer."

| | |
|---|---|
| Inspected By | _____ |
| Date | _____ |
| Doc | 010611df.agm |
| CCN/Agmt. No. | 3823 - 101 / 10553 - 2 |

# TABLE OF CONTENTS

Page

Reinsurance Coverage                                                      1
Payments by Ceding Company                                               1
Payments by Reinsurer                                                    2
Funds Withheld Account                                                   2
Portfolio                                                                3
Excise Taxes                                                             3
Reports and Accounting for Reinsurance                                   4
Terms of Reinsurance                                                     5
Material Changes                                                         6
Arbitration                                                              7
Insolvency of the Ceding Company                                        7
Offset                                                                   8
Acknowledgments                                                          8
Termination                                                              9
Payments and Accounting Upon Termination of Agreement                   9
Jurisdiction and Service of Suit                                        10
Miscellaneous                                                           11
Definition of Terms                                                     12
Execution                                                               14
   SCHEDULE I
    QUOTA SHARE AND POLICIES SUBJECT TO REINSURANCE    16
   SCHEDULE II, PART A
    SUMMARY OF MONETARY TRANSACTIONS                    17
   SCHEDULE II, PART B
    SUMMARY OF MONETARY TRANSACTIONS                    18
   SCHEDULE III
    ANNUAL REPORT                                       19
   SCHEDULE IV
    ALLOWANCES                                          20
   SCHEDULE V
    INVESTMENT INCOME RATE                              21
   SCHEDULE VI
    ARBITRATION SCHEDULE                                22
   SCHEDULE VII
    CEDING COMPANY INFORMATION                          24
   SCHEDULE VIII
    INVESTMENT POLICY                                   25

## Reinsurance Coverage

1. The Ceding Company shall cede, and the Reinsurer shall accept, reinsurance of a Quota Share of the Policies, including active and disabled lives, on a coinsurance basis, without regard to whether the reinsured liability arose or arises prior to, on or after the Effective Date. For the avoidance of doubt, the reinsurance hereunder shall include reinsurance of claims in the course of settlement and claims being litigated.

2. The Effective Date of this Agreement is _____.

3. Reinsurance of a Policy shall be maintained in force without reduction so long as the liability of the Ceding Company under such Policy remains in force without reduction, unless reinsurance is terminated or reduced as provided herein.

4. In no event shall reinsurance be in force under this Agreement for a Policy unless the Policy's issue and delivery complies with the laws of all applicable jurisdictions and the Issuing Insurer's corporate charter.

## Payments by Ceding Company

1. To effect reinsurance on Policies in force on the Effective Date, the Ceding Company shall pay the Reinsurer an initial reinsurance premium on the Execution Date equal to the Quota Share of the Reserves on the Effective Date less the Lump Sum Allowance.

2. For each Accounting Period the Ceding Company shall pay the Reinsurer a reinsurance premium equal to the Quota Share of gross premiums the Ceding Company incurs during an Accounting Period pursuant to the Policies less reinsurance premiums incurred by the Ceding Company for Other Reinsurance during the Accounting Period.

3. The Ceding Company shall retain the gross investment income derived from the assets held by the Ceding Company in the funds withheld account, but shall pay the Reinsurer investment income which shall be equal to (a) times (b) times the sum of (c) plus (d), where
   - (a) equals the Investment Income Rate; and
   - (b) equals one-half the ratio of the number of days in the current Accounting Period to the number of days in the current calendar month; and
   - (c) equals the funds withheld account balance on the Last Day Of The Current Accounting Period, except that for the Terminal Accounting Period it shall equal the funds withheld account

010611df.agrm
3823 - 101 / 10553 - 2

Page 1

balance immediately prior to termination; and

(d) equals the funds withheld account balance on the Last Day Of The Preceding Accounting Period, except that for the Initial Accounting Period it shall equal the funds withheld account balance on the Effective Date.

## Payments by Reinsurer

1. The Reinsurer shall reimburse its Quota Share of the following amounts incurred or paid (without double counting) by the Ceding Company:

    (a) Benefits;

    (b) Expenses;

    provided that each of the amounts listed above shall be computed net of amounts actually recovered from Other Reinsurance.

2. For each Accounting Period the Reinsurer shall pay the Ceding Company a Periodic Allowance.

3. The Reinsurer shall reimburse the Ceding Company for any state premium taxes the Ceding Company may be required to pay with respect to the Policies.

## Funds Withheld Account

1. The Ceding Company shall maintain a funds withheld account during the term of this Agreement.

2. Simultaneously with the payment of the initial reinsurance premium by the Ceding Company pursuant to paragraph 1 of the "Payments by Ceding Company" article, the Ceding Company shall withhold from the Reinsurer an amount equal to the difference between the Quota Share of the Reserves as of the Effective Date and the Lump Sum Allowance. This amount shall be the initial balance of the funds withheld account.

3. The balance of the funds withheld account as of the Last Day Of The Current Accounting Period shall equal the result of the following computation:

    (a) The balance of the funds withheld account as of the Last Day Of The Preceding Accounting Period; plus

    (b) The Reserve Change;

    provided, however, the balance of the funds withheld account may not be less than zero (0).

4.    Payments made to the Ceding Company by the Reinsurer pursuant to the "Payments by Reinsurer" article shall be reduced by any decrease in, and increased by any increase in, the funds withheld account during the Accounting Period.

**Portfolio**

1.    Ceding Company may use its discretion in managing the assets in the Portfolio. The Reinsurer may only challenge Ceding Company's investment strategy and buy/sell decisions with respect to the Portfolio if Ceding Company fails to maintain a reasonable matching between assets and liabilities. Notwithstanding the preceding, Ceding Company shall take due consideration of any recommendations made by the Reinsurer regarding Ceding Company's investment strategy or its individual buy/sell decisions. Assets to be held by the Ceding Company in the Portfolio are limited to the following types of assets:
   (a) cash;
   (b) certificates of deposit issued by any national or state chartered bank or savings and loan association;
   (c) United States Government or Canadian Government issued or guaranteed bonds, bills, or notes, or United States Government money market funds;
   (d) any other bonds with a Standard & Poor's or Moody's quality rating of "Baa/BBB" or better; or
   (e) any other instruments agreed to by the parties hereto evidenced by a written amendment to this Agreement.

2.    The current investment policy for the portfolio is attached hereto as Schedule VIII.

**Excise Taxes**

1.    The Reinsurer represents that
   (a) pursuant to the provisions of the United States-Ireland Income Tax Treaty, it is eligible for the exemption to the excise tax imposed by Section 4371 of the Internal Revenue Code with respect to any premium paid by the Ceding Company under this Agreement; and

010611df.agm
3823 - 101 / 10553 - 2

Page 3

(b) it will remit the excise tax, together with any appropriate return or other filing, to the Internal Revenue Service or other permitted or required taxing authority, if it retrocedes, or otherwise reinsures, any risk under this Agreement to any non-United States person that is not eligible for an exemption to such excise tax.

2. Notwithstanding any other provision hereof, in the event that any premium payment made hereunder is, in the discretion of the Ceding Company, subject to such excise tax, the Ceding Company shall withhold such tax from the premium payable by the Ceding Company and shall remit such tax, together with any appropriate return or other filing, to the Internal Revenue Service or other permitted or required taxing authority.

3. In the event that any premium payment paid by the Ceding Company hereunder is not exempt from such excise tax, the Reinsurer shall indemnify and hold the Ceding Company harmless from any and all excise taxes and related interest, penalties, or additional amounts imposed on, paid by or collected from the Ceding Company in respect of such premiums. The Reinsurer's obligation hereunder shall not be reduced or affected by the Ceding Company's failure to withhold such taxes under paragraph 2.

## Reports and Accounting for Reinsurance

1. The Ceding Company shall notify the Reinsurer of reinsurance ceded pursuant to this Agreement by means of the reports specified in this article.

2. The Ceding Company shall summarize all monetary transactions under this Agreement by submitting a written report within thirty (30) days following the end of each month. The report shall be formatted as set forth in Schedule II, Parts A and B. Any amounts shown in such reports as due from the Ceding Company shall be paid by the Ceding Company when submitting the reports to the Reinsurer. If a report shows an amount due from the Reinsurer, the amount shall be paid by the Reinsurer within thirty (30) days of its receipt of such report.

3. The reports and reconciliations prescribed in paragraph 2 shall be considered preliminary reports and reconciliations only. The Ceding Company shall calculate a final report

and reconcile any amounts owed for the Accounting Period within thirty (30) days following the end of such Accounting Period. Payments previously made by either party during the Accounting Period shall be taken into account in determining final amounts due for such Accounting Period. If any amount cannot be determined on an exact basis on the date the final monetary summary and reconciliation is due, an estimated payment shall be made and any final adjustments shall be made as soon as practicable.

4.  Amounts due from either party pursuant to this Agreement shall be paid net of amounts due from the other party.

5.  The Ceding Company shall provide the Reinsurer with information about the Policies which the Reinsurer may need to prepare its financial statements, including but not limited to information described in Schedule II and III. Such information shall be submitted at the end of each calendar year. A preliminary report shall be provided within ten (10) days following the end of each calendar year and a final report shall be provided within sixty (60) days following the end of the calendar year.

6.  If the Ceding Company ever becomes aware that its summary of monetary transactions for an Accounting Period as required in this article did not accurately reflect the actual experience of the Policies during the Accounting Period, it shall promptly submit a revised summary to the Reinsurer. Any amount shown by the revised summary as owed by either the Ceding Company or the Reinsurer to the other shall be paid promptly.

7.  The Reinsurer may unilaterally change Schedules II and III in order to obtain the data required to administer this Agreement or to prepare its financial statements, provided such data is readily available from the Ceding Company.

**Terms of Reinsurance**

1.  All monetary amounts expressed in this Agreement are expressed in United States dollars and all amounts payable pursuant to this Agreement are payable in United States dollars.

2.  This is an Agreement for indemnity reinsurance solely between the Ceding Company and the Reinsurer. The acceptance of reinsurance hereunder shall not create any right or legal relation whatever between the Reinsurer and

any person other than the Ceding Company.

3.   The Reinsurer shall not participate in capital gains and losses of the Ceding Company other than as may be reflected in the computation of the Investment Income Rate. No part of the gains and losses of the Ceding Company from, or considered as from, sales and exchanges of capital assets supporting the Quota Share of the Reserves shall be treated as gains and losses from sales and exchanges of capital assets of the Reinsurer.

4.   In the event of the insolvency of the Issuing Insurer, the Ceding Company's inability to collect amounts owed to it by the Issuing Insurer with respect to Policies, including, but not limited to, the Ceding Company's inability to offset or to net amounts owed to it against amounts owed by it, shall reduce any amount owed by the Ceding Company to the Reinsurer, or increase any amount owed by the Reinsurer to the Ceding Company, whichever is applicable.

5.   The Reinsurer shall take all reasonable steps to assist the Ceding Company in receiving statutory credit for reinsurance ceded pursuant to this Agreement in its interim and annual financial statements submitted to the Indiana Insurance Department and New York Insurance Department, including establishing Reserves on the Quota Share of the Policies and notifying the Ceding Company regarding the amount of such Reserves as required by Regulation 20 of the New York Insurance Department in effect on the Effective Date.

**Material Changes**

1.   The Ceding Company shall promptly notify the Reinsurer of any Material Change in the terms of the Policies, in the method used to calculate Reserves for the Policies or in its Other Reinsurance.

2.   Following a Material Change agreed to by the Ceding Company, the Reinsurer may in its sole discretion
   (a)  continue to reinsure the Policies under current terms;
   (b)  retroactively adjust its Quota Share of the Policies to compensate for the Material Change; or
   (c)  implement a combination of (a) and (b).

3.   The rights set forth in paragraph 2 above shall not apply where a Material Change is imposed by law, regulation or otherwise and not subject to the Ceding Company's

approval.

**Arbitration**

1. If the Ceding Company and the Reinsurer cannot mutually resolve a dispute regarding the interpretation or operation of this Agreement, the dispute shall be decided through arbitration as set forth in Schedule VI. The arbitrators shall base their decision on the terms and conditions of this Agreement. However, if the terms and conditions of this Agreement do not explicitly dispose of an issue in dispute between the parties, the arbitrators may base their decision on the customs and practices of the insurance and reinsurance industry rather than solely on an interpretation of applicable law. The arbitrators' decision shall take into account the right to offset mutual debts and credits as provided in this Agreement. There shall be no appeal from the arbitrators' decision. Any court having jurisdiction over the subject matter and over the parties may reduce the arbitrators' decision to judgment.

2. The parties intend this article to be enforceable in accordance with the Federal Arbitration Act (9 U.S.C., Section 1) including any amendments to that Act which are subsequently adopted. In the event that either party refuses to submit to arbitration as required by paragraph 1, the other party may request a United States Federal District Court to compel arbitration in accordance with the Federal Arbitration Act. Both parties consent to the jurisdiction of such court to enforce this article and to confirm and enforce the performance of any award of the arbitrators.

**Insolvency of the Ceding Company**

1. In the event of the insolvency of the Ceding Company and the appointment of a conservator, liquidator or statutory successor of the Ceding Company, reinsurance shall be payable to such conservator, liquidator or statutory successor on the basis of claims allowed against the Ceding Company by any court of competent jurisdiction or by the conservator, liquidator or statutory successor of the Ceding Company without diminution because of the insolvency of the Ceding Company or because such conservator, liquidator or statutory successor has failed to pay all or a portion of any claims.

2. In the event of the insolvency of the Ceding Company, the conservator, liquidator or other statutory successor of the Ceding Company agrees to give the Reinsurer written

notice of the pendency of a claim on a Policy within a reasonable time after such claim is filed in the insolvency proceeding. During the pendency of any such claim, the Reinsurer may investigate the claim and interpose in the proceeding where such claim is to be adjudicated in the name of the Ceding Company (its conservator, liquidator or statutory successor), but at its own expense, any defense or defenses which the Reinsurer may deem available to the Ceding Company or its conservator, liquidator or statutory successor.

3.  The Reinsurer may charge a Quota Share of the expense thus incurred by it, subject to court approval, against the Ceding Company as part of the expense of liquidation.

**Offset**

Any debts or credits, matured or unmatured, liquidated or unliquidated, regardless of when they arose or were incurred, in favor of or against either the Ceding Company or the Reinsurer with respect to this Agreement or any other agreement between the parties or any other claim of one party against the other are deemed to be mutual debts or credits, as the case may be, and shall be set off and only the balance shall be allowed or paid.

**Acknowledgments**

1.  The Ceding Company acknowledges having provided the Reinsurer with the documents and materials listed in Schedule VII prior to the Execution Date.

2.  The Ceding Company affirms that all factual information contained in these documents was, as of the date of their making, correct and accurate in all material respects to the best of the Ceding Company's knowledge and belief.

3.  The Ceding Company affirms to the best of its knowledge and belief that there has been no Material Change in the expected profitability of the Policies between the "as of" date of the documents listed and described in paragraph 1 and the Execution Date.

4.  The Ceding Company makes no representations and warranties as to the actual experience or profitability to be realized from the Policies beyond the date of the execution of this Agreement.

5.  The Ceding Company acknowledges its responsibility for independently forming its own conclusions regarding

(a) the compliance of this Agreement with the laws and regulations of any particular state or jurisdiction;

(b) the statutory or other accounting impact of this Agreement on the Ceding Company's financial statements; and

(c) the tax impact of this Agreement on the Ceding Company.

6.   Unless otherwise explicitly provided for herein, the Ceding Company and the Reinsurer shall each be solely responsible for determining and discharging any income tax liability resulting from this Agreement, including any tax liability resulting from the initial monetary transactions.

## Termination

1.   Except as otherwise provided in this article, this Agreement shall be unlimited in duration.

2.   If none of the Policies are in force as of the end of any Accounting Period, this Agreement shall automatically terminate as of the day the last Policy terminated.

3.   If the Ceding Company fails to pay reinsurance premiums when due, the Reinsurer may terminate this Agreement with respect to all reinsurance hereunder.  To effect such termination, the Reinsurer shall give the Ceding Company written notice of termination.  The Ceding Company may avoid termination by paying all delinquent reinsurance premiums, plus all additional reinsurance premiums that may have become due, within thirty (30) days following its receipt of notice of termination.  Termination shall be effective as of the last date to which reinsurance premiums had been paid.

4.   The termination of this Agreement or of any reinsurance hereunder shall not affect any rights or obligations of either party applicable to the period prior to the effective date of termination.

## Payments and Accounting Upon Termination of Agreement

1.   If this Agreement is terminated, the Ceding Company shall summarize all monetary transactions for the Terminal Accounting Period and report its summary to the Reinsurer within thirty (30) days of the later of the effective date of termination or of notice of termination.  The report shall be in the form of Schedule II, Parts A and B.

2.   The Reinsurer shall pay the Ceding Company an amount

equal to the Reserves immediately prior to termination, less the balance of the funds withheld account.

3. Following the summarization of all monetary transactions and payment of any amounts due for the Terminal Accounting Period, neither the Ceding Company nor the Reinsurer shall owe the other any additional payment or amount pursuant to this Agreement. The Reinsurer shall not owe the Ceding Company any amount as an allowance upon termination, and the balance of the funds withheld account as of the end of the Terminal Accounting Period shall have been reduced to zero (0).

4. The Ceding Company shall provide the Reinsurer with information the Reinsurer may need to prepare its financial statements for the Terminal Accounting Period as required by the "Reports and Accounting for Reinsurance" article.

5. If the Ceding Company ever becomes aware that its summary of monetary transactions for the Terminal Accounting Period as required in this article did not accurately reflect the actual experience of the Policies during the Terminal Accounting Period, it shall promptly submit a revised summary to the Reinsurer. Any amount shown by the revised summary as owed by either the Ceding Company or the Reinsurer to the other shall be paid promptly.

## Jurisdiction and Service of Suit

1. If the Reinsurer fails to perform any of its obligations under this Agreement, the Ceding Company may request the Reinsurer to submit to the jurisdiction of a court of competent jurisdiction within any state of the United States. The Reinsurer shall comply with all reasonable requirements necessary to give such court jurisdiction over it and shall abide by the final decision of such court or of any appellate court in the event of an appeal.

2. The Reinsurer hereby designates the Commissioner of Insurance of the Ceding Company's state of domicile as its true and lawful attorney within such state upon whom any lawful process in any action, suit, or proceeding instituted by or on behalf of the Ceding Company may be served.

3. This article is not intended to conflict with or override the obligation of the parties to arbitrate disputes hereunder. Consequently, it shall only apply as necessary to enforce the terms of the "Arbitration" article or to enforce a written

decision of the arbitrators.

**Miscellaneous**

1. Certain terms used in this Agreement are defined in the "Definition of Terms" article and are to be interpreted in accordance with such definitions. In the absence of a specific definition, a term used in this Agreement is to be interpreted in accordance with customary insurance and reinsurance industry practices.

2. References in this Agreement to specific lines, pages and exhibits of the statutory financial statement refer to such lines, pages and exhibits as of the Effective Date. Changes in the statutory financial statement which affect such items shall modify references in this Agreement so as to keep such references current with the statutory financial statement, provided such modification does not alter the rights and obligations of either party.

3. Any Error made by either the Ceding Company or the Reinsurer in the administration of reinsurance under this Agreement shall be corrected by submitting revised reports and restoring both the Ceding Company and the Reinsurer to the positions they would have occupied had no Error occurred.

4. The Reinsurer may audit, at any reasonable time and at its own expense, all records and procedures relating to reinsurance under this Agreement. The Ceding Company shall cooperate in the audit, including providing any information requested by the Reinsurer in advance of the audit. Further, the Ceding Company agrees to complete, at the request of the Reinsurer and in a manner acceptable to the Reinsurer, a process which confirms the existence of the Policies. The Ceding Company shall continue to review, in accordance with its current practices, all reports and other materials received from the Issuing Insurers with respect to the reinsurance agreements identified on Schedule I. In addition, the Ceding Company shall, at the Reinsurer's expense, take such actions as may be reasonably requested by the Reinsurer to enforce the Ceding Company's rights under such agreements.

5. In the event that any of the Policies are continued into Continuation Policies issued by the Issuing Insurer, its successor or any of its affiliates, the Continuation Policies shall be reinsured under this Agreement. The Reinsurer shall instruct the Ceding Company with respect to the Ceding Company's rights on Continuation Policies. The Ceding Company shall carry out the Reinsurer's instruction

on a timely basis.

6. Neither the Ceding Company nor the Reinsurer may assign any of the rights and obligations under this Agreement, nor may either party sell, assumption reinsure or transfer the Policies without the prior written consent of the other party. Consent will not be withheld if the assignment, sale, assumption reinsurance or transfer does not have a material effect on the risks transferred or the expected economic results to the party requested to consent. This provision shall not prohibit the Reinsurer from reinsuring the Policies on an indemnity basis.

7. This Agreement represents the entire agreement between the Ceding Company and the Reinsurer and supercedes, with respect to its subject matter, any prior oral or written agreements between the parties.

8. No modification of any provision of this Agreement shall be effective unless set forth in a written amendment to this Agreement which is executed by both parties.

9. A waiver shall constitute a waiver only with respect to the particular circumstance for which it is given and not a waiver of any future circumstance.

## Definition of Terms

1. **Accounting Period** - for the month in which this Agreement becomes effective, the period beginning on the Effective Date and ending on the Last Day Of The Current Accounting Period. Thereafter, the period beginning on the day following the Last Day Of The Preceding Accounting Period and ending on the Last Day Of The Current Accounting Period.

2. **Agreement** - this document and all schedules and amendments to it.

3. **Benefits** - the health benefits and any other benefits paid by the Issuing Insurer pursuant to the Policies or with respect to any claims thereunder.

4. **Continuation Policy** - a new Policy changing or replacing a Policy made or issued either
    (a) in compliance with the terms of the Policy; or
    (b) without the same new underwriting information that the Issuing Insurer would obtain in the absence of the Policy, without a contestable period as long as those contained in new issues of the Issuing Insurer, or without the payment of the same commissions in the first year that

the Issuing Insurer would have paid in the
absence of the Policy.

5. **Effective Date** - the date set forth in paragraph 3 of the
"Reinsurance Coverage" article.

6. **Error** - any isolated, inadvertent deviation from the terms
of this Agreement resulting from the act or omission of an
employee of either the Ceding Company or the Reinsurer
whose principal function is administrative in nature.

7. **Execution Date** - the date this Agreement is signed by the
last of the parties to sign it.

8. **Expenses** - any and all charges including, for the avoidance
of doubt, litigation expenses incurred by the Issuing Insurer
which are reimbursed by the Ceding Company.

9. **Investment Income Rate** - the interest rate set forth in
Schedule V.

10. **Last Day Of The Current Accounting Period** - the last
day of the calendar month for which the calculation is
being made.

11. **Last Day Of The Preceding Accounting Period** - the last
day of the preceding calendar month.

12. **Lump Sum Allowance** - the amount set forth in
Schedule IV.

13. **Material Change** - a change that a prudent insurance
executive would consider as likely to have a material
impact on the Reinsurer's experience under this Agreement.

14. **Other Reinsurance** - reinsurance other than reinsurance
provided pursuant to this Agreement which inures to the
Ceding Company's benefit with respect to the Policies.

15. **Periodic Allowance** - the amount described in
Schedule IV.

16. **Policy(ies)** - the insurance policy(ies) identified in
Schedule I which are reinsured pursuant to this Agreement.

17. **Portfolio** - The Paul Revere Life Insurance Company asset
portfolios (LNR05823) and (LNR05834) maintained by the
Ceding Company.

18. **Quota Share** - the percentage of the Policies set forth in
Schedule I which is ceded by the Ceding Company to the
Reinsurer pursuant to this Agreement.

19. **Reserve Change** - the increase in the Reserves from the
Last Day Of The Preceding Accounting Period to the Last
Day Of The Current Accounting Period.

010611df.agm
3823 - 101 / 10553 - 2

20. **Reserves** - the active life and disabled life reserves and claim liabilities calculated and reported for Block A is The Lincoln National Life Insurance Company, Block B is Monarch Life Insurance Company; and Block C is The Paul Revere Life Insurance Company pursuant to the reinsurance agreements identified in Schedule I.

21. **Terminal Accounting Period** - the period commencing on the day following the Last Day Of The Preceding Accounting Period and ending on the effective date of termination pursuant to any notice of termination given under this Agreement or such other date as shall be mutually agreed to in writing.

22. **Underlying Agreements** - the agreements identified in Schedule I.

**Execution**

The Ceding Company and the Reinsurer, by their respective officers, executed this Agreement in duplicate on the dates shown below. As of the Effective Date, this Agreement consists of

- this Indemnity Reinsurance Agreement numbered 101 / 2;
- Schedule I, Quota Share and Policies Subject to Reinsurance;
- Schedule II, Part A, Summary of Monetary Transactions;
- Schedule II, Part B, Summary of Monetary Transactions;
- Schedule III, Annual Report;
- Schedule IV, Allowances;
- Schedule V, Investment Income Rate;
- Schedule VI, Arbitration Schedule;
- Schedule VII, Ceding Company Information; and
- Schedule VIII, Investment Policy.

010611df.agm
3823 - 101 / 10553 - 2

LINCOLN NATIONAL REINSURANCE COMPANY
(BARBADOS) LIMITED

Signed in Fort Wayne, Indiana

By _____
                        President

Date _____

By _____
                   Assistant Secretary

Date _____

LINCOLN RE (IRELAND) LIMITED

Signed in Dublin, Ireland

By _____
                   Managing Director

Date _____

# SCHEDULE I

(Effective as of _____)

to

Agreement Number 101 / 2

### QUOTA SHARE AND POLICIES SUBJECT TO REINSURANCE

A one hundred percent (100%) Quota Share of the insurance Policies reinsured by the Ceding Company pursuant to the underlying indemnity reinsurance agreements effective as shown below:

| Block | Underlying Agreements | Agreement Effective Date | Agreement Number |
|-------|----------------------|--------------------------|------------------|
| A | The Lincoln National Life Insurance Company | December 31, 1991 | 104 |
| B | The Lincoln National Life Insurance Company | December 31, 1990 | 035 |
| C | The Paul Revere Life Insurance Company | July 1, 1995 | 007 |

# SCHEDULE II, PART A
(Effective as of _____ )
to
Agreement Number 101 / 2

## SUMMARY OF MONETARY TRANSACTIONS

for the period from _____ to _____
with respect to the following Quota Share of the Policies: _____

1.  Initial reinsurance premium (first Accounting Period only)
    [(a) - (b)]
    (a) Reserves
    (b) Lump Sum Allowance

2.  Gross premiums
3.  Premiums - Other Reinsurance
4.  Net Premiums [(2) - (3)]

5.  Investment Income [((5a) x (5b))] x [(5c) + (5d)]
    (a) Investment Income Rate
    (b) One-half actual days in the current Accounting Period
        divided by calendar days in the current calendar month
    (c) Funds withheld balance Last Day Of The Current
        Accounting Period
    (d) Funds withheld balance Last Day Of The Preceding
        Accounting Period

6.  Benefits
7.  Benefits - Other Reinsurance
8.  Net Benefits [(6) - (7)]

9.  Other reimbursement net of Other Reinsurance
        Expenses

10. Periodic Allowance

11. Reserves - Last Day Of The Preceding Accounting Period
12. Reserves - Last Day Of The Current Accounting Period
13. Reserve Change [(12) - (11)]

# SCHEDULE II, PART B

(Effective as of _____ )

to

Agreement Number 101 / 2

## SUMMARY OF MONETARY TRANSACTIONS

for the period from _____ to _____

1. Due Reinsurer

    Initial reinsurance premium (1) (first period only)
    Net premiums (4)
    Investment Income (5)

    Total Due - Reinsurer

2. Due Ceding Company

    Net Benefits (8)
    Other Reimbursements (9)
       Expenses
    Periodic Allowance (10)

    Total Due - Ceding Company

3. Gross Due Reinsurer (1 less 2)

4. Funds withheld account
   (Last Day Of The Current Accounting Period)

5. Funds withheld account
   (Last Day Of The Preceding Accounting Period, equals zero (0) for first
   Accounting Period)

6. Amount Due Reinsurer (if positive) or Due Ceding Company (if negative)
   (3 less 4 plus 5)

7. Amounts Previously Paid for Accounting Period

8. Net Amount Due (6 less 7)

# SCHEDULE III

(Effective as of _____)

to

Agreement Number 101 / 2

## ANNUAL REPORT

The annual report shall provide the following information:

- An actuarial opinion on the reported Reserves

# SCHEDULE IV

(Effective as of _____ )

to

Agreement Number 101 / 2

## **ALLOWANCES**

### Lump Sum Allowance

The Lump Sum Allowance equals _____ ($_____ ), adjusted for the tax effect of the initial Lump Sum Allowance on the Reinsurer.

### Periodic Allowance

The amount of Periodic Allowances shall be equal to the allowances paid by the Ceding Company on the business reinsured, net of allowances actually recovered from Other Reinsurance, plus expenses equal to:

Block A = .5% of premiums
Block B = .25% of premiums
Block C = _____

# SCHEDULE V

(Effective as of _____)

to

Agreement Number 101 / 2

## INVESTMENT INCOME RATE

The Investment Income Rate shall be equal to the

Block A = Rate earned on the Underlying Agreement.

Block B = Rate earned on the Underlying Agreement.

Block C =

(1)  the net investment income, including realized capital gains and losses earned for the Accounting Period by Ceding Company from investing the assets in the Portfolios; divided by

(2)  the weighted average amount of assets in the Portfolio for the Accounting Period.

(3)  a deduction of .1845 percent (.1845%) times the number of calendar days in the current Accounting Period, divided by 365.

$$Rate \ = \ \frac{(1)}{(2)} - (3)$$

# SCHEDULE VI

(Effective as of _____ )
to
Agreement Number 101 / 2

## ARBITRATION SCHEDULE

To initiate arbitration, either the Ceding Company or the Reinsurer shall notify the other party in writing of its desire to arbitrate, stating the nature of its dispute and the remedy sought. The party to which the notice is sent shall respond to the notification in writing within ten (10) days of its receipt.

The arbitration hearing shall be before a panel of three (3) arbitrators, each of whom must be a present or former officer of a life insurance company. An arbitrator may not be a present or former officer, attorney, or consultant of the Ceding Company or the Reinsurer or either's affiliates.

The Ceding Company and the Reinsurer shall each name five (5) candidates to serve as an arbitrator. The Ceding Company and the Reinsurer shall each choose one (1) candidate from the other party's list, and these two (2) candidates shall serve as the first two (2) arbitrators. If one (1) or more candidates so chosen shall decline to serve as an arbitrator, the party which named such candidate shall add an additional candidate to its list, and the other party shall again choose one (1) candidate from the list. This process shall continue until two (2) arbitrators have been chosen and have accepted. The Ceding Company and the Reinsurer shall each present their initial lists of five (5) candidates by written notification to the other party within twenty-five (25) days of the date of the mailing of the notification initiating the arbitration. Any subsequent additions to the list which are required shall be presented within ten (10) days of the date the naming party receives notice that a candidate that has been chosen declines to serve.

The two (2) arbitrators shall then select the third arbitrator from the eight (8) candidates remaining on the lists of the Ceding Company and the Reinsurer within fourteen (14) days of the acceptance of their positions as arbitrators. If the two (2) arbitrators cannot agree on the choice of a third, then this choice shall be referred back to the Ceding Company and the Reinsurer. The Ceding Company and the Reinsurer shall take turns striking the name of one (1) of the remaining candidates from the initial eight (8) candidates until only one (1) candidate remains. If the candidate so chosen shall decline to serve as the third arbitrator, the candidate whose name was stricken last shall be nominated as the

third arbitrator. This process shall continue until a candidate has been chosen and has accepted. This candidate shall serve as the third arbitrator. The first turn at striking the name of a candidate shall belong to the party that is responding to the other party's initiation of the arbitration. Once chosen, the arbitrators are empowered to decide all substantive and procedural issues by a majority of votes.

It is agreed that each of the three (3) arbitrators should be impartial regarding the dispute and should resolve the dispute on the basis described in the "Arbitration" article. Therefore, at no time will either the Ceding Company or the Reinsurer contact or otherwise communicate with any person who is to be or has been designated as a candidate to serve as an arbitrator concerning the dispute, except upon the basis of jointly drafted communications (which may include independently prepared statements) provided by both the Ceding Company and the Reinsurer to inform those candidates actually chosen as arbitrators of the nature and facts of the dispute. Likewise, any written or oral arguments provided to the arbitrators concerning the dispute shall be coordinated with the other party and shall be provided simultaneously to the other party or shall take place in the presence of the other party. Further, at no time shall any arbitrator be informed that the arbitrator has been named or chosen by one (1) party or the other.

The arbitration hearing shall be held on the date fixed by the arbitrators. In no event shall this date be later than six (6) months after the appointment of the third arbitrator. The arbitration hearing shall be held in the city where the home office of the party responding to the arbitration is located. As soon as possible, the arbitrators shall establish prearbitration procedures as warranted by the facts and issues of the particular case. At least ten (10) days prior to the arbitration hearing, each party shall provide the other party and the arbitrators with a detailed statement of the facts and arguments it will present at the arbitration hearing. The arbitrators may consider any relevant evidence; they shall give the evidence such weight as they deem it entitled to after consideration of any objections raised concerning it. The party initiating the arbitration shall have the burden of proving its case by a preponderance of the evidence. Each party may examine any witnesses who testify at the arbitration hearing. Within twenty (20) days following the end of the arbitration hearing, the arbitrators shall issue a written decision which shall set forth their decision and the factual basis for their decision. In their written decision the arbitrators shall demonstrate that they have offset mutual debts and credits as provided in this Agreement. In no event, however, may the arbitrators award punitive or exemplary damages. In their decision, the arbitrators shall also apportion the costs of arbitration, which shall include, but not be limited to, their own fees and expenses.

# SCHEDULE VII

(Effective as of _____)

to

Agreement Number 101 / 2

## CEDING COMPANY INFORMATION

Actuarial appraisal of Individual Disability Income Business of Lincoln Re as of December 31, 2000, by Milliman USA, Inc.

# SCHEDULE VIII

(Effective as of _____ )

to

Agreement Number 101 / 2

## INVESTMENT POLICY

COMPANY:     Lincoln National Reinsurance Company (Barbados) Limited

PORTFOLIO:   LNR, Ltd. - Barbados/Paul Revere (LNR05823)

LNR, Ltd. - Barbados/Paul Revere (2) (LNR05834)

Regulation:     Not applicable.

Compliance with this Investment Policy is not required at the portfolio level. The total percentage of assets in Portfolio LNR05823 and portfolio LNR05834 that are invested in a specified class of eligible assets must comply with the limitations imposed by this Investment Policy.

**Product Description:**

Lincoln National Reinsurance Company (Barbados) Limited (LNBAR) is operated and managed by the reinsurance business unit of Lincoln Financial Group (LFG). In 1995 LNBAR entered into an agreement under which LNBAR reinsured 80 percent (80%) of the existing individual disability income claims older than two (2) years of The Paul Revere Life Insurance Company and The Paul Revere Protective Life Insurance Company. No active lives are covered nor are any new claims covered. Liability cash flows from this business are relatively stable and predictable and are not sensitive to changes in interest rates.

This statement of Investment Policy has been designed to authorize the proper alignment of assets with the expected future funding requirements of the disability claims ceded and to maintain the net portfolio yield at a level which will enhance the future profitability of the Agreement to the Ceding Companies and the Reinsurer.

The investment guidelines that follow are included as an appendix to the reinsurance agreement. Additionally, policy statement limitations include restrictions resulting from the deposit of assets in a New York reserve credit trust.

**Investment Objective:**

The primary objectives for management of this portfolio are: 1) to limit market risk by maintaining sufficient asset cash flows (coupons and maturities) to meet anticipated claim payments while maintaining prudent liquidity, credit and diversification risk profiles; and 2) maximize value in relation to the risks assumed consistent with the first objective.

**Asset Categories:**

Exposure limits are based on admitted invested assets.

| | Maximum % of Assets |
|---|---|
| Money Market Asssets | 50% |
| | |
| **Taxable Fixed Income** | |
| U.S. Treasury/Agency Securities | 100% |
| Public bonds | 100% |
| Mortgage-backed Securities | 0% |
| | |
| **Tax-advantaged Securities** | |
| Municipal Securities | 5% |
| | |
| Equity-related Securities | 0% |
| | |
| **Less Liquid Investments** | |
| Investments in less liquid investments are further restricted as follows: | |
| Fixed rate private placements (Rule 144A only) | 20% |
| Commercial mortgage loans | 10% |
| Fixed rate private placements other than Rule 144A | 10% |
| | |
| **Diversification:** | |
| Per Industry | 30% |
| Per Non-Government Issuer | 2% |
| Non-U.S. or Canadian Issuers | 15% |
| | |
| **Quality Restrictions:** | |
| Maximum % assets rated NAIC 2 Category | 30% |
| Maximum % assets NAIC 3 or over | 5% |
| Targeted average portfolio quality | A3 |

**Derivatives:**

Use only when consistent with objectives and upon notification and written agreement with the ceding companies.

**Currency:**

U.S. dollar-denominated securities only.

**Uses of Leverage:**

Securities lending, Repurchase Agreements or other portfolio leveraging activities will not be permitted.

**Duration:**

The investment guidelines do not incorporate a duration target since the portfolio is managed on a cash matched basis versus liabilities. The current liability duration is estimated to be 5.5 years. Prospectively, the maturity profile of the assets will be adjusted consistent with liability characteristics.

**Other:**

* Municipal securities exposure is limited to securities delivered under the Agreement.

The assets held in this portfolio will not normally be traded, although they may be classified as "Available for Sale" (as defined under FASB #115 for GAAP accounting purposes) and sold in order to support the investment objectives stated above. It is further understood that since this is a liquidating portfolio, the limitation referenced above with respect to diversification shall apply to new purchases only and does not by itself, constitute a requirement to sell securities.

Reporting Frequency: Quarterly

*Approving Bodies for Investments:*
    Lincoln Re Investment Committee

*Date Approved:* May 19, 1998

http://www.xerox.com/downloads/SPOSTABS.dot

Seller's Schedule

## DISCLOSURE SCHEDULES

Related to That Certain
Put Agreement
by and between
Lincoln National Reinsurance Company (Barbados) Limited
and
Swiss Re Life & Health America Inc.

Dated July 27, 2001

These Disclosure Schedules ("Schedules") of Lincoln National Reinsurance Company (Barbados) Limited ("Lincoln Barbados") are delivered in connection with the Put Agreement By and Between Lincoln Barbados and Swiss Re Life & Health America Inc. (the "Put Agreement") . Where a matter is initially set forth on these Schedules, the disclosure shall specify the representation, warranty or other Put Agreement provision to which the disclosed matter relates. However, it is understood by Parties to the Put Agreement, that a matter which is disclosed herein with respect to one section or provision of the Put Agreement, shall also be deemed disclosed with respect to all other sections or provisions to which it would reasonably be deemed related and applicable to such other section or provisions, notwithstanding the omission of an appropriate cross-reference thereto.  Capitalized terms used but not otherwise defined herein shall have the meanings given them in the Put Agreement.

**Schedule 2.04**
**Governmental Approvals**

1.    Approval of Republic of Ireland insurance regulatory authorities with respect to the change of control of Lincoln Ireland if Lincoln Barbados exercises the Put Right.

**Schedule 2.07**
**Material Rights and Permits**

1.    A letter dated June 12, 2001 from the Department of Enterprise, Trade and Employment stating it had no objection to Lincoln Ireland being incorporated for purposes of acting as a reinsurer.

**Schedule 2.08**
**Contracts**

1.    Indemnity Reinsurance Agreement effective as of June 30, 2001 between Lincoln Life
      and Lincoln Ireland.

2.    See form of Aon agreement attached.

# MANAGEMENT AGREEMENT

THIS AGREEMENT, made with effect the 20th day of June 2001 by and between Aon Insurance Managers (Dublin) Limited (hereinafter called "**the Manager**"), an Irish Company, having its principal office at 22 Upper Fitzwilliam Street, Dublin Ireland, Ireland and "Lincoln Re (Ireland) Limited. (hereinafter referred to as "**the Company**"), an Irish Company, having its principal office at 22 Upper Fitzwilliam Street, Dublin Ireland.

**WITNESSETH:**

WHEREAS, **the Manager** is a company providing for management and administrative services to (re)insurance companies, and

WHEREAS, **the Company** desires to retain **the Manager** for the provision of certain management and administrative services;

NOW, THEREFORE, in consideration of their respective promises and covenants hereinafter contained, it is hereby agreed as follows:

## ARTICLE 1. – MANAGEMENT MANDATE

1.1.    **The Company** hereby appoints **the Manager** as its agent to manage any and all of the daily business of **the Company** falling under its corporate purpose, and **the Manager** accepts such appointment.

1.2.    Unless otherwise agreed herein, **the Manager** shall always remain subject to the direction of **the Company**'s Board of Directors or any other person designated to that effect by the Board of Directors with the approval of **the Manager**, in compliance with the laws and regulations applicable in Ireland and good business practice.

1.3.    Within the boundaries of the powers granted by the Company, the Manager shall be responsible for the proper management of the Company and the performance and follow up of daily business. The Manager undertakes to control the procedures of the Company and to formulate any proposal likely to improve the operations of the Company.

1.4.    It is understood and agreed that (i) the status of the Manager under this Agreement is that of an independent contractor, and (ii) this Agreement sets out the entire agreement and understanding between the parties hereto in relation to the services to be provided by the Manager.

## ARTICLE 2. –    THE DUTIES OF THE MANAGER

### 2.1.    Accounting and financial management

The Manager shall provide for all aspects of the accounting and financial activities of the Company, including:

2.1.1.    Keeping proper books of account on behalf of the Company in accordance with law and generally accepted accounting principles and the directions of the Board and preparing management accounts on a quarterly basis.

2.1.2.    Providing such information as the auditors may from time to time require and generally co-operating with the auditors to facilitate the carry out of the audit.

2.1.3.    Billing and collection of premiums in accordance with the terms and conditions of each policy of insurance and/or reinsurance issued by the Company.

2.1.4.    Arranging to discharge (subject to due authorisation from the Board or its delegates) of all invoices and bills properly payable by the Company.

2.1.5.    To manage the company's treasury function as specified in Schedule 1 to this agreement.

## 2.2.    Administration of insurance activities

**The Manager** shall provide for the following services on such terms and in such manner as may be agreed from time to time with **the Company**:

2.2.1   The issuance of policies of insurance and/or reinsurance as may be requested by **the Company**.

2.2.2.  The maintenance of any reinsurance programme for an insurance or reinsurance policy, specified above, to the extent such reinsurance is available.

2.2.3.  Assistance in the implementation of such programmes as to risks, rates and general policy conditions and rendering advice on such programmes.

2.2.4.  Recommendations as to forms, contracts, policies and binders.

2.2.5.  The prompt conveyance of the results or summaries of insurance surveys, inspections, computations and research as may be requested by **the Company**.

2.2.6   The provision of statistical and other information to include recommendations as to premium, rating and insuring conditions as well as claim reports, including details of any reserved claims incurred and incurred but not reported (IBNR) losses.

2.2.7.  The handling, to the best interest of **the Company** and in conformity with good business practice, of any insurance or reinsurance claims arising in the course of business. **The manager** shall have authority to pursue any rights of recovery available to **the Company** against reinsurers or others and to compromise, settle or reject any insurance or reinsurance claim.

2.2.8.  All supervisory loss adjustment requirements, excluding the fees of independent adjusters.

2.2.9.  The provisions for continuing advice on insurance industry customs, practices and other technical matters.

## 2.3.    General administration of the Company

2.3.1.  **The Manager** shall prepare, on such terms and in such manner as may be agreed from time to time with **the Company**, statistics and other reports, including:

(i)      Investments made for **the Company**, the current rate of return of such investments and the current status thereof.

(ii)     All financial data, including the balance sheet and profit and loss statements. Such reports will be prepared in compliance with generally accepted accounting principles as prescribed by the accounting firm selected by **the Company**.

(iii)    Records of any insurance and/or reinsurance accepted or ceded, including official documentation thereof in the form of policies, reinsurance agreements, and billings and receipts.

(iv)    Claim reports, including details of any reserved claims incurred as well as incurred but not reported (IBNR) losses.

(v)     Other reports common to the function of **the Company**.

2.3.2.  **The Manager** shall assist with the convening of regular shareholder/board meetings and despatching board packs to the directors in advance of each such meeting.

2.3.3.  **The Manager** shall take minutes at all board meetings and shall circulate minutes to the directors for comment within a reasonable period of each board meeting.

2.3.4.  **The Manager** shall keep confidential all information about the business of **the Company** received directly or indirectly as a result of this Agreement save in so far as it is necessary to disclose such information for the proper performance of this Agreement.

## ARTICLE 3. –    THE DUTIES OF THE COMPANY

3.1.    **The Company** shall comply promptly with any reasonable request for instructions which **the Manager** may make in order to perform its duties efficiently under this agreement.

3.2.    **The Company** shall approve or disapprove promptly all proposals for insurance or reinsurance submitted by **the Manager**.

3.3.    **The Company** shall be responsible for the opening of bank accounts. **The Manager** shall be authorised to operate such accounts in accordance with the signature regulations in force.

3.4.    **The Company** holds **the Manager** harmless for any loss, damage, expense or cost arising from **the Manager's** performance of its duties under the present Agreement, unless **the Manager** has acted with gross negligence or wilful misfeasance. **The Manager** shall receive quietus at each Shareholders Annual General Meeting for the performance of its duties hereunder, unless **the Manager** has acted with gross negligence or wilful misfeasance.

3.5.    **The Company** and its representatives shall not divulge any information regarding the procedures and systems used by **the Manager** in fulfilling its duties thereunder.

## ARTICLE 4. –    REMUNERATION

4.1.    In consideration of the services to be performed hereunder, **the Company** shall pay to **the Manager**, a minimum annual fee of EUR 60,000, payable quarterly in advance, adjustable within thirty  (30) days after the year end on the basis of actual number of hours expended. It is further agreed that the annual fee will be indexed on the

basis of the Retail Price Index in Ireland.

Commencing sixty (60) days prior to the anniversary date of each agreement year the parties reserve the right to negotiate in good faith to fix a fee for the succeeding year. For purposes of this Agreement, the first agreement year shall commence on the date hereof and expire on 19th June 2002.

4.2.    **The Company** shall reimburse **the Manager** for its itemised out of pocket expenses incurred in operating the business of **the Company**, including but not limited to the following:

      (i)    Attorneys' fees, taxes, printing, photocopying, stationary, office supplies, telephone, facsimile, postage.

      (ii)    Travel expenses incurred at the request and on behalf of **the Company**.

Any out of pocket expenses incurred that are greater than US$4,000, shall require the prior written approval of the company's Managing Director.

## ARTICLE 5. –    MISCELLANEOUS

5.1.    **The Manager** shall have no power to enter into contracts on behalf of **the Company** unless specifically instructed in writing by the Managing Director of the Company to do so.

5.2.    This Agreement may not be assigned in whole or in part by either party without the prior written consent of the other. However, it is hereby understood and agreed that **the Manager** may fulfil its obligations under this Agreement by subcontracting for various services with third parties to the extent it deems advisable.

5.3.    **The Manager** shall not be liable for any foreign exchange loss whatsoever realised on any transaction effected in the performance of its functions.

5.4.    **The Manager** shall not be liable of any damage caused to **the Company** by Insurers, Reinsurers, Fund Managers or any person other than those referred to in article 5.2 above.

5.5.    It is hereby understood and agreed that **the Company** retains ownership of all books, records, reports and statistics produced by **the Manager** and/or its subcontractors in rendering services to **the Company** under this Agreement.

## ARTICLE 6. – TERMINATION

6.1.    This Agreement shall become effective upon the date hereof and subject to Clauses 6.2 and 6.3 herein, shall remain in full force and effect thereafter until terminated as provided therein.

6.2.    The Agreement may be terminated by either party as of any anniversary date by giving the other party not less than sixty (60) days notice prior to such anniversary date. Termination of this Agreement shall not relieve either party of its liability for the performance of obligations imposed upon said party during the effective period of this Agreement if such obligations have not been performed or completed at the time of termination.

6.3.    Either party hereto may terminate this Agreement forthwith by written notice to the other party if the other party (i) is seriously incapacitated from performing its obligations thereunder for any reason, or (ii) becomes insolvent or bankrupt or compounds with its creditors or if a resolution is passed or an order made for its winding up (other than for the purposes of amalgamation or reconstruction only).

6.4.    Termination shall operate without prejudice to the rights of either party which have accrued at the date of such termination.

## ARTICLE 7. –   APPLICABLE LAW

This Agreement shall in all respects be governed by and construed in accordance with the laws of Ireland. The Courts of Ireland have exclusive jurisdiction for any and all claims arising therefrom.

**IN WITNESS WHEREOF**, the parties have hereunto set their hands to duplicate originals hereof

**SIGNED by**                                              **DIRECTOR**
For and on behalf of
**Lincoln Re Ireland Limited**


in the presence of :


This 26th day of June 2001, Dublin, Ireland.


**SIGNED by**                                              **DIRECTOR**
for and on behalf of
**Aon Insurance Managers (Dublin) Limited**


in the presence of :


This 26th day of June 2001, Dublin, Ireland.


**Given effect in Ireland the 20th day of June 2001**

n/users/wordir/Alain/master mgt agt 2

# Schedule I

# Lincoln Re (Ireland) Limited
# Treasury Policies

## Cash Management

- Operating accounts will be maintained at Barclays Bank, Plc for Euro (EUR) and US Dollar (USD) currencies.
- The Euro account will maintain a maximum balance of 30,000 EUR. The exception to this maximum balance is in the event a payment to a reinsurance client or policyholder in excess of 30,000 EUR is required and the EUR account is to be funded to sufficiently cover the payment. This account will be funded as needed by the USD account.
- The USD account will maintain a maximum balance of 25,000 USD. Any excess balance over this maximum will be invested in a short-term investment vehicle in accordance with the investment policy approved by the board of directors. The exception to this maximum balance is in the event a payment to a reinsurance client or policyholder in excess of 25,000 USD is required and the USD account is to be funded to sufficiently cover the payment.

## Disbursement Authorizations

Authorizations for disbursements made via check, wire or electronic funds transfer (EFT) are as follows:

| Name | Title | General Expense Authorization | Reinsurance Client/Policyholder Authorization | Intercompany Transfers |
|------|-------|-------------------------------|-----------------------------------------------|------------------------|
| Aon Management Company: Anne-Marie Kearns James Langton Eamon O'Brien | Account Manager Director Account Manager | 25,000 USD 30,000 EUR | 250,000 USD 300,000 EUR | 250,000 USD 300,000 EUR |
| David Dillon | Director | 25,000 USD 30,000 EUR | 750,000 USD 900,000 EUR | 750,000 USD 900.000 EUR |
| Jonathon Vickers | Managing Director | 25,000 USD 30,000 EUR | 750,000, USD 900,000,EUR | 750,000 USD 900,000 EUR |

Authorization for General Expense and Reinsurance Client/Policyholder disbursements shall require the signature of two authorized signatories, at least one of whom should be a Director. Authorization for Intercompany Transfers shall require the signature of either an Account Manager or a Director. Any disbursement exceeding the limits noted above shall require the authorization of Jonathon Vickers in addition to any one of the above noted Account Managers or Directors.

General expenses are defined as those payments for general or budgeted expenses such as travel & entertainment, office operations, advertising fees, conferences, periodicals, utilities, consulting, purchasing contracts, labor, auditing and tax services, legal and professional fees, etc.

Reinsurance client/policyholder disbursements include payments directly related to a specific Lincoln Re policyholder or reinsurance contract such as for claims, premiums, refunds, cash surrender values, etc.

Intercompany transfers are defined as the movement of funds between and among the Lincoln Re (Ireland) Ltd. USD and EUR bank and short-term investment accounts at Barclays Bank, Plc.

## Authorized Signatories

- The following individuals will be designated as authorized signers on Lincoln Re (Ireland) Ltd. bank accounts:

| Name | Title |
| --- | --- |
| Aon Management Company: | |
| Anne-Marie Kearns | Account Manager |
| James Langton | Director |
| Eamon O'Brien | Account Manager |
| David Dillon | Director |
| Jonathon Vickers | Managing Director |
| | |

## Treasury Controls and Reporting

- Aon Insurance Managers (Dublin) Limited (Aon) will provide to the Assistant Treasurer of Lincoln National Reinsurance Company (Barbados) Ltd. (LNBAR) copies of documentation submitted to any commercial or investment bank to establish accounts and/or services.
- Aon will provide duplicate copies of monthly bank statements to the Managing Director.
- Aon will reconcile Lincoln Re (Ireland) Ltd. bank accounts on a monthly basis. Aon will provide copies of reconciliations to the Assistant Treasurer of LNBAR. Included with the monthly reconciliations will be a copy of the check register identifying the check #, amount, payee and a description of each check issued for that month.

**Schedule 5.01(f)**
**Retrocession Transaction**

(i)     Business to be reinsured by Lincoln Ireland:

| Issuing Insurer | Effective Date |
|---|---|
| Paul Revere Life Insurance Company | July 1, 1995 |
| Paul Revere Protective Life Insurance Company | July 1, 1995 |
| Lincoln Life (IHX 91) | December 31, 1991 |
| Lincoln Life (Monarch 90) | December 31, 1990 |

(ii)     See attachment for further description.

WO 35982.1

A MILLIMAN GLOBAL FIRM

 **Milliman** USA

*Consultants and Actuaries*

55 W. Monroe Street, 40th Floor
Chicago, IL 60603-5011
Tel +1 312 726.0677  Fax +1 312 726.5225
www.milliman.com

## MEMORANDUM

TO:        Monte Lightner
           Steve Prendergast

FROM:      Laird Zacheis

DATE:      July 25, 2001

RE:        *Lincoln Ireland – DI Roll-Forward*

---

The following table summarizes the projection of surplus in Lincoln Ireland, based on the Actuarial Appraisal of Individual Disability Income Business of Lincoln Re as of December 31, 2000, dated June 26, 2001 ("DI Appraisal"):

| Projection of Surplus<br>As of April 30, 2002<br>(in thousands, after tax) | | | |
|---|---|---|---|
| Item | LNL Business | LNBar Business | Total |
| Income from DI Appraisal<br>Capitalized Ceding Commission: | $(1,903) | $925 | $(978) |
| • Amortization | (499) | (2,843) | (3,342) |
| • Loss of Investment Income | (433) | (2,217) | (2,650) |
| • LOC Cost | (27) | (139) | (166) |
| Total | $(2,862) | $(4,274) | $(7,136) |

The following assumptions are reflected:

1)    LNL business transferred as of July 1, 2001.  LNBar business transferred as of October 1, 2001.

2)    Ceding commission capitalized of $8.8 million LNL and $64.5 million LNBar. Investment income adjustment is based on an 8.0% yield.

3)    Earnings on $10 million of equity in Lincoln Ireland not reflected.

4)    Earnings on required capital, which is held outside of Lincoln Ireland, not reflected.

A:\Memo725.doc

OFFICES IN PRINCIPAL CITIES WORLDWIDE



**Memorandum to Monte Lightner & Steve Prendergast**
**July 25, 2001**
**Page 2**

Please contact me with any questions on this analysis.

**LDZ:sm**

cc:    Andy Creighton
       Jon Lundy
       Jim Sjoreen
       Bruce Winterhof

A:\Memo725.doc

Milliman USA

A:\Memo725.doc

**Schedule 7.01(a)**
**Lincoln Barbados's Knowledge People**

Lawrence T. Rowland
William K. Tyler
Raymond L. Prosser
Monte J. Lightner
Andy R. Creighton
Kevin L. Adamson
Linda C. Fraley
Kenneth J. Clark
David A. Hopper
Jay D. Biehl
Patsy Campola
Chris L. Goeglein
James P. Sjoreen
Dennis L. Schoff
Casey J. Trumble
Stephen D. Prendergast
Barbara S. Kowalcyzk
Patrick R. Chasey

WO 35982.1

**Schedule 7.01(b)**
**Reference Balance Sheet**

http://www.xerox.com/downloads/5POSTABS.dot

Purchaser's Schedule

# DISCLOSURE SCHEDULES OF THE PURCHASER

Related to That Certain
Put Agreement
by and between
Lincoln National Reinsurance Company (Barbados) Limited
And
Swiss Re Life & Health America Inc.

Dated July 27, 2001

These Disclosure Schedules of the Purchaser are delivered in connection with the above-referenced Put Agreement (the "Put Agreement").  Where a matter is initially set forth on these Schedules, the disclosure shall specify the representation, warranty or other Put Agreement provision to which the disclosed matter relates.  However, it is understood by Lincoln Barbados and Purchaser that a matter which is disclosed with respect to one section or provision of the Put Agreement, shall also be deemed disclosed with respect to all other sections or provisions to which it would reasonably be deemed related and applicable to such other section or provisions, notwithstanding the omission of an appropriate cross-reference thereto.  Capitalized terms used but not otherwise defined herein shall have the meanings given them in the Put Agreement.

**Schedule 3.04**
**Consents and Approvals**

Approval of Republic of Ireland insurance regulatory authorities with respect to the change of control of Lincoln Ireland if Lincoln Barbados exercises the Put Right.

sapphd/eterly/PreliminlaAssetPortion0705015pwedsheet.xls backup 8/3/01 1:18 PM

## Irish Insurance Company to be Sold

| | Form Irish Newco | See Note | | Subtotal | Paul Revere 95 | Total Irish Newco |
|---|---|---|---|---|---|---|
| | | LNL DI | LNR Barbados DI | | | |
| **Assets** | | | | | | |
| Cash | 10,000,000 | | | | | 10,000,000 |
| Estimated ceding commission on transaction | | 8,600,000 | 84,500,000 | 73,300,000 | | 73,300,000 |
| Amounts recoverable from reinsurers | | 1,559,330 | | 1,559,330 | | 1,559,330 |
| Commissions and expense allowances due | | 3,229,865 | | 3,229,865 | | 3,229,865 |
| Accident and health premiums due and paid | | 3,778,070 | 9,420,527 | 13,198,597 | | 13,198,597 |
| Funds withheld by ceding company | | 281,545,852 | 736,395,454 | 997,941,306 | 279,573,522 | 1,277,514,828 |
| Total assets | 10,000,000 | 278,911,117 | 810,315,981 | 1,089,227,098 | 279,573,522 | 1,378,800,620 |
| **Liabilities** | | | | | | |
| Aggregate reserve for accident and health policies | | | | | | |
| M&R ALR | | 53,511,787 | 161,747,408 | 215,259,195 | | 215,259,195 |
| M&R DLR | | 177,847,853 | 561,471,437 | 739,319,290 | | 739,319,290 |
| M&R IBNR | | 2,184,538 | 62,473,953 | 64,658,491 | | 64,658,491 |
| M&R Claim Expense Reserve | | 691,148 | 15,323,496 | 16,014,644 | | 16,014,644 |
| ICOS | | 16,172,562 | | 16,172,562 | | 16,172,562 |
| Aggregate reserve on recaptured Paul Revere 92 | | 21,000,000 | | 21,000,000 | | 21,000,000 |
| Aggre reserve transferred on excluded contracts | | 5,000,000 | | 5,000,000 | | 5,000,000 |
| Claims DAU on Paul Revere 92, excluded contracts | | 369,211 | | 369,211 | | 369,211 |
| Policyholders' dividends | | (144) | 144 | | | |
| Claims DAU | | (14,064,715) | 14,064,715 | | | |
| Commissions and expense allowances payable on reinsura | | 2,285,967 | 2,171,353 | 4,457,320 | | 4,457,320 |
| General expenses due or accrued | | | | | | |
| Taxes, licenses and fees due or accrued, excluding federal l | | 604,875 | 123,243 | 728,118 | | 728,118 |
| Remittances and items not allocated | | 6,248,267 | | 6,248,267 | | 6,248,267 |
| Funds held under coinsurance | | | | | | |
| Investment income payable to clients | | 7,059,770 | (7,059,770) | | | |
| Total Liabilities | | 278,911,117 | 810,315,981 | 1,089,227,098 | 279,573,522 | 1,368,800,620 |
| Contributed capital | 10,000,000 | | | | | 10,000,000 |
| Total Liabilities and Surplus | 10,000,000 | 278,911,117 | 810,315,981 | 1,089,227,098 | 279,573,522 | 1,378,800,620 |

Note - Estimated ceding commissions on transaction have been calculated using the M&R appraisal of the DI business split between LNL and LNR Barbados assuming a 12% discount rate. The estimated ceding commissions further reflect a) Irish regulatory reserves equal US statutory, b) the ceding commission is capitalized for Irish regulatory reporting and is amortized over 30 years in proportion to premium, and c) the Irish tax basis with respect to reserves and the treatment of the ceding commission is equal to Irish regulatory reporting.