Execution Copy

ADMINISTRATIVE SERVICES AGREEMENT

between

THE LINCOLN NATIONAL LIFE INSURANCE COMPANY

(referred to as the Company)

and

SWISS RE LIFE & HEALTH AMERICA INC.

(referred to as the Administrator)

Dated as of December 7, 2001

NYO 49960.2

# TABLE OF CONTENTS

ARTICLE I ADMINISTRATIVE SERVICES ................................................................. 1

    1.01   Appointment and Acceptance of Appointment........................................ 1

    1.02   Administrative Services .......................................................................... 2

    1.03   Legally Required Company Actions........................................................ 3

    1.04   Compensation. ........................................................................................ 4

    1.05   Standards................................................................................................. 4

    1.06   Reserve Calculations.............................................................................. 4

ARTICLE II BOOKS AND RECORDS; BANK ACCOUNTS ................................... 5

    2.01   Transfer of Records................................................................................ 5

    2.02   Maintenance of Books and Records ....................................................... 5

    2.03   Quarterly Accountings and Payments.................................................... 5

    2.04   Bank Accounts and Lockboxes .............................................................. 6

ARTICLE III INABILITY TO PERFORM SERVICES, ERRORS ........................... 7

    3.01   Capacity ................................................................................................. 7

    3.02   Inability to Perform Services ................................................................. 7

    3.03   Errors...................................................................................................... 7

ARTICLE IV REGULATORY MATTERS.................................................................. 7

    4.01   Responsibilities of the Administrator .................................................... 7

ARTICLE V DURATION .............................................................................................. 8

    5.01   Duration ................................................................................................. 8

    5.02   Termination............................................................................................. 8

    5.03   Survival .................................................................................................. 9

ARTICLE VI INSURANCE........................................................................................... 9

    6.01   Liability Insurance ................................................................................. 9

6.02    Fidelity Bond ................................................................................................ 9

6.03    Qualifying Insurers ......................................................................................... 9


ARTICLE VII ARBITRATION ................................................................................. 10

7.01    Arbitration ..................................................................................................... 10


ARTICLE VIII DEFINITIONS .................................................................................. 10

8.01    Definitions ..................................................................................................... 10


ARTICLE IX MISCELLANEOUS .............................................................................. 12

9.01    Confidentiality ............................................................................................... 12

9.02    Notices ........................................................................................................... 12

9.03    Entire Agreement ........................................................................................... 13

9.04    Waivers and Amendments; Preservation of Remedies ................................. 13

9.05    Governing Law .............................................................................................. 13

9.06    Jurisdiction .................................................................................................... 13

9.07    Binding Effect; No Assignment .................................................................... 13

9.08    No Third Party Beneficiaries ........................................................................ 14

9.09    Expenses ........................................................................................................ 14

9.10    Counterparts .................................................................................................. 14

9.11    Headings ........................................................................................................ 14

9.12    Severability .................................................................................................... 14

WO 49960.2

# INDEX OF SCHEDULES

Schedule 7.01(a)    Arbitration
Schedule 8.01(A)    Disability Income Business

## ADMINISTRATIVE SERVICES AGREEMENT

THIS ADMINISTRATIVE SERVICES AGREEMENT (the "Agreement") is made and entered into as of December 7, 2001 (the "Closing Date") by and between The Lincoln National Life Insurance Company, an Indiana-domiciled stock life insurance company (the "Company") and Swiss Re Life & Health America Inc., a Connecticut corporation (the "Administrator"). Capitalized terms used herein but not defined in the text shall have the meanings ascribed to them in Article VIII of this Agreement.

WHEREAS, Lincoln National Corporation, an Indiana corporation ("LNC"), The Lincoln National Life Insurance Company, an Indiana insurance company, Lincoln National Reinsurance Company (Barbados) Limited, a Barbadian insurance company ("Lincoln Barbados"), and the Administrator have entered into a Stock and Asset Purchase Agreement, dated as of July 27, 2001 (the "Purchase Agreement"), pursuant to which the Administrator has agreed to reinsure and administer certain business of the Company; and

WHEREAS, in accordance with the terms and conditions of the Purchase Agreement, the Company and the Administrator have entered into a Coinsurance Agreement, a Modified Coinsurance Agreement and a Funds Withheld Coinsurance Agreement, all of even date herewith and referred to herein as the "Reinsurance Agreements", pursuant to which the Company, as ceding company, has ceded and transferred the Reinsured Liabilities to the Administrator, as reinsurer, and the Administrator has reinsured and assumed the Reinsured Liabilities; and

WHEREAS, the parties hereto have agreed, on the terms and conditions set forth herein, that the Administrator will perform certain administrative functions on behalf of the Company with respect to the Administered Business; and

NOW, THEREFORE, in consideration of the mutual promises and undertakings contained herein and in the Purchase Agreement and the Reinsurance Agreements, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Company and the Administrator agree as follows:

## ARTICLE I
## ADMINISTRATIVE SERVICES

**1.01    Appointment and Acceptance of Appointment.**

(a) Except as expressly provided herein or unless specifically required by Applicable Law, the Company hereby appoints the Administrator, for the period specified in Section 5.01 hereof, to provide all services required to administer the Administered Business, including, without limitation, the administrative services specified in Section 1.02 (collectively, the

"Administrative Services") and the Administrator hereby accepts such appointment and agrees to perform such Administrative Services.

(b)     The parties shall cooperate fully in the transfer of responsibility for the performance of the Administrative Services from the Company to the Administrator. All costs and expenses relating to such transfer shall be borne by the Administrator; provided, however, that no internal costs are to be allocated by the Company except pursuant to the Transition Services Agreement. The Administrator agrees to send to all counterparties to the Covered Insurance Contracts a written notice, provided by the Company prior to the Closing and reasonably acceptable to the Administrator, advising that the Administrator has been appointed by the Company to provide the Administrative Services. The Administrator shall send such notice, by first class U.S. mail, at its own expense, promptly after receipt thereof but in no event more than thirty (30) calendar days after the Closing Date.

**1.02    Administrative Services.** The Administrator agrees to perform all Administrative Services and is authorized and licensed to do so on behalf of the Company where appropriate; *provided, however*, that its performance of the Administrative Services shall comply with, and be subject in all events to, all Applicable Laws and the terms and conditions of the Administered Business. Unless specifically provided for in this Agreement or the Transition Services Agreement, and except for Legally Required Actions, as between the parties, the Company shall not be obligated to provide any services relating to the Administered Business. The Administrative Services include, without limitation, the following:

(a)     collecting Premiums and other amounts due with respect to the Administered Business;

(b)     paying for liabilities reinsured under the Reinsurance Agreements and administering claims (including, without limitation, any disputes or litigation with respect thereto), provided, that the Company shall cooperate with the Administrator by making available any information necessary to respond to any such dispute or litigation on a timely basis.

(c)     processing all necessary Tax reporting, customer notifications and collection in connection with the Administered Business;

(d)     calculating and paying all Commissions to Producers entitled thereto, if any, and compliance with any and all withholding and Tax reporting requirements of the Tax laws in connection therewith;

(e)     monitoring and complying with all applicable licensing requirements of the Company with respect to the Administered Business;

(f)     preparation of all accounting and actuarial information related to the Administered Business that is necessary to timely meet statutory, Tax or GAAP

accounting requirements, including, but not limited to, preparation of quarterly and annual financial statement data necessary for inclusion in the Company's statutory and GAAP financial statements and delivery of such data in a form usable by the Company within thirty (30) calendar days after the end of each calendar quarter or year;

(g)     administering all Outbound Retrocession Contracts and Assigned Contracts including, without limitation, paying all reinsurance premiums and collecting all reinsurance recoverables due the ceding company under the Outbound Retrocession Contracts;

(h)     subject to the terms and conditions of Section 4.01 hereof, handling all regulatory compliance and market conduct matters in connection with the Administered Business;

(i)     providing all financial, accounting and other data reasonably requested by the Company;

(j)     (i) providing information to the Company to allow the Company to fulfill its escheat filing responsibilities and (ii) otherwise fully discharging all escheat obligations to any Governmental Entity relating to Administered Business; and

(k)     providing a schedule to the Company by May 1 of each year of its calculation of the net consideration under each Reinsurance Agreement for the preceding taxable year, in order to satisfy the Company's obligations under Section 6.01(d) of each Reinsurance Agreement.

## 1.03    Legally Required Company Actions.

(a)     The Administrator will give the Company timely notice of any Legally Required Company Actions, including, without limitation, filings with insurance regulators, other Governmental Entities and guaranty associations and filings and premium and other Tax returns with taxing authorities, which, in each case, relate to the Administered Business. The Administrator will, not less than forty-five (45) calendar days prior to the date on which such filings are required, provide to the Company all information with respect to the Administered Business that may be required for the Company to prepare such filings and Tax returns in a timely fashion. However, all such information necessary for the preparation of any federal or state income Tax return will be provided by June 1st following the end of the taxable year, subject to acceleration of such due date upon the reasonable request of the Company. In addition, the Administrator will be responsible for complying with all applicable reporting, withholding and disclosure requirements under the Code and state and local Tax laws with respect to the Administered Business, and the Company will cooperate with the Administrator to the extent necessary to allow the Administrator to fulfill its responsibilities. The Company agrees to act in good faith to utilize the Administrator to the greatest extent practicable to limit

the expenses of the Company that the Administrator is required to reimburse under Section 1.03(b).

(b)     The Administrator will, promptly upon the Company's request therefor, compensate the Company for the performance of any Legally Required Company Actions; *provided, however,* that there will be no charge for *de minimis* administrative functions such as the execution of documents and similar ministerial activities. The compensation and reimbursement referred to in this Section 1.03(b) shall be based on the Company's fully-allocated costs, including a proportionate share of corporate overhead, as detailed in invoices to the Administrator.

### 1.04   Compensation.

(a)     The Administrator agrees to perform the Administrative Services with respect to the Administered Business (other than Disability Income Business) at its own expense and without any rights of reimbursement from the Company, in consideration of the Company having entered into the Purchase Agreement, the Reinsurance Agreements and other related agreements and for other good and valuable consideration, the receipt of which is hereby acknowledged.

(b)     In consideration for the provision of administrative services with respect to the Disability Income Business, the Company will pay to the Administrator an amount equal to the expense allowances provided for in the reinsurance agreement pursuant to which the Company cedes the Disability Income Business to Lincoln Re (Ireland) Limited. For the avoidance of doubt, the expense allowances referred to in the preceding sentence shall be limited to those expressed as a percentage of premiums.

### 1.05   Standards.

The Administrator acknowledges that the performance of the Administrative Services including, but not limited to, all reporting obligations to the Company required by this Agreement, in an accurate and timely manner is of critical importance to the Company. The Administrator agrees to perform the Administrative Services with the skill, diligence and expertise commonly expected from experienced and qualified personnel performing such duties and in conformance with applicable industry standards and Applicable Law. The Administrator further agrees to adhere to the Company's internal privacy guidelines and any other written guidelines and procedures regarding Administrative Services, in each case as may reasonably be agreed to by the parties from time to time. Without limiting the generality of the foregoing, the Administrator shall administer and service the Administered Business in a manner that adheres to all Applicable Laws, the terms and conditions of the Administered Business.

### 1.06   Reserve Calculations.

The Administrator shall provide the Company, not less than annually, with copies of all actuarial opinions and actuarial memoranda and all reserve evaluations pertaining to the Reserves attributable to the Covered Insurance Contracts, including, without limitation, any actuarial opinions and reserve evaluations performed by independent actuaries, auditors or other outside consultants. The Administrator shall also provide the

Company annually no later than February 20th of each year a certification of its appointed actuary that the Reserves are calculated in accordance with SAP. At the option of the Company, the Company may, at its own cost at any time following the Closing, examine the Books and Records maintained by the Administrator and review its (or the Reinsurer's (as defined in any of the applicable Reinsurance Agreements)) reserve procedures. If the results of such examination are not reasonably satisfactory to the Company, the Administrator shall, at the Company's request and expense, obtain and deliver to the Company an actuarial opinion as to the adequacy of the Reserves attributable to the Covered Insurance Contracts, produced by an independent actuary acceptable to the Company. The Administrator shall promptly adjust the amount of such Reserves and implement appropriate changes to its reserve procedures if an actuarial opinion, reserve evaluation or review, including, without limitation, any evaluation or review made by the Company, reasonably indicates an inadequacy in such Reserves or in the Administrator's (or the Reinsurer's) reserve procedures.

## ARTICLE II
## BOOKS AND RECORDS; BANK ACCOUNTS

2.01   **Transfer of Records.**  Except as provided in the Transition Services Agreement, the Company shall deliver the Books and Records to the Administrator on the Closing Date. The Books and Records and the books and records maintained by the Administrator in accordance with the terms of this Agreement shall be made available to the Company, its auditors or other designees, during normal business hours and at any time on reasonable notice, for review, inspection, and examination, and for reproduction to the extent necessary to comply with Applicable Laws, financial reporting obligations, and audit requirements, at the Company's expense (subject to Sections 1.01(b), 1.03(b) and 3.02, as applicable).

2.02   **Maintenance of Books and Records.**  The Administrator shall maintain (including, without limitation, backing up its computer files, and maintaining facilities and procedures for safekeeping and retaining documents) books and records of all transactions pertaining to the Administered Business (i) in accordance with prudent standards of insurance record-keeping and any and all Applicable Laws; and (ii) in a manner no less prudent than the manner in which such books and records are maintained by the Administrator in its other business. Upon any termination of this Agreement, the Books and Records and all books and records maintained at such time in accordance herewith by the Administrator pertaining to the Administered Business shall be delivered promptly to the Company or such other person or entity as the Company shall designate in writing.

2.03   **Quarterly Accountings and Payments.**

(a)     Beginning with and after the calendar quarter during which the Closing Date falls, the Administrator shall provide the Company with a Quarterly Accounting as of the end of each calendar quarter, no later than thirty (30) days after the end of such quarter; *provided, however,* that the Administrator shall deliver the final Quarterly Accounting no later than thirty (30) days

after the date on which this Agreements terminates in accordance with Article V hereof; *provided*, further, that in the event that subsequent data or calculations require revision of the final Quarterly Accounting, the required revision and any appropriate payments shall be made in cash by the parties five (5) Business Days after they mutually agree as to the appropriate revision. The Administrator shall provide such Accounting in a format that is mutually acceptable to the Company and the Administrator.

(b)     If a Quarterly Accounting reflects a balance due to the Company, the amount(s) shown as due shall be paid by the Administrator, on behalf of the Reinsurer, within five (5) Business Days of the delivery of the Quarterly Accounting. If (i) a Quarterly Accounting reflects a balance due to the Reinsurer and (ii) the Company does not object to the Quarterly Accounting within five (5) Business Days of its delivery, the amount(s) shown as due shall be paid by the Administrator, on behalf of the Company, to the Reinsurer within seven (7) Business Days after the date on which the Quarterly Accounting was delivered. Amounts due from either party pursuant to this Agreement shall be paid net of amounts due from the other party.

(c)     Not later than June 30 after each calendar year falling within the term of this Agreement, the Administrator shall provide the Company with an accounting of its actual premium Tax and guaranty fund assessment liability with respect to the Covered Insurance Contracts that are direct written policies for such calendar year (giving effect to any credits due to the Company for any guaranty fund assessments paid by or on behalf of the Company prior to Closing). If such accounting reflects amounts owed to the Reinsurer, the Administrator, on behalf of the Company, shall pay such amounts in cash to the Reinsurer, with the accounting. If it reflects amounts owed to the Company (including any interest or penalties relating to underpayment of estimated Taxes based on information provided by the Administrator), the Administrator, on behalf of the Reinsurer, shall pay such amounts in cash to the Company within five (5) Business Days of receiving the accounting.

**2.04   Bank Accounts and Lockboxes.**  During the term of this Agreement, the Company shall give the Administrator non-exclusive authority over the bank accounts and lockboxes of the Company to the extent used solely in the operation of the Administered Business. For the avoidance of doubt, the Administrator shall not be responsible for any funds withdrawn by the Company from such bank accounts and lockboxes. In the event the Company inappropriately withdraws any funds, the Administrator shall be entitled to offset any such inappropriate withdrawal against any amounts due the Company through the Quarterly Accounting. In addition, to the extent reasonably requested by the Administrator, the Company shall do all things reasonably necessary to enable the Administrator to open and maintain new bank accounts including, without limitation, executing and delivering such depository resolutions and other documents as may be requested by a particular bank. The Company agrees that without the Administrator's prior written consent it shall not make any changes to the authorized signatories on the Bank Accounts nor attempt to withdraw any funds therefrom. The Administrator shall own all funds deposited in the bank accounts, shall be entitled to all interest thereon, and shall pay all Taxes on such interest.

## ARTICLE III
## INABILITY TO PERFORM SERVICES, ERRORS

**3.01    Capacity.**  The Administrator shall at all times during the terms of this Agreement maintain or engage sufficient personnel, appropriately trained, and obtain and maintain all necessary licenses, authorizations, permits and qualifications from Governmental Entities under Applicable Laws as necessary to perform the Administrative Services in the manner required by this Agreement.

**3.02    Inability to Perform Services.**  In the event that the Administrator shall be unable to perform services as required by this Agreement for any reason for a period that can reasonably be expected to exceed thirty (30) Business Days, the Administrator shall provide notice to the Company of its inability to perform the services and shall cooperate with the Company in obtaining an alternative means of providing such services.  The Administrator will be responsible for all costs incurred in restoring services.

**3.03    Errors.**  The Administrator shall, at its own expense, correct any errors in Administrative Services caused by it within a reasonable time after receiving written notice thereof from the Company or other Person.

## ARTICLE IV
## REGULATORY MATTERS

**4.01    Responsibilities of the Administrator.**  Except (i) as otherwise provided by this Agreement; and (ii) with respect to any Legally Required Actions, the Administrator, on behalf of the Company, shall be responsible for filings with all state insurance department and any other Governmental Entities (including, but not limited to, filings of policy forms, riders, and amendments), compliance with all regulatory requirements and the taking of all required actions with respect to Governmental Entities relating to the Administered Business.  Nevertheless, if the Company or the Administrator receive notice of, or otherwise become aware of any inquiry, investigation, examination, audit or proceeding by Governmental Entities, relating to the Administered Business, the Company or the Administrator, as applicable, shall promptly notify the other party thereof, whereupon the parties shall cooperate in good faith to resolve such matter in a mutually satisfactory manner and shall act reasonably in light of the parties' respective interests in the matter at issue.  Notwithstanding the immediately preceding sentence, neither the Administrator nor the Company shall be relieved or discharged from any liability or obligation which it has incurred or assumed in connection with such matter under the terms of this Agreement or any of the Purchase Agreement, the Reinsurance Agreements or other Related Agreements.

## ARTICLE V
## DURATION

**5.01   Duration.**  This Agreement shall commence on the date of its execution and, shall continue until it is terminated under Section 5.02.

**5.02   Termination.**

(a) Subject to the provisions regarding survivability set forth in Section 5.03 hereof, this Agreement shall terminate:

    (i)    at any time upon the mutual written consent of the parties hereto, which writing shall state the effective date of termination, and consistent with Section 5.02(b) hereof, shall set forth in reasonable detail the procedures for transferring the Administrative Services to the Company or the Company's designee;

    (ii)    automatically upon the termination of the Reinsurance Agreements in accordance with the terms thereof;

    (iii)    at the option of the Company, upon written notice to the Administrator, on the occurrence of any of the following events:

        (A)    Administrator becomes subject to dissolution, liquidation, conservation, rehabilitation, bankruptcy, statutory reorganization, receivership, compulsory composition, or similar proceedings in any jurisdiction, or if creditors of Administrator take over its management, or if Administrator otherwise enters into any arrangement with creditors, or makes an assignment for the benefit of creditors, or if any significant part of Administrator's undertakings or property is impounded or confiscated by action of any Governmental Entity; or

        (B)    there is a material breach by the Administrator of any term or condition of this Agreement that is not cured by the Administrator within thirty (30) days of receipt of written notice from the Company of such breach or act; or

        (C)    the Administrator failed to maintain any liability policy or bond required pursuant to Article VI of this Agreement; or

        (D)    there has been a Change of Control of the Administrator; or

     (iv)   at the option of the Administrator, solely with respect to the administration of the Disability Income Business, ninety (90) days after the expiration of the Put Period (as defined in the Put Agreement) if Lincoln Barbados has not exercised the Put Right (as defined in the Put Agreement) during the Put Period.

(b)     Following any termination of this Agreement, the Administrator shall cooperate fully with the Company in effecting the prompt transfer of the Administrative Services, turning over of the authority over the bank accounts and lockboxes exercised by the Administrator hereunder and transfer of all books and records maintained by the Administrator pursuant to Section 2.02 hereof or other applicable provisions of the Purchase Agreement or Related Agreements (or, where appropriate, copies thereof) to the Company or the Company's designee, so that the Company or its designee will be able to perform the services required under this Agreement without interruption following any such termination.

(c)     Following any termination of this Agreement pursuant to Section 5.02(a)(iii), the Administrator shall reimburse the Company for any out-of-pocket cost arising as a result of such termination, including, without limitation, (i) the cost of transitioning the Administrative Services to a substitute provider or the Company, (ii) any fees paid to any such substitute provider and (iii) any costs incurred by the Company with respect the Administrative Services after termination of this Agreement.

**5.03**   **Survival.**   The provisions of Sections 2.02, 5.02(b), 5.02(c), 9.01, 9.05 and 9.10 shall survive the termination of this Agreement.

## ARTICLE VI
## INSURANCE

**6.01**   **Liability Insurance.**  The Administrator shall maintain errors and omissions liability coverages with limits in commercially prudent amounts, to cover any loss arising as a result of any real or alleged negligence, errors or omissions on the part of the Administrator's officers, agents or employees in any aspect of the performance of services under this Agreement.

**6.02**   **Fidelity Bond.**  The Administrator shall maintain fidelity bond coverage in a commercially prudent bond amount to cover any loss due to the misdeeds of the Administrator's officers, employees or agents in any respect of the performance of services under this Agreement.

**6.03**   **Qualifying Insurers.**  The Administrator shall obtain the coverages specified in Sections 6.01 and 6.02 hereof from insurers having an A.M. Best Company rating of at least A-, a Standard & Poor's Corporation insurer financial strength rating of at least BBB+ and/or a Moody's Investors Services, Inc. claims-paying ability rating of at least Baa1. In the event that the ratings of an insurer which has issued one or more of the coverages specified in Sections 6.01

and 6.02 are downgraded so that such insurer would no longer qualify to issue such coverage under the provisions of the preceding sentence, the Administrator shall promptly obtain replacement coverage from another insurer that so qualifies.

## ARTICLE VII
## ARBITRATION

7.01    **Arbitration**.  (a) After the Closing Date, any dispute between the parties with respect to the calculation of amounts that are to be calculated, reported, or that may be audited pursuant to this Agreement shall be decided through negotiation and, if necessary, arbitration as set forth in Schedule 7.01(a).

(b)    The parties intend this Section 7.01 to be enforceable in accordance with the Federal Arbitration Act (9 U.S.C., Section 1) including any amendments to that Act which are subsequently adopted.  In the event that either party refuses to submit to arbitration as required by Section 7.01(a), the other party may request the court specified in Section 9.06 to compel arbitration in accordance with the Federal Arbitration Act.

## ARTICLE VIII
## DEFINITIONS

8.01    **Definitions**.  Any capitalized term used but not defined herein shall have the meaning set forth in the Purchase Agreement.  The following terms shall have the respective meanings set forth below throughout this Agreement:

"Administered Business" means the Covered Insurance Contracts and the Disability Income Business.

"Administrative Services" has the meaning set forth in Section 1.01.

"Administrator" has the meaning set forth in the preamble.

"Agreement" has the meaning set forth in the preamble.

"Books and Records" shall have the same meaning as in the Purchase Agreement, but, under this Agreement, only as applicable to the Administered Business.

"Change of Control" means with respect to the Administrator (other than to or with an Affiliate of the Administrator) (i) a merger, consolidation, liquidation, dissolution, reorganization or share exchange to which the Administrator is not the surviving entity; (ii) a sale, transfer or other disposition of all or substantially all of the assets of the Administrator; or (iii) a sale, transfer or

other disposition or other change of ownership, directly or indirectly, of more than 50% of the capital stock of the Administrator.

"Closing Date" has the meaning set forth in the preamble.

"Commissions" means all commissions, expenses allowances, benefit credits and other fees and compensation payable to Producers.

"Covered Insurance Contracts" means all insurance policies and reinsurance agreements reinsured pursuant to the Reinsurance Agreements.

"Disability Income Business" means the business covered by the treaties described on Schedule 8.01(A).

"Legally Required Company Actions" means any actions the Company is required by Applicable Law or Governmental Entities to take without the Administrator acting on its behalf, but only to the extent such actions are directly related to the Administered Business.

"Outbound Retrocession Contracts" means all reinsurance agreements under which the Company has ceded or retroceded to reinsurers (whether Affiliates or non-Affiliates) risks with respect to the Administered Business.

"Premiums" means premiums, considerations, deposits and similar receipts with respect to the Administered Business.

"Producers" means all brokers, agents, general agents, producers or other Persons who market or produce the Administered Business.

"Purchase Agreement" has the meaning set forth in the preamble.

"Put Agreement" means that certain Put Agreement, dated as of July 27, 2001, by and between Lincoln Barbados and the Administrator.

"Quarterly Accounting" shall mean a quarterly accounting with respect to the Administered Business prepared in accordance with SAP and delivered by the Administrator to the Company in accordance with the provisions of Section 2.03 hereof.

"Reinsurance Agreements" has the meaning set forth in the preamble.

"Reinsured Liabilities" means liabilities reinsured pursuant to the Reinsurance Agreements.

"Reinsurer" has the meaning set forth in Section 1.06.

WO 49960.2                              11

"Termination Date" shall mean the date on which this Agreement is terminated in accordance with the terms and conditions of Article V hereof.

## ARTICLE IX
## MISCELLANEOUS

**9.01    Confidentiality.**    Each of the parties shall maintain the confidentiality of all information related to the Administered Business and all other information denominated as confidential by the other party provided to it in connection with this Agreement and, except as required by Applicable Law, shall not disclose such information to any third parties without prior written consent of the other party.

**9.02    Notices.**  Any notice or other communication required or permitted hereunder shall be in writing and shall be delivered personally, sent by facsimile transmission (and immediately after transmission confirmed by telephone) or sent by certified, registered or express mail, postage prepaid.  Any such notice shall be deemed given when so delivered personally or sent by facsimile transmission (and immediately after transmission confirmed by telephone) or, if mailed, on the date shown on the receipt therefor, as follows:

      (i)      If to the Company to:

The Lincoln National Life Insurance Company
1300 South Clinton Street
Fort Wayne, Indiana  46802
Attn:  General Counsel
Fax No.:  219-455-5135

With a copy to:

      Sutherland Asbill & Brennan LLP
      1275 Pennsylvania Ave., N.W.
      Washington, D.C., 20004
      Attn:  David A. Massey
      Fax No.:  (202) 637-3593

      (ii)     If to Reinsurer to:

      Swiss Re Life & Health America Inc.
      969 High Ridge Road
      Stamford, Connecticut  06905
      Attn:  W. Weldon Wilson
      Fax No.:  (203) 968-0920

With a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
One Beacon Street
Boston, Massachusetts 02108
Attn: David T. Brewster
Fax No.: (617) 573-4822

Any party may, by notice given in accordance with this Section 9.02 to the other parties, designate another address or person for receipt of notices hereunder.

     **9.03    Entire Agreement.** This Agreement, the other Related Agreements and the Purchase Agreement contain the entire agreement between the Company and the Administrator with respect to the subject matter hereof and supersede all prior agreements, written or oral, with respect thereto except that the Confidentiality Agreement shall remain in full force and effect in accordance with its terms.

     **9.04    Waivers and Amendments; Preservation of Remedies.** This Agreement may be amended, superseded, canceled, renewed or extended, and the terms hereof may be waived, only by a written instrument signed by all of the parties or, in the case of a waiver, by the party waiving compliance. No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right, power, remedy or privilege, nor any single or partial exercise of any such right, power, remedy or privilege, preclude any further exercise thereof or the exercise of any other such right, remedy, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies that any party may otherwise have at law or in equity.

     **9.05    Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without giving effect to the principles of conflicts of laws thereof.

     **9.06    Jurisdiction.** Each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of any state or federal court sitting in New York, New York. In any such action, suit or other proceeding, each of the parties hereto irrevocably and unconditionally waives and agrees not to assert by way of motion, as a defense or otherwise any claims that it is not subject to the jurisdiction of the above court, that such action or suit is brought in an inconvenient forum or that the venue of such action, suit or other proceeding is improper. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 9.02 shall be deemed effective service of process on such party.

     **9.07    Binding Effect; No Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, assigns and legal representatives, whether by merger, consolidation or otherwise. This Agreement may not be assigned by any party without the prior written consent of the other party hereto.

**9.08    No Third Party Beneficiaries.** Except as otherwise expressly set forth in any provision of this Agreement, nothing in this Agreement is intended or shall be construed to give any Person, other than the parties hereto, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.

**9.09    Expenses.** Regardless of whether any or all of the transactions contemplated by this Agreement are consummated, and except as otherwise provided herein, the parties hereto shall each bear their respective expenses incurred in connection with the negotiation, preparation, execution, and performance of this Agreement and the transactions contemplated hereby, including, without limitation, all fees and expenses of agents, representatives, investment bankers, counsel, actuaries and accountants.

**9.10    Counterparts.** This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument. Each counterpart may consist of a number of copies hereof each signed by less than all, but together signed by all of the parties hereto. Each counterpart may be delivered by facsimile transmission, which transmission shall be deemed delivery of an originally executed document.

**9.11    Headings.** The headings in this Agreement are for reference only, and shall not affect the interpretation of this Agreement.

**9.12    Severability.** Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. If any provision of this Agreement is so broad as to be unenforceable, that provision shall be interpreted to be only so broad as is enforceable.

[The rest of this page intentionally left blank.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed effective this 7ᵗʰ day of December , 200 1 .

THE LINCOLN NATIONAL LIFE INSURANCE COMPANY

By: _Will 11. Ty_____
Name:  William K. Tyler
Title: Senior Vice President

SWISS RE LIFE & HEALTH AMERICA INC.

By:_____
Name: Chris C. Stroup
Title: President and Chief Executive Officer

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed effective this 17th day of December , 200 1 .

THE LINCOLN NATIONAL LIFE INSURANCE COMPANY

By: _____

Name: William K. Tyler

Title: Senior Vice President

SWISS RE LIFE & HEALTH AMERICA INC.

By: _____

Name: Chris C. Stroup

Title: President and Chief Executive Officer

9

10

## SCHEDULE 7.01(a)
## ARBITRATION

The Company and Reinsurer intend that any dispute between them under or with respect to this Agreement be resolved without resort to any litigation.  Accordingly, the Company and Reinsurer agree that they will negotiate diligently and in good faith to agree on a mutually satisfactory resolution of any such dispute; provided, however, that if any such dispute cannot be so resolved by them within sixty calendar days (or such longer period as the parties may agree) after commencing such negotiations, the Company and Reinsurer agree that they will submit such dispute to arbitration in the manner specified in, and such arbitration proceeding will be conducted in accordance with, the Commercial Arbitration Rules of the American Arbitration Association.

The arbitration hearing will be before a panel of three disinterested arbitrators, each of whom must  be a present or former officer of a life insurance or life reinsurance company familiar with the life reinsurance business. The Company and Reinsurer will each appoint one arbitrator by written notification to the other party within thirty calendar days after the date of the mailing of the notification initiating the arbitration. These two arbitrators will then select the third arbitrator within sixty calendar days after the date of the mailing of the notification initiating arbitration.

If either the Company and Reinsurer fails to appoint an arbitrator, or should the two arbitrators be unable to agree upon the choice of a third arbitrator, the president of the American Arbitration Association or of its successor organization or (if necessary) the president of any similar organization designated by lot of the Company and Reinsurer within thirty calendar days after the request will appoint the necessary arbitrators.

The arbitrators shall base their decision on the terms and conditions of this Agreement. However, if the terms and conditions of this Agreement do not explicitly dispose of an issue in dispute between the parties, the arbitrators may base their decision on the customs and practices of the life insurance and life reinsurance industry rather than solely on an interpretation of Applicable Law.  The vote or approval of a majority of the arbitrators will decide any question considered by the arbitrators.  The place of arbitration will be determined by the arbitrators. Each decision (including without limitation each award) of the arbitrators will be final and binding on all parties and will be nonappealable, and (at the request of either the Company and Reinsurer) any award of the arbitrators may be confirmed by a judgment entered by the court specified in Section 9.06.  In no event, may the arbitrators award punitive or exemplary damages. Each party will be responsible for paying (a) all fees and expenses charged by its respective counsel, accountants, actuaries, and other representatives in conjunction with such arbitration and (b) one-half of the fees and expenses charged by each arbitrator.

## SCHEDULE 8.01(A)
## DISABILITY INCOME BUSINESS

| **Issuing Insurer/Reinsurer** | **Effective Date** |
|---|---|
| 1. Monarch Life Insurance Company | January 1, 1990 |
| 2. The Penn Mutual Life Insurance Company | January 1, 1995 |
| 3. Hartford Life Insurance Company | January 1, 1996 |
| 4. Hartford Life & Accident Insurance Company | January 1, 1996 |
| 5. Disability Income Contracts excluded from the LNL, LLANY – Metropolitan Life Asset Purchase Agreement | May 10, 1999 |
| 6. Commutation agreement entered into by Lincoln Life and Paul Revere | July 25, 2000. |

9