# EXHIBIT D



**Lincoln**
**Financial Group**
Lincoln Re

# INDEMNITY REINSURANCE
# AGREEMENT

**Effective as of June 30, 2001,**

between

## THE LINCOLN NATIONAL LIFE INSURANCE COMPANY
of
Fort Wayne, Indiana,

referred to as the "Ceding Company,"

and

## LINCOLN RE (IRELAND) LIMITED
of
Dublin, Ireland,

referred to as the "Reinsurer."

| | |
|---|---|
| Inspected By | _____ |
| Date | _____ |
| Doc | 010496df.agm |
| CCN/Agmt. No. | 694 - 210 / 10553 - 1 |

# TABLE OF CONTENTS

|  | Page |
|---|---|
| Reinsurance Coverage | 1 |
| Payments by Ceding Company | 1 |
| Payments by Reinsurer | 2 |
| Funds Withheld Account | 2 |
| Portfolio | 3 |
| Excise Taxes | 3 |
| Reports and Accounting for Reinsurance | 4 |
| Terms of Reinsurance | 5 |
| Material Changes | 6 |
| Arbitration | 7 |
| Insolvency of the Ceding Company | 7 |
| Offset | 8 |
| Acknowledgments | 8 |
| Termination | 9 |
| Payments and Accounting Upon Termination of Agreement | 9 |
| Jurisdiction and Service of Suit | 10 |
| Miscellaneous | 11 |
| Definition of Terms | 12 |
| Execution | 14 |
| SCHEDULE I | |
| QUOTA SHARE AND POLICIES SUBJECT TO REINSURANCE | 16 |
| SCHEDULE II, PART A | |
| SUMMARY OF MONETARY TRANSACTIONS | 17 |
| SCHEDULE II, PART B | |
| SUMMARY OF MONETARY TRANSACTIONS | 18 |
| SCHEDULE III | |
| ANNUAL REPORT | 19 |
| SCHEDULE IV | |
| ALLOWANCES | 20 |
| SCHEDULE V | |
| INVESTMENT INCOME RATE | 21 |
| SCHEDULE VI | |
| ARBITRATION SCHEDULE | 22 |
| SCHEDULE VII | |
| CEDING COMPANY INFORMATION | 24 |
| SCHEDULE VIII | |
| INVESTMENT POLICY | 25 |

**Reinsurance Coverage**

1. The Ceding Company shall cede, and the Reinsurer shall accept, reinsurance of a Quota Share of the Policies, including active and disabled lives, on a coinsurance basis, without regard to whether the reinsured liability arose or arises prior to, on or after the Effective Date. For the avoidance of doubt, the reinsurance hereunder shall include reinsurance of claims in the course of settlement and claims being litigated.

2. The Effective Date of this Agreement is June 30, 2001.

3. Reinsurance of a Policy shall be maintained in force without reduction so long as the liability of the Ceding Company under such Policy remains in force without reduction, unless reinsurance is terminated or reduced as provided herein.

4. In no event shall reinsurance be in force under this Agreement for a Policy unless the Policy's issue and delivery complies with the laws of all applicable jurisdictions and the Issuing Insurer's corporate charter.

**Payments by Ceding Company**

1. To effect reinsurance on Policies in force on the Effective Date, the Ceding Company shall pay the Reinsurer an initial reinsurance premium on the Execution Date equal to the Quota Share of the Reserves on the Effective Date less the Lump Sum Allowance.

2. For each Accounting Period the Ceding Company shall pay the Reinsurer a reinsurance premium equal to the Quota Share of gross premiums the Ceding Company incurs during an Accounting Period pursuant to the Policies less reinsurance premiums incurred by the Ceding Company for Other Reinsurance during the Accounting Period.

3. The Ceding Company shall retain the gross investment income derived from the assets held by the Ceding Company in the funds withheld account, but shall pay the Reinsurer investment income which shall be equal to (a) times (b) times the sum of (c) plus (d), where

   (a) equals the Investment Income Rate earned on the Portfolio; and

   (b) equals one-half the ratio of the number of days in the current Accounting Period to the number of days in the current calendar month; and

   (c) equals the funds withheld account balance on the Last Day Of The Current Accounting Period, except that for the Terminal Accounting

Period it shall equal the funds withheld account balance immediately prior to termination; and

(d) equals the funds withheld account balance on the Last Day Of The Preceding Accounting Period, except that for the Initial Accounting Period it shall equal the funds withheld account balance on the Effective Date.

**Payments by Reinsurer**

1. The Reinsurer shall reimburse its Quota Share of the following amounts incurred or paid (without double counting) by the Ceding Company:
   (a) Benefits;
   (b) Expenses;
   provided that each of the amounts listed above shall be computed net of amounts actually recovered from Other Reinsurance.
2. For each Accounting Period the Reinsurer shall pay the Ceding Company a Periodic Allowance.
3. The Reinsurer shall reimburse the Ceding Company for any state premium taxes the Ceding Company may be required to pay with respect to the Policies.

**Funds Withheld Account**

1. The Ceding Company shall maintain a funds withheld account during the term of this Agreement.
2. Simultaneously with the payment of the initial reinsurance premium by the Ceding Company pursuant to paragraph 1 of the "Payments by Ceding Company" article, the Ceding Company shall withhold from the Reinsurer an amount equal to the difference between the Quota Share of the Reserves as of the Effective Date and the Lump Sum Allowance. This amount shall be the initial balance of the funds withheld account.
3. The balance of the funds withheld account as of the Last Day Of The Current Accounting Period shall equal the result of the following computation:
   (a) The balance of the funds withheld account as of the Last Day Of The Preceding Accounting Period; plus
   (b) The Reserve Change;
   provided, however, the balance of the funds withheld account may not be less than zero (0).

019496df.v02
694 - 210 / 10553 - 1

Page 2

4.  Payments made to the Ceding Company by the Reinsurer pursuant to the "Payments by Reinsurer" article shall be reduced by any decrease in, and increased by any increase in, the funds withheld account during the Accounting Period.

**Portfolio**

1.  Ceding Company may use its discretion in managing the assets in the Portfolio. The Reinsurer may only challenge Ceding Company's investment strategy and buy/sell decisions with respect to the Portfolio if Ceding Company fails to maintain a reasonable matching between assets and liabilities. Notwithstanding the preceding, Ceding Company shall take due consideration of any recommendations made by the Reinsurer regarding Ceding Company's investment strategy or its individual buy/sell decisions. Assets to be held by the Ceding Company in the Portfolio are limited to the following types of assets:
    (a) cash;
    (b) certificates of deposit issued by any national or state chartered bank or savings and loan association;
    (c) United States Government or Canadian Government issued or guaranteed bonds, bills, or notes, or United States Government money market funds;
    (d) any other bonds with a Standard & Poor's or Moody's quality rating of "Baa/BBB" or better; or
    (e) any other instruments agreed to by the parties hereto evidenced by a written amendment to this Agreement.
2.  The current investment policy for the portfolio is attached hereto as Schedule VIII.

**Excise Taxes**

1.  The Reinsurer represents that
    (a) pursuant to the provisions of the United States-Ireland Income Tax Treaty, it is eligible for the exemption to the excise tax imposed by Section 4371 of the Internal Revenue Code with respect to any premium paid by the Ceding Company under this Agreement; and

(b) it will remit the excise tax, together with any appropriate return or other filing, to the Internal Revenue Service or other permitted or required taxing authority, if it retrocedes, or otherwise reinsures, any risk under this Agreement to any non-United States person that is not eligible for an exemption to such excise tax.

2.  Notwithstanding any other provision hereof, in the event that any premium payment made hereunder is, in the discretion of the Ceding Company, subject to such excise tax, the Ceding Company shall withhold such tax from the premium payable by the Ceding Company and shall remit such tax, together with any appropriate return or other filing, to the Internal Revenue Service or other permitted or required taxing authority.

3.  In the event that any premium payment paid by the Ceding Company hereunder is not exempt from such excise tax, the Reinsurer shall indemnify and hold the Ceding Company harmless from any and all excise taxes and related interest, penalties, or additional amounts imposed on, paid by or collected from the Ceding Company in respect of such premiums. The Reinsurer's obligation hereunder shall not be reduced or affected by the Ceding Company's failure to withhold such taxes under paragraph 2.

**Reports and Accounting for Reinsurance**

1.  The Ceding Company shall notify the Reinsurer of reinsurance ceded pursuant to this Agreement by means of the reports specified in this article.

2.  The Ceding Company shall summarize all monetary transactions under this Agreement by submitting a written report within thirty (30) days following the end of each month. The report shall be formatted as set forth in Schedule II, Parts A and B. Any amounts shown in such reports as due from the Ceding Company shall be paid by the Ceding Company when submitting the reports to the Reinsurer. If a report shows an amount due from the Reinsurer, the amount shall be paid by the Reinsurer within thirty (30) days of its receipt of such report.

3.  The reports and reconciliations prescribed in paragraph 2 shall be considered preliminary reports and reconciliations only. The Ceding Company shall calculate a final report and reconcile any amounts owed for the Accounting Period

within thirty (30) days following the end of such Accounting Period. Payments previously made by either party during the Accounting Period shall be taken into account in determining final amounts due for such Accounting Period. If any amount cannot be determined on an exact basis on the date the final monetary summary and reconciliation is due, an estimated payment shall be made and any final adjustments shall be made as soon as practicable.

4.  Amounts due from either party pursuant to this Agreement shall be paid net of amounts due from the other party.

5.  The Ceding Company shall provide the Reinsurer with information about the Policies which the Reinsurer may need to prepare its financial statements, including but not limited to information described in Schedule II and III. Such information shall be submitted at the end of each calendar year. A preliminary report shall be provided within ten (10) days following the end of each calendar year and a final report shall be provided within sixty (60) days following the end of the calendar year.

6.  If the Ceding Company ever becomes aware that its summary of monetary transactions for an Accounting Period as required in this article did not accurately reflect the actual experience of the Policies during the Accounting Period, it shall promptly submit a revised summary to the Reinsurer. Any amount shown by the revised summary as owed by either the Ceding Company or the Reinsurer to the other shall be paid promptly.

7.  The Reinsurer may unilaterally change Schedules II and III in order to obtain the data required to administer this Agreement or to prepare its financial statements, provided such data is readily available from the Ceding Company.

## Terms of Reinsurance

1.  All monetary amounts expressed in this Agreement are expressed in United States dollars and all amounts payable pursuant to this Agreement are payable in United States dollars.

2.  This is an Agreement for indemnity reinsurance solely between the Ceding Company and the Reinsurer. The acceptance of reinsurance hereunder shall not create any right or legal relation whatever between the Reinsurer and any person other than the Ceding Company.

010096dK-02
694-210/10353-1

3. The Reinsurer shall not participate in capital gains and losses of the Ceding Company other than as may be reflected in the computation of the Investment Income Rate. No part of the gains and losses of the Ceding Company from, or considered as from, sales and exchanges of capital assets supporting the Quota Share of the Reserves shall be treated as gains and losses from sales and exchanges of capital assets of the Reinsurer.

4. In the event of the insolvency of the Issuing Insurer, the Ceding Company's inability to collect amounts owed to it by the Issuing Insurer with respect to Policies, including, but not limited to, the Ceding Company's inability to offset or to net amounts owed to it against amounts owed by it, shall reduce any amount owed by the Ceding Company to the Reinsurer, or increase any amount owed by the Reinsurer to the Ceding Company, whichever is applicable.

5. The Reinsurer shall take all reasonable steps to assist the Ceding Company in receiving statutory credit for reinsurance ceded pursuant to this Agreement in its interim and annual financial statements submitted to the Indiana Insurance Department and New York Insurance Department, including establishing Reserves on the Quota Share of the Policies and notifying the Ceding Company regarding the amount of such Reserves as required by Regulation 20 of the New York Insurance Department in effect on the Effective Date.

**Material Changes**

1. The Ceding Company shall promptly notify the Reinsurer of any Material Change in the terms of the Policies, in the method used to calculate Reserves for the Policies or in its Other Reinsurance.

2. Following a Material Change agreed to by the Ceding Company, the Reinsurer may in its sole discretion
    (a) continue to reinsure the Policies under current terms;
    (b) retroactively adjust its Quota Share of the Policies to compensate for the Material Change; or
    (c) implement a combination of (a) and (b).

3. The rights set forth in paragraph 2 above shall not apply where a Material Change is imposed by law, regulation or otherwise and not subject to the Ceding Company's approval.

**Arbitration**

1. If the Ceding Company and the Reinsurer cannot mutually resolve a dispute regarding the interpretation or operation of this Agreement, the dispute shall be decided through arbitration as set forth in Schedule VI. The arbitrators shall base their decision on the terms and conditions of this Agreement. However, if the terms and conditions of this Agreement do not explicitly dispose of an issue in dispute between the parties, the arbitrators may base their decision on the customs and practices of the insurance and reinsurance industry rather than solely on an interpretation of applicable law. The arbitrators' decision shall take into account the right to offset mutual debts and credits as provided in this Agreement. There shall be no appeal from the arbitrators' decision. Any court having jurisdiction over the subject matter and over the parties may reduce the arbitrators' decision to judgment.

2. The parties intend this article to be enforceable in accordance with the Federal Arbitration Act (9 U.S.C., Section 1) including any amendments to that Act which are subsequently adopted. In the event that either party refuses to submit to arbitration as required by paragraph 1, the other party may request a United States Federal District Court to compel arbitration in accordance with the Federal Arbitration Act. Both parties consent to the jurisdiction of such court to enforce this article and to confirm and enforce the performance of any award of the arbitrators.

**Insolvency of the Ceding Company**

1. In the event of the insolvency of the Ceding Company and the appointment of a conservator, liquidator or statutory successor of the Ceding Company, reinsurance shall be payable to such conservator, liquidator or statutory successor on the basis of claims allowed against the Ceding Company by any court of competent jurisdiction or by the conservator, liquidator or statutory successor of the Ceding Company without diminution because of the insolvency of the Ceding Company or because such conservator, liquidator or statutory successor has failed to pay all or a portion of any claims.

2. In the event of the insolvency of the Ceding Company, the conservator, liquidator or other statutory successor of the Ceding Company agrees to give the Reinsurer written notice of the pendency of a claim on a Policy within a reasonable time after such claim is filed in the insolvency

010496dCv02
694 - 210 / 10553 - 1

proceeding. During the pendency of any such claim, the Reinsurer may investigate the claim and interpose in the proceeding where such claim is to be adjudicated in the name of the Ceding Company (its conservator, liquidator or statutory successor), but at its own expense, any defense or defenses which the Reinsurer may deem available to the Ceding Company or its conservator, liquidator or statutory successor.

3. The Reinsurer may charge a Quota Share of the expense thus incurred by it, subject to court approval, against the Ceding Company as part of the expense of liquidation.

**Offset**

Any debts or credits, matured or unmatured, liquidated or unliquidated, regardless of when they arose or were incurred, in favor of or against either the Ceding Company or the Reinsurer with respect to this Agreement or any other agreement between the parties or any other claim of one party against the other are deemed to be mutual debts or credits, as the case may be, and shall be set off and only the balance shall be allowed or paid.

**Acknowledgments**

1. The Ceding Company acknowledges having provided the Reinsurer with the documents and materials listed in Schedule VII prior to the Execution Date.

2. The Ceding Company affirms that all factual information contained in these documents was, as of the date of their making, correct and accurate in all material respects to the best of the Ceding Company's knowledge and belief.

3. The Ceding Company affirms to the best of its knowledge and belief that there has been no Material Change in the expected profitability of the Policies between the "as of" date of the documents listed and described in paragraph 1 and the Execution Date.

4. The Ceding Company makes no representations and warranties as to the actual experience or profitability to be realized from the Policies beyond the date of the execution of this Agreement.

5. The Ceding Company acknowledges its responsibility for independently forming its own conclusions regarding
    (a) the compliance of this Agreement with the laws and regulations of any particular state or jurisdiction;

(b) the statutory or other accounting impact of this Agreement on the Ceding Company's financial statements; and

(c) the tax impact of this Agreement on the Ceding Company.

6. Unless otherwise explicitly provided for herein, the Ceding Company and the Reinsurer shall each be solely responsible for determining and discharging any income tax liability resulting from this Agreement, including any tax liability resulting from the initial monetary transactions.

## Termination

1. Except as otherwise provided in this article, this Agreement shall be unlimited in duration.

2. If none of the Policies are in force as of the end of any Accounting Period, this Agreement shall automatically terminate as of the day the last Policy terminated.

3. If the Ceding Company fails to pay reinsurance premiums when due, the Reinsurer may terminate this Agreement with respect to all reinsurance hereunder. To effect such termination, the Reinsurer shall give the Ceding Company written notice of termination. The Ceding Company may avoid termination by paying all delinquent reinsurance premiums, plus all additional reinsurance premiums that may have become due, within thirty (30) days following its receipt of notice of termination. Termination shall be effective as of the last date to which reinsurance premiums had been paid.

4. The termination of this Agreement or of any reinsurance hereunder shall not affect any rights or obligations of either party applicable to the period prior to the effective date of termination.

## Payments and Accounting Upon Termination of Agreement

1. If this Agreement is terminated, the Ceding Company shall summarize all monetary transactions for the Terminal Accounting Period and report its summary to the Reinsurer within thirty (30) days of the later of the effective date of termination or of notice of termination. The report shall be in the form of Schedule II, Parts A and B.

2. The Reinsurer shall pay the Ceding Company an amount equal to the Reserves immediately prior to termination, less the balance of the funds withheld account.

3. Following the summarization of all monetary transactions and payment of any amounts due for the Terminal

010498df.w02
694 - 210 / 10553 - 1

Page 9

Accounting Period, neither the Ceding Company nor the Reinsurer shall owe the other any additional payment or amount pursuant to this Agreement. The Reinsurer shall not owe the Ceding Company any amount as an allowance upon termination, and the balance of the funds withheld account as of the end of the Terminal Accounting Period shall have been reduced to zero (0).

4. The Ceding Company shall provide the Reinsurer with information the Reinsurer may need to prepare its financial statements for the Terminal Accounting Period as required by the "Reports and Accounting for Reinsurance" article.

5. If the Ceding Company ever becomes aware that its summary of monetary transactions for the Terminal Accounting Period as required in this article did not accurately reflect the actual experience of the Policies during the Terminal Accounting Period, it shall promptly submit a revised summary to the Reinsurer. Any amount shown by the revised summary as owed by either the Ceding Company or the Reinsurer to the other shall be paid promptly.

**Jurisdiction and Service of Suit**

1. If the Reinsurer fails to perform any of its obligations under this Agreement, the Ceding Company may request the Reinsurer to submit to the jurisdiction of a court of competent jurisdiction within any state of the United States. The Reinsurer shall comply with all reasonable requirements necessary to give such court jurisdiction over it and shall abide by the final decision of such court or of any appellate court in the event of an appeal.

2. The Reinsurer hereby designates the Commissioner of Insurance of the Ceding Company's state of domicile as its true and lawful attorney within such state upon whom any lawful process in any action, suit, or proceeding instituted by or on behalf of the Ceding Company may be served.

3. This article is not intended to conflict with or override the obligation of the parties to arbitrate disputes hereunder. Consequently, it shall only apply as necessary to enforce the terms of the "Arbitration" article or to enforce a written decision of the arbitrators.

**Miscellaneous**

1. Certain terms used in this Agreement are defined in the "Definition of Terms" article and are to be interpreted in accordance with such definitions. In the absence of a specific definition, a term used in this Agreement is to be interpreted in accordance with customary insurance and reinsurance industry practices.

2. References in this Agreement to specific lines, pages and exhibits of the statutory financial statement refer to such lines, pages and exhibits as of the Effective Date. Changes in the statutory financial statement which affect such items shall modify references in this Agreement so as to keep such references current with the statutory financial statement, provided such modification does not alter the rights and obligations of either party.

3. Any Error made by either the Ceding Company or the Reinsurer in the administration of reinsurance under this Agreement shall be corrected by submitting revised reports and restoring both the Ceding Company and the Reinsurer to the positions they would have occupied had no Error occurred.

4. The Reinsurer may audit, at any reasonable time and at its own expense, all records and procedures relating to reinsurance under this Agreement. The Ceding Company shall cooperate in the audit, including providing any information requested by the Reinsurer in advance of the audit. Further, the Ceding Company agrees to complete, at the request of the Reinsurer and in a manner acceptable to the Reinsurer, a process which confirms the existence of the Policies. The Ceding Company shall continue to review, in accordance with its current practices, all reports and other materials received from the Issuing Insurers with respect to the reinsurance agreements identified on Schedule 1. In addition, the Ceding Company shall, at the Reinsurer's expense, take such actions as may be reasonably requested by the Reinsurer to enforce the Ceding Company's rights under such agreements.

5. In the event that any of the Policies are continued into Continuation Policies issued by the Issuing Insurer, its successor or any of its affiliates, the Continuation Policies shall be reinsured under this Agreement. The Reinsurer shall instruct the Ceding Company with respect to the Ceding Company's rights on Continuation Policies. The Ceding Company shall carry out the Reinsurer's instruction on a timely basis.

6.  Neither the Ceding Company nor the Reinsurer may assign any of the rights and obligations under this Agreement, nor may either party sell, assumption reinsure or transfer the Policies without the prior written consent of the other party. Consent will not be withheld if the assignment, sale, assumption reinsurance or transfer does not have a material effect on the risks transferred or the expected economic results to the party requested to consent. This provision shall not prohibit the Reinsurer from reinsuring the Policies on an indemnity basis.

7.  This Agreement represents the entire agreement between the Ceding Company and the Reinsurer and supercedes, with respect to its subject matter, any prior oral or written agreements between the parties.

8.  No modification of any provision of this Agreement shall be effective unless set forth in a written amendment to this Agreement which is executed by both parties.

9.  A waiver shall constitute a waiver only with respect to the particular circumstance for which it is given and not a waiver of any future circumstance.

### Definition of Terms

1.  Accounting Period - for the month in which this Agreement becomes effective, the period beginning on the Effective Date and ending on the Last Day Of The Current Accounting Period. Thereafter, the period beginning on the day following the Last Day Of The Preceding Accounting Period and ending on the Last Day Of The Current Accounting Period.

2.  Agreement - this document and all schedules and amendments to it.

3.  Benefits - the health benefits and any other benefits paid by the Issuing Insurer pursuant to the Policies or with respect to any claims thereunder.

4.  Continuation Policy - a new Policy changing or replacing a Policy made or issued either
    (a) in compliance with the terms of the Policy; or
    (b) without the same new underwriting information that the Issuing Insurer would obtain in the absence of the Policy, without a contestable period as long as those contained in new issues of the Issuing Insurer, or without the payment of the same commissions in the first year that the Issuing Insurer would have paid in the absence of the Policy.

810496dC v02
694 - 210 / 10553 - 1

5.  **Effective Date** - the date set forth in paragraph 3 of the "Reinsurance Coverage" article.

6.  **Error** - any isolated, inadvertent deviation from the terms of this Agreement resulting from the act or omission of an employee of either the Ceding Company or the Reinsurer whose principal function is administrative in nature.

7.  **Execution Date** - the date this Agreement is signed by the last of the parties to sign it.

8.  **Expenses** - any and all charges including, for the avoidance of doubt, litigation expenses incurred by the Issuing Insurer which are reimbursed by the Ceding Company.

9.  **Investment Income Rate** - the interest rate set forth in Schedule V.

10. **Issuing Insurer** - the insurance company referred to as such in Schedule I.

11. **Last Day Of The Current Accounting Period** - the last day of the calendar month for which the calculation is being made.

12. **Last Day Of The Preceding Accounting Period** - the last day of the preceding calendar month.

13. **Lump Sum Allowance** - the amount set forth in Schedule IV.

14. **Material Change** - a change that a prudent insurance executive would consider as likely to have a material impact on the Reinsurer's experience under this Agreement.

15. **Other Reinsurance** - reinsurance other than reinsurance provided pursuant to this Agreement which inures to the Ceding Company's benefit with respect to the Policies.

16. **Periodic Allowance** - the amount described in Schedule IV.

17. **Policy(ies)** - the insurance policy(ies) identified in Schedule I which are reinsured pursuant to this Agreement.

18. **Portfolio** - the Monarch Life Insurance Company asset portfolio (LNL01024) maintained by the Ceding Company.

19. **Quota Share** - the percentage of the Policies set forth in Schedule I which is ceded by the Ceding Company to the Reinsurer pursuant to this Agreement.

20. **Reserve Change** - the increase in the Reserves from the Last Day Of The Preceding Accounting Period to the Last Day Of The Current Accounting Period.

0104960f.v02
694 - 210 / 10553 - 1

21. Reserves - the active life and disabled life reserves and claim liabilities calculated and reported by the Monarch Life Insurance Company pursuant to the reinsurance agreements identified in Schedule I and active life and disabled life reserves and claim liabilities calculated by the Ceding Company for other business identified in Schedule I.

22. **Terminal Accounting Period** - the period commencing on the day following the Last Day Of The Preceding Accounting Period and ending on the effective date of termination pursuant to any notice of termination given under this Agreement or such other date as shall be mutually agreed to in writing.

**Execution**

The Ceding Company and the Reinsurer, by their respective officers, executed this Agreement in duplicate on the dates shown below.  As of the Effective Date, this Agreement consists of

- this Indemnity Reinsurance Agreement numbered 210 / 1;
- Schedule I, Quota Share and Policies Subject to Reinsurance;
- Schedule II, Part A, Summary of Monetary Transactions;
- Schedule II, Part B, Summary of Monetary Transactions;
- Schedule III, Annual Report;
- Schedule IV, Allowances;
- Schedule V, Investment Income Rate;
- Schedule VI, Arbitration Schedule;
- Schedule VII, Ceding Company Information; and
- Schedule VIII, Investment Policy.

010496df.v02
894 - 210 / 10553 - 1

## THE LINCOLN NATIONAL LIFE INSURANCE COMPANY

Signed in _Ft Wayne, In_

By _[signature]_
Senior Vice President

Date _6/29/01_

By _[signature]_
Assistant Secretary

Date _6-29-01_

## LINCOLN RE (IRELAND) LIMITED

Signed in Dublin, Ireland

By _[signature]_
Managing Director

Date _29 June 2001_

# SCHEDULE I
(Effective as of June 30, 2001)
to
Agreement Number 210 / 1

## QUOTA SHARE AND POLICIES SUBJECT TO REINSURANCE

A one hundred percent (100%) Quota Share of the insurance Policies reinsured by the Ceding Company pursuant to an indemnity reinsurance agreements effective as shown below between the Ceding Company and the following Issuing Insurer:

| Issuing Insurer | Agreement Effective Date |
|---|---|
| Monarch Life Insurance Company | January 1, 1990 |
| The Penn Mutual Life Insurance Company | January 1, 1995 |
| Hartford Life Insurance company | January 1, 1996 |
| Hartford Life And Accident Insurance Company | January 1, 1996 |

D10496df.v02
694 - 210 / 10353 - 1

Page 16

# SCHEDULE II, PART A

**(Effective as of June 30, 2001)**

to

Agreement Number 210 / 1


## SUMMARY OF MONETARY TRANSACTIONS

for the period from _____ to _____

with respect to the following Quota Share of the Policies: _____

1. Initial reinsurance premium (first Accounting Period only)
   [(a) - (b)]
   (a) Reserves
   (b) Lump Sum Allowance

2. Gross premiums
3. Premiums – Other Reinsurance
4. Net Premiums [(2) - (3)]

5. Investment Income [((5a) x (5b))] x [(5c) + (5d)]
   (a) Investment Income Rate
   (b) One-half actual days in the current Accounting Period divided by calendar days in the current calendar month
   (c) Funds withheld balance Last Day Of The Current Accounting Period
   (d) Funds withheld balance Last Day Of The Preceding Accounting Period

6. Benefits
7. Benefits – Other Reinsurance
8. Net Benefits [(6) - (7)]

9. Other reimbursement net of Other Reinsurance
   Expenses

10. Periodic Allowance

11. Reserves - Last Day Of The Preceding Accounting Period
12. Reserves - Last Day Of The Current Accounting Period
13. Reserve Change [(12) - (11)]

# SCHEDULE II, PART B

**(Effective as of June 30, 2001)**

to

Agreement Number 210 / I'

## SUMMARY OF MONETARY TRANSACTIONS

for the period from _____ to _____

1. Due Reinsurer

    Initial reinsurance premium (1) (first period only)
    Net premiums (4)
    Investment Income (5)

    Total Due - Reinsurer

2. Due Ceding Company

    Net Benefits (8)
    Other Reimbursements (9)
        Expenses
    Periodic Allowance (10)

    Total Due - Ceding Company

3. Gross Due Reinsurer (1 less 2)

4. Funds withheld account
    (Last Day Of The Current Accounting Period)

5. Funds withheld account
    (Last Day Of The Preceding Accounting Period, equals zero (0) for first
    Accounting Period)

6. Amount Due Reinsurer (if positive) or Due Ceding Company (if negative)
    (3 less 4 plus 5)

7. Amounts Previously Paid for Accounting Period

8. Net Amount Due (6 less 7)

010496df.v02
694 - 210 / 10553 - 1

Page 18

# SCHEDULE III

(Effective as of June 30, 2001)

to

Agreement Number 210 / I

## ANNUAL REPORT

The annual report shall provide the following information:
- An actuarial opinion on the reported Reserves

010496d0.v02
694 - 210 / 10553 - 3

# SCHEDULE IV

(Effective as of June 30, 2001)

to

Agreement Number 210 / 1

## ALLOWANCES

### Lump Sum Allowance

The Lump Sum Allowance equals five million five hundred thousand dollars ($5,500,000), adjusted for the tax effect of the initial Lump Sum Allowance on the Reinsurer.

### Periodic Allowance

The amount of Periodic Allowances shall be equal to the allowances paid by the Ceding Company on the business reinsured, net of allowances actually recovered from Other Reinsurance, plus expenses equal to .5% of premiums.

010496dl.v02
694 - 210 / 10553 - 1

# SCHEDULE V

(Effective as of June 30, 2001)
to
Agreement Number 210 / 1

## INVESTMENT INCOME RATE

The Investment Income Rate shall be equal to the net of

(1)   the net investment income, including realized capital gains and losses earned for the Accounting Period by Ceding Company from investing the assets in the Portfolio; divided by

(2)   the weighted average amount of assets in the Portfolio for the Accounting Period.

(3)   a deduction of .1845 percent (.1845%) times the number of calendar days in the current Accounting Period, divided by 365.

$$Rate = \frac{(1)}{(2)} - (3)$$

# SCHEDULE VI

(Effective as of June 30, 2001)

to

Agreement Number 210 / 1

## ARBITRATION SCHEDULE

To initiate arbitration, either the Ceding Company or the Reinsurer shall notify the other party in writing of its desire to arbitrate, stating the nature of its dispute and the remedy sought. The party to which the notice is sent shall respond to the notification in writing within ten (10) days of its receipt.

The arbitration hearing shall be before a panel of three (3) arbitrators, each of whom must be a present or former officer of a life insurance company. An arbitrator may not be a present or former officer, attorney, or consultant of the Ceding Company or the Reinsurer or either's affiliates.

The Ceding Company and the Reinsurer shall each name five (5) candidates to serve as an arbitrator. The Ceding Company and the Reinsurer shall each choose one (1) candidate from the other party's list, and these two (2) candidates shall serve as the first two (2) arbitrators. If one (1) or more candidates so chosen shall decline to serve as an arbitrator, the party which named such candidate shall add an additional candidate to its list, and the other party shall again choose one (1) candidate from the list. This process shall continue until two (2) arbitrators have been chosen and have accepted. The Ceding Company and the Reinsurer shall each present their initial lists of five (5) candidates by written notification to the other party within twenty-five (25) days of the date of the mailing of the notification initiating the arbitration. Any subsequent additions to the list which are required shall be presented within ten (10) days of the date the naming party receives notice that a candidate that has been chosen declines to serve.

The two (2) arbitrators shall then select the third arbitrator from the eight (8) candidates remaining on the lists of the Ceding Company and the Reinsurer within fourteen (14) days of the acceptance of their positions as arbitrators. If the two (2) arbitrators cannot agree on the choice of a third, then this choice shall be referred back to the Ceding Company and the Reinsurer. The Ceding Company and the Reinsurer shall take turns striking the name of one (1) of the remaining candidates from the initial eight (8) candidates until only one (1) candidate remains. If the candidate so chosen shall decline to serve as the third arbitrator, the candidate whose name was stricken last shall be nominated as the third arbitrator. This process shall continue until a candidate has been chosen

and has accepted. This candidate shall serve as the third arbitrator. The first turn at striking the name of a candidate shall belong to the party that is responding to the other party's initiation of the arbitration. Once chosen, the arbitrators are empowered to decide all substantive and procedural issues by a majority of votes.

It is agreed that each of the three (3) arbitrators should be impartial regarding the dispute and should resolve the dispute on the basis described in the "Arbitration" article. Therefore, at no time will either the Ceding Company or the Reinsurer contact or otherwise communicate with any person who is to be or has been designated as a candidate to serve as an arbitrator concerning the dispute, except upon the basis of jointly drafted communications (which may include independently prepared statements) provided by both the Ceding Company and the Reinsurer to inform those candidates actually chosen as arbitrators of the nature and facts of the dispute. Likewise, any written or oral arguments provided to the arbitrators concerning the dispute shall be coordinated with the other party and shall be provided simultaneously to the other party or shall take place in the presence of the other party. Further, at no time shall any arbitrator be informed that the arbitrator has been named or chosen by one (1) party or the other.

The arbitration hearing shall be held on the date fixed by the arbitrators. In no event shall this date be later than six (6) months after the appointment of the third arbitrator. The arbitration hearing shall be held in the city where the home office of the party responding to the arbitration is located. As soon as possible, the arbitrators shall establish prearbitration procedures as warranted by the facts and issues of the particular case. At least ten (10) days prior to the arbitration hearing, each party shall provide the other party and the arbitrators with a detailed statement of the facts and arguments it will present at the arbitration hearing. The arbitrators may consider any relevant evidence; they shall give the evidence such weight as they deem it entitled to after consideration of any objections raised concerning it. The party initiating the arbitration shall have the burden of proving its case by a preponderance of the evidence. Each party may examine any witnesses who testify at the arbitration hearing. Within twenty (20) days following the end of the arbitration hearing, the arbitrators shall issue a written decision which shall set forth their decision and the factual basis for their decision. In their written decision the arbitrators shall demonstrate that they have offset mutual debts and credits as provided in this Agreement. In no event, however, may the arbitrators award punitive or exemplary damages. In their decision, the arbitrators shall also apportion the costs of arbitration, which shall include, but not be limited to, their own fees and expenses.

# SCHEDULE VII

### (Effective as of June 30, 2001)
### to
### Agreement Number 210 / 1

### CEDING COMPANY INFORMATION

Actuarial appraisal of Individual Disability Income Business of Lincoln Re as of December 31, 2000, by Milliman USA, Inc.

010-956d1.v02
694 - 210 / 10553 - 1

## SCHEDULE VIII
(Effective as of June 30, 2001)
to
Agreement Number 210 / 1

### INVESTMENT POLICY

COMPANY:   The Lincoln National Life Insurance Company
PORTFOLIO:  Reinsurance Monarch Life (LNL01024)

Regulation: Indiana Insurance Company Law and various State Insurance
Department and regulatory authorities. This Statement of Investment Policy
is subject to and will comply with applicable laws and regulations.

**Product Description:**
This portfolio contains the assets supporting the reserves of individual
disability income insurance written by Monarch Life Insurance Company and
reinsured by Lincoln National Life (LNL) under a 1990 reinsurance
agreement. The block includes an 80 percent quota share of business issued
prior to 1990, excluding existing claims as of December 31, 1989, and 50
percent of 1990 and 1991 issues. No new business is accepted under this
agreement. The block consists primarily of non-cancellable disability income
policies. 55 percent/80 percent of the 80 percent quota share block is ceded
from LNL to Lincoln National Reinsurance Company (Barbados) Ltd. under a
coinsurance with funds withheld contract.

The liabilities are not sensitive to changes in interest rates. The significant
risks associated with this business are the risk of deteriorating incidence and
continuance and the risk of reinvestment. Comprehensive cash flow testing is
conducted annually and documented in the Appointed Actuary's Actuarial
Memorandum.

**Investment Objective:**
The primary objective is to maximize portfolio book yield and to reduce
reinvestment risk by matching asset duration with the estimated liability
duration, while maintaining acceptable liquidity and credit risk profiles.

**Asset Categories:**

Exposure limits are based on admitted invested assets calculated on the basis of the most recent statutory financial statement.

|  | Maximum % of Assets |
|---|---|
| Money Market Instruments | 20% |
| Marketable Securities | 100% |
| Investments in marketable securities are further restricted as follows: | |
| U.S. Treasury/Agency securities | 100% |
| Public bonds | 100% |
| Mortgage-backed investments | 35%* |

*Mortgage-backed securities with significant option risk are not appropriate for this portfolio.

| | |
|---|---|
| Less Liquid Investments | 50% |
| Investments in less liquid investments are further restricted as follows: | |
| Private placements (including Rule 144A securities) | 50% |
| Commercial mortgage loans | 35% |
| Internal loans | 0% |
| Equity-related Securities | 15% |
| Investments in equity-related securities are further restricted as follows: | |
| Equity-linked notes | 15% |
| Convertible bonds & bonds w/warrants | 5% |
| Convertible preferred stock | 5% |
| Common stock | 5% |
| Other equity interests | 10% |
| Real Estate | 10% |
| Tax-advantaged Securities | 0% |
| Diversification: | |
| Per Industry | 30% |
| Per Non-government Issuer | 2% |
| Canadian Governments | 10% |
| Supranationals | 20% |

**Tax Multipliers:**

| | |
|---|---|
| Stock | 1.084062 |
| Tax-Exempts | 1.120088 |
| ESOP | 1.269231 |

**Quality Restrictions:**

| | |
|---|---|
| Minimum % of assets in government securities: | 0% |
| Maximum % of assets rated "Baa/BBB": | 60% |
| Maximum % of assets rated below investment grade: | 10% |
| Target average portfolio quality: | A3/Baa1 |

**Maturity or Duration Profile:**

Target Duration: 10.0 years ± 2.0 years

The portfolio will be managed toward the target duration. Target duration will be reviewed and adjusted periodically.

**Maturity Distribution:**

| | Allowable % of Assets |
|---|---|
| Money Market & Bonds <1 yr. | 0% - 20% |
| Intermediates | 0% - 100% |
| Long (>10 years) | 0% - 100% |

**Other:**

Only call protected assets are appropriate for this portfolio.

Derivative products are permitted for the prudent management of risk and return subject to *The Lincoln National Life Insurance Company Statement of Policy, Guidelines and Internal Control Procedures for Derivatives* approved by the LNL Investment Committee February 11, 1997 and reviewed February 18, 1998.

Reporting Frequency: Quarterly

---

Approving Parties for Investments:
Lincoln Re Investment Committee

Date Approved: May 13, 1998

---

LINCOLN    Fax:01452374436    10 May '02  16:20  P.08/11

# AMENDMENT

to the Indemnity Reinsurance Agreement (the "Agreement")
effective June 30, 2001, between

THE LINCOLN NATIONAL LIFE INSURANCE COMPANY of Fort Wayne, Indiana, U.S.A.,

hereinafter referred to as the "Ceding Company,"

and

LINCOLN RE (IRELAND) LIMITED of Dublin, Ireland,

hereinafter referred to as the "Reinsurer."

1.    It is hereby agreed that effective the thirtieth day of June, 2001, the "Letters of Credit" article shall be added to the Agreement and shall read as follows:

**"Letters of Credit**    1.    The Reinsurer shall provide the Ceding Company letters of credit in an amount equal to the amount by which the Reserves on the Quota Share of the Policies exceeds the Funds Withheld Account.

    2.    Notwithstanding any other provision of this Agreement, the Ceding Company or its successors in interest may draw upon such letters of credit at any time, but only for any one or more of the following reasons, with such amounts drawn to be applied without diminution because of the insolvency of the Ceding Company or the Reinsurer:

    (a)    to reimburse the Ceding Company for the Quota Share of premiums returned to owners of Policies due to cancellations of Policies;

    (b)    to reimburse the Ceding Company for the Quota Share of surrenders and benefits or losses paid by the Ceding Company under the terms and provisions of Policies;

    (c)    to fund an account with the Ceding Company in an amount at least equal to the deduction, for reinsurance ceded, from the Ceding Company's liabilities for Policies ceded under this Agreement. Such amount shall

01071QdLamd / 694-10553
Agreement No. 210-1 / Revision No. 1

Page 1

duplicate on the dates shown below.

THE LINCOLN NATIONAL LIFE INSURANCE AND

LINCOLN          Fax:01452374436          10 May '02   16:20     P.09/11

THE LINCOLN NATIONAL LIFE INSURANCE COMPANY

Signed at Fort Wayne, Indiana, U.S.A.

By _Kenneth X Clark_            By _Elina Giliv_
        Senior Vice-President                    Assistant Secretary

Date __10/16/01__               Date __October 2, 2001__

LINCOLN RE (IRELAND) LIMITED

Signed at Dublin, Ireland

By _____
        Managing Director

Date __23 October 2001__

0|07|0dLamd / 694-10553.
Agreement No. 210-1 / Revision No. 1                                    Page 2