on a timely basis.

6.  Neither the Ceding Company nor the Reinsurer may assign any of the rights and obligations under this Agreement, nor may either party sell, assumption reinsure or transfer the Policies without the prior written consent of the other party. Consent will not be withheld if the assignment, sale, assumption reinsurance or transfer does not have a material effect on the risks transferred or the expected economic results to the party requested to consent. This provision shall not prohibit the Reinsurer from reinsuring the Policies on an indemnity basis.

7.  This Agreement represents the entire agreement between the Ceding Company and the Reinsurer and supercedes, with respect to its subject matter, any prior oral or written agreements between the parties.

8.  No modification of any provision of this Agreement shall be effective unless set forth in a written amendment to this Agreement which is executed by both parties.

9.  A waiver shall constitute a waiver only with respect to the particular circumstance for which it is given and not a waiver of any future circumstance.

## Definition of Terms

1.  **Accounting Period** - for the month in which this Agreement becomes effective, the period beginning on the Effective Date and ending on the Last Day Of The Current Accounting Period. Thereafter, the period beginning on the day following the Last Day Of The Preceding Accounting Period and ending on the Last Day Of The Current Accounting Period.

2.  **Agreement** - this document and all schedules and amendments to it.

3.  **Benefits** - the health benefits and any other benefits paid by the Issuing Insurer pursuant to the Policies or with respect to any claims thereunder.

4.  **Continuation Policy** - a new Policy changing or replacing a Policy made or issued either
    (a) in compliance with the terms of the Policy; or
    (b) without the same new underwriting information that the Issuing Insurer would obtain in the absence of the Policy, without a contestable period as long as those contained in new issues of the Issuing Insurer, or without the payment of the same commissions in the first year that

the Issuing Insurer would have paid in the absence of the Policy.

5. **Effective Date** - the date set forth in paragraph 3 of the "Reinsurance Coverage" article.

6. **Error** - any isolated, inadvertent deviation from the terms of this Agreement resulting from the act or omission of an employee of either the Ceding Company or the Reinsurer whose principal function is administrative in nature.

7. **Execution Date** - the date this Agreement is signed by the last of the parties to sign it.

8. **Expenses** - any and all charges including, for the avoidance of doubt, litigation expenses incurred by the Issuing Insurer which are reimbursed by the Ceding Company.

9. **Investment Income Rate** - the interest rate set forth in Schedule V.

10. **Last Day Of The Current Accounting Period** - the last day of the calendar month for which the calculation is being made.

11. **Last Day Of The Preceding Accounting Period** - the last day of the preceding calendar month.

12. **Lump Sum Allowance** - the amount set forth in Schedule IV.

13. **Material Change** - a change that a prudent insurance executive would consider as likely to have a material impact on the Reinsurer's experience under this Agreement.

14. **Other Reinsurance** - reinsurance other than reinsurance provided pursuant to this Agreement which inures to the Ceding Company's benefit with respect to the Policies.

15. **Periodic Allowance** - the amount described in Schedule IV.

16. **Policy(ies)** - the insurance policy(ies) identified in Schedule I which are reinsured pursuant to this Agreement.

17. **Portfolio** - The Paul Revere Life Insurance Company asset portfolios (LNR05823) and (LNR05834) maintained by the Ceding Company.

18. **Quota Share** - the percentage of the Policies set forth in Schedule I which is ceded by the Ceding Company to the Reinsurer pursuant to this Agreement.

19. **Reserve Change** - the increase in the Reserves from the Last Day Of The Preceding Accounting Period to the Last Day Of The Current Accounting Period.

20. **Reserves** - the active life and disabled life reserves and claim liabilities calculated and reported for Block A is The Lincoln National Life Insurance Company, Block B is Monarch Life Insurance Company; and Block C is The Paul Revere Life Insurance Company pursuant to the reinsurance agreements identified in Schedule I.

21. **Terminal Accounting Period** - the period commencing on the day following the Last Day Of The Preceding Accounting Period and ending on the effective date of termination pursuant to any notice of termination given under this Agreement or such other date as shall be mutually agreed to in writing.

22. **Underlying Agreements** - the agreements identified in Schedule I.

**Execution**

The Ceding Company and the Reinsurer, by their respective officers, executed this Agreement in duplicate on the dates shown below. As of the Effective Date, this Agreement consists of

- this Indemnity Reinsurance Agreement numbered 101 / 2;
- Schedule I, Quota Share and Policies Subject to Reinsurance;
- Schedule II, Part A, Summary of Monetary Transactions;
- Schedule II, Part B, Summary of Monetary Transactions;
- Schedule III, Annual Report;
- Schedule IV, Allowances;
- Schedule V, Investment Income Rate;
- Schedule VI, Arbitration Schedule;
- Schedule VII, Ceding Company Information; and
- Schedule VIII, Investment Policy.

01061.1df.agm
3823 - 101 / 10553 - 2

LINCOLN NATIONAL REINSURANCE COMPANY
(BARBADOS) LIMITED

Signed in Fort Wayne, Indiana

By _____
                    President

Date _____

By _____
              Assistant Secretary

Date _____

LINCOLN RE (IRELAND) LIMITED

Signed in Dublin, Ireland

By _____
              Managing Director

Date _____

# SCHEDULE I

(Effective as of _____)

to

Agreement Number 101 / 2

## QUOTA SHARE AND POLICIES SUBJECT TO REINSURANCE

A one hundred percent (100%) Quota Share of the insurance Policies reinsured by the Ceding Company pursuant to the underlying indemnity reinsurance agreements effective as shown below:

| Block | Underlying Agreements | Agreement Effective Date | Agreement Number |
|-------|----------------------|--------------------------|------------------|
| A | The Lincoln National Life Insurance Company | December 31, 1991 | 104 |
| B | The Lincoln National Life Insurance Company | December 31, 1990 | 035 |
| C | The Paul Revere Life Insurance Company | July 1, 1995 | 007 |

010611df.agm
3823 - 101 / 10553 - 2

Page 19

# SCHEDULE II, PART A

(Effective as of _____ )

to

Agreement Number 101 / 2

## SUMMARY OF MONETARY TRANSACTIONS

for the period from _____ to _____

with respect to the following Quota Share of the Policies: _____

1. Initial reinsurance premium (first Accounting Period only)
   [(a) - (b)]
   (a) Reserves
   (b) Lump Sum Allowance

2. Gross premiums
3. Premiums - Other Reinsurance
4. Net Premiums [(2) - (3)]

5. Investment Income [((5a) x (5b))] x [(5c) + (5d)]
   (a) Investment Income Rate
   (b) One-half actual days in the current Accounting Period
       divided by calendar days in the current calendar month
   (c) Funds withheld balance Last Day Of The Current
       Accounting Period
   (d) Funds withheld balance Last Day Of The Preceding
       Accounting Period

6. Benefits
7. Benefits - Other Reinsurance
8. Net Benefits [(6) - (7)]

9. Other reimbursement net of Other Reinsurance
       Expenses

10. Periodic Allowance

11. Reserves - Last Day Of The Preceding Accounting Period
12. Reserves - Last Day Of The Current Accounting Period
13. Reserve Change [(12) - (11)]

010611df.agm
3823 - 101 / 10553 - 2

Page 20

# SCHEDULE II, PART B

(Effective as of _____)

to

Agreement Number 101 / 2

## SUMMARY OF MONETARY TRANSACTIONS

for the period from _____ to _____

1. Due Reinsurer

    Initial reinsurance premium (1) (first period only)
    Net premiums (4)
    Investment Income (5)

    Total Due - Reinsurer

2. Due Ceding Company

    Net Benefits (8)
    Other Reimbursements (9)
      Expenses
    Periodic Allowance (10)

    Total Due - Ceding Company

3. Gross Due Reinsurer (1 less 2)

4. Funds withheld account
    (Last Day Of The Current Accounting Period)

5. Funds withheld account
    (Last Day Of The Preceding Accounting Period, equals zero (0) for first
    Accounting Period)

6. Amount Due Reinsurer (if positive) or Due Ceding Company (if negative)
    (3 less 4 plus 5)

7. Amounts Previously Paid for Accounting Period

8. Net Amount Due (6 less 7)

010611df.agm
3823 - 101 / 10553 - 2

# SCHEDULE III

(Effective as of _____ )

to

Agreement Number 101 / 2

## ANNUAL REPORT

The annual report shall provide the following information:
- An actuarial opinion on the reported Reserves

# SCHEDULE IV

(Effective as of _____ )

to

Agreement Number 101 / 2

## ALLOWANCES

### Lump Sum Allowance

The Lump Sum Allowance equals _____ ($_____), adjusted for the tax effect of the initial Lump Sum Allowance on the Reinsurer.

### Periodic Allowance

The amount of Periodic Allowances shall be equal to the allowances paid by the Ceding Company on the business reinsured, net of allowances actually recovered from Other Reinsurance, plus expenses equal to:

Block A = .5% of premiums
Block B = .25% of premiums
Block C = _____

# SCHEDULE V

(Effective as of _____)

to

Agreement Number 101 / 2

## INVESTMENT INCOME RATE

The Investment Income Rate shall be equal to the

Block A = Rate earned on the Underlying Agreement.

Block B = Rate earned on the Underlying Agreement.

Block C =

    (1)    the net investment income, including realized capital gains and losses earned for the Accounting Period by Ceding Company from investing the assets in the Portfolios; divided by

    (2)    the weighted average amount of assets in the Portfolio for the Accounting Period.

    (3)    a deduction of .1845 percent (.1845%) times the number of calendar days in the current Accounting Period, divided by 365.

$$Rate \ = \ \frac{(1)}{(2)} - (3)$$

# SCHEDULE VI

(Effective as of _____ )

to

Agreement Number 101 / 2

## ARBITRATION SCHEDULE

To initiate arbitration, either the Ceding Company or the Reinsurer shall notify the other party in writing of its desire to arbitrate, stating the nature of its dispute and the remedy sought. The party to which the notice is sent shall respond to the notification in writing within ten (10) days of its receipt.

The arbitration hearing shall be before a panel of three (3) arbitrators, each of whom must be a present or former officer of a life insurance company. An arbitrator may not be a present or former officer, attorney, or consultant of the Ceding Company or the Reinsurer or either's affiliates.

The Ceding Company and the Reinsurer shall each name five (5) candidates to serve as an arbitrator. The Ceding Company and the Reinsurer shall each choose one (1) candidate from the other party's list, and these two (2) candidates shall serve as the first two (2) arbitrators. If one (1) or more candidates so chosen shall decline to serve as an arbitrator, the party which named such candidate shall add an additional candidate to its list, and the other party shall again choose one (1) candidate from the list. This process shall continue until two (2) arbitrators have been chosen and have accepted. The Ceding Company and the Reinsurer shall each present their initial lists of five (5) candidates by written notification to the other party within twenty-five (25) days of the date of the mailing of the notification initiating the arbitration. Any subsequent additions to the list which are required shall be presented within ten (10) days of the date the naming party receives notice that a candidate that has been chosen declines to serve.

The two (2) arbitrators shall then select the third arbitrator from the eight (8) candidates remaining on the lists of the Ceding Company and the Reinsurer within fourteen (14) days of the acceptance of their positions as arbitrators. If the two (2) arbitrators cannot agree on the choice of a third, then this choice shall be referred back to the Ceding Company and the Reinsurer. The Ceding Company and the Reinsurer shall take turns striking the name of one (1) of the remaining candidates from the initial eight (8) candidates until only one (1) candidate remains. If the candidate so chosen shall decline to serve as the third arbitrator, the candidate whose name was stricken last shall be nominated as the

third arbitrator. This process shall continue until a candidate has been chosen and has accepted. This candidate shall serve as the third arbitrator. The first turn at striking the name of a candidate shall belong to the party that is responding to the other party's initiation of the arbitration. Once chosen, the arbitrators are empowered to decide all substantive and procedural issues by a majority of votes.

It is agreed that each of the three (3) arbitrators should be impartial regarding the dispute and should resolve the dispute on the basis described in the "Arbitration" article. Therefore, at no time will either the Ceding Company or the Reinsurer contact or otherwise communicate with any person who is to be or has been designated as a candidate to serve as an arbitrator concerning the dispute, except upon the basis of jointly drafted communications (which may include independently prepared statements) provided by both the Ceding Company and the Reinsurer to inform those candidates actually chosen as arbitrators of the nature and facts of the dispute. Likewise, any written or oral arguments provided to the arbitrators concerning the dispute shall be coordinated with the other party and shall be provided simultaneously to the other party or shall take place in the presence of the other party. Further, at no time shall any arbitrator be informed that the arbitrator has been named or chosen by one (1) party or the other.

The arbitration hearing shall be held on the date fixed by the arbitrators. In no event shall this date be later than six (6) months after the appointment of the third arbitrator. The arbitration hearing shall be held in the city where the home office of the party responding to the arbitration is located. As soon as possible, the arbitrators shall establish prearbitration procedures as warranted by the facts and issues of the particular case. At least ten (10) days prior to the arbitration hearing, each party shall provide the other party and the arbitrators with a detailed statement of the facts and arguments it will present at the arbitration hearing. The arbitrators may consider any relevant evidence; they shall give the evidence such weight as they deem it entitled to after consideration of any objections raised concerning it. The party initiating the arbitration shall have the burden of proving its case by a preponderance of the evidence. Each party may examine any witnesses who testify at the arbitration hearing. Within twenty (20) days following the end of the arbitration hearing, the arbitrators shall issue a written decision which shall set forth their decision and the factual basis for their decision. In their written decision the arbitrators shall demonstrate that they have offset mutual debts and credits as provided in this Agreement. In no event, however, may the arbitrators award punitive or exemplary damages. In their decision, the arbitrators shall also apportion the costs of arbitration, which shall include, but not be limited to, their own fees and expenses.

# SCHEDULE VII

(Effective as of _____ )

to

Agreement Number 101 / 2

## CEDING COMPANY INFORMATION

Actuarial appraisal of Individual Disability Income Business of Lincoln Re as of December 31, 2000, by Milliman USA, Inc.

010611df.sgm
3823 - 101 / 10353 - 2

Page 27

# SCHEDULE VIII

(Effective as of _____)

to

Agreement Number 101 / 2

## INVESTMENT POLICY

COMPANY:  Lincoln National Reinsurance Company (Barbados) Limited
PORTFOLIO:  LNR, Ltd. - Barbados/Paul Revere (LNR05823)
 LNR, Ltd. - Barbados/Paul Revere (2) (LNR05834)

Regulation:  Not applicable.

Compliance with this Investment Policy is not required at the portfolio level. The total percentage of assets in Portfolio LNR05823 and portfolio LNR05834 that are invested in a specified class of eligible assets must comply with the limitations imposed by this Investment Policy.

**Product Description:**
Lincoln National Reinsurance Company (Barbados) Limited (LNBAR) is operated and managed by the reinsurance business unit of Lincoln Financial Group (LFG). In 1995 LNBAR entered into an agreement under which LNBAR reinsured 80 percent (80%) of the existing individual disability income claims older than two (2) years of The Paul Revere Life Insurance Company and The Paul Revere Protective Life Insurance Company. No active lives are covered nor are any new claims covered. Liability cash flows from this business are relatively stable and predictable and are not sensitive to changes in interest rates.

This statement of Investment Policy has been designed to authorize the proper alignment of assets with the expected future funding requirements of the disability claims ceded and to maintain the net portfolio yield at a level which will enhance the future profitability of the Agreement to the Ceding Companies and the Reinsurer.

The investment guidelines that follow are included as an appendix to the reinsurance agreement. Additionally, policy statement limitations include restrictions resulting from the deposit of assets in a New York reserve credit trust.

**Investment Objective:**

The primary objectives for management of this portfolio are: 1) to limit market risk by maintaining sufficient asset cash flows (coupons and maturities) to meet anticipated claim payments while maintaining prudent liquidity, credit and diversification risk profiles; and 2) maximize value in relation to the risks assumed consistent with the first objective.

**Asset Categories:**

Exposure limits are based on admitted invested assets.

|  | Maximum % of Assets |
|---|---|
| Money Market Asssets | 50% |
| Taxable Fixed Income | |
| U.S. Treasury/Agency Securities | 100% |
| Public bonds | 100% |
| Mortgage-backed Securities | 0% |
| Tax-advantaged Securities | |
| Municipal Securities | 5% |
| Equity-related Securities | 0% |
| Less Liquid Investments | |

Investments in less liquid investments are
further restricted as follows:

| Fixed rate private placements (Rule 144A only) | 20% |
|---|---|
| Commercial mortgage loans | 10% |
| Fixed rate private placements other than Rule 144A | 10% |

**Diversification:**

| Per Industry | 30% |
|---|---|
| Per Non-Government Issuer | 2% |
| Non-U.S. or Canadian Issuers | 15% |

**Quality Restrictions:**

| Maximum % assets rated NAIC 2 Category | 30% |
|---|---|
| Maximum % assets NAIC 3 or over | 5% |
| Targeted average portfolio quality | A3 |

**Derivatives:**

Use only when consistent with objectives and upon notification and written agreement with the ceding companies.

**Currency:**
U.S. dollar-denominated securities only.

**Uses of Leverage:**
Securities lending, Repurchase Agreements or other portfolio leveraging activities will not be permitted.

**Duration:**
The investment guidelines do not incorporate a duration target since the portfolio is managed on a cash matched basis versus liabilities. The current liability duration is estimated to be 5.5 years. Prospectively, the maturity profile of the assets will be adjusted consistent with liability characteristics.

**Other:**

* Municipal securities exposure is limited to securities delivered under the Agreement.

The assets held in this portfolio will not normally be traded, although they may be classified as "Available for Sale" (as defined under FASB #115 for GAAP accounting purposes) and sold in order to support the investment objectives stated above. It is further understood that since this is a liquidating portfolio, the limitation referenced above with respect to diversification shall apply to new purchases only and does not by itself, constitute a requirement to sell securities.

Reporting Frequency: Quarterly



Approving Bodies for Investments:
Lincoln Reinvestment Committee

Date Approved: May 19, 1998

http://www.xerox.com/downloads/SPOSTABS.doc

Seller's Schedule

## DISCLOSURE SCHEDULES

Related to That Certain
Put Agreement
by and between
Lincoln National Reinsurance Company (Barbados) Limited
and
Swiss Re Life & Health America Inc.

Dated July 27, 2001

These Disclosure Schedules ("Schedules") of Lincoln National Reinsurance Company (Barbados) Limited ("Lincoln Barbados") are delivered in connection with the Put Agreement By and Between Lincoln Barbados and Swiss Re Life & Health America Inc. (the "Put Agreement") . Where a matter is initially set forth on these Schedules, the disclosure shall specify the representation, warranty or other Put Agreement provision to which the disclosed matter relates. However, it is understood by Parties to the Put Agreement, that a matter which is disclosed herein with respect to one section or provision of the Put Agreement, shall also be deemed disclosed with respect to all other sections or provisions to which it would reasonably be deemed related and applicable to such other section or provisions, notwithstanding the omission of an appropriate cross-reference thereto. Capitalized terms used but not otherwise defined herein shall have the meanings given them in the Put Agreement.

WO 35982.1

**Schedule 2.04**
**Governmental Approvals**

1.    Approval of Republic of Ireland insurance regulatory authorities with respect to the
change of control of Lincoln Ireland if Lincoln Barbados exercises the Put Right.

**Schedule 2.07**
**Material Rights and Permits**

1.    A letter dated June 12, 2001 from the Department of Enterprise, Trade and Employment stating it had no objection to Lincoln Ireland being incorporated for purposes of acting as a reinsurer.

WO 35982.1

**Schedule 2.08**
**Contracts**

1.    Indemnity Reinsurance Agreement effective as of June 30, 2001 between Lincoln Life and Lincoln Ireland.

2.    See form of Aon agreement attached.

# MANAGEMENT AGREEMENT

THIS AGREEMENT, made with effect the 20th day of June 2001 by and between Aon Insurance Managers (Dublin) Limited (hereinafter called "the Manager"), an Irish Company, having its principal office at 22 Upper Fitzwilliam Street, Dublin Ireland, Ireland and "Lincoln Re (Ireland) Limited. (hereinafter referred to as "the Company"), an Irish Company, having its principal office at 22 Upper Fitzwilliam Street, Dublin Ireland.

WITNESSETH:

WHEREAS, the Manager is a company providing for management and administrative services to (re)insurance companies, and

WHEREAS, the Company desires to retain the Manager for the provision of certain management and administrative services;

NOW, THEREFORE, in consideration of their respective promises and covenants hereinafter contained, it is hereby agreed as follows:

## ARTICLE 1. – MANAGEMENT MANDATE

1.1.    The Company hereby appoints the Manager as its agent to manage any and all of the daily business of the Company falling under its corporate purpose, and the Manager accepts such appointment.

1.2.    Unless otherwise agreed herein, the Manager shall always remain subject to the direction of the Company's Board of Directors or any other person designated to that effect by the Board of Directors with the approval of the Manager, in compliance with the laws and regulations applicable in Ireland and good business practice.

1.3.    Within the boundaries of the powers granted by the Company, the Manager shall be responsible for the proper management of the Company and the performance and follow up of daily business. **The Manager** undertakes to control the procedures of the Company and to formulate any proposal likely to improve the operations of the Company.

1.4.    It is understood and agreed that (i) the status of **the Manager** under this Agreement is that of an independent contractor, and (ii) this Agreement sets out the entire agreement and understanding between the parties hereto in relation to the services to be provided by **the Manager**.

## ARTICLE 2. –    THE DUTIES OF THE MANAGER

### 2.1.    Accounting and financial management

**The Manager** shall provide for all aspects of the accounting and financial activities of **the Company**, including:

2.1.1. Keeping proper books of account on behalf of **the Company** in accordance with law and generally accepted accounting principles and the directions of the Board and preparing management accounts on a quarterly basis.

2.1.2. Providing such information as the auditors may from time to time require and generally co-operating with the auditors to facilitate the carry out of the audit.

2.1.3. Billing and collection of premiums in accordance with the terms and conditions of each policy of insurance and/or reinsurance issued by **the Company**.

2.1.4. Arranging to discharge (subject to due authorisation from the Board or its delegates) of all invoices and bills properly payable by **the Company**.

2.1.5. To manage the company's treasury function as specified in Schedule 1 to this agreement.

## 2.2.    Administration of insurance activities

**The Manager** shall provide for the following services on such terms and in such manner as may be agreed from time to time with the **Company**:

2.2.1   The issuance of policies of insurance and/or reinsurance as may be requested by the **Company**.

2.2.2.  The maintenance of any reinsurance programme for an insurance or reinsurance policy, specified above, to the extent such reinsurance is available.

2.2.3.  Assistance in the implementation of such programmes as to risks, rates and general policy conditions and rendering advice on such programmes.

2.2.4.  Recommendations as to forms, contracts, policies and binders.

2.2.5.  The prompt conveyance of the results or summaries of insurance surveys, inspections, computations and research as may be requested by the **Company**.

2.2.6   The provision of statistical and other information to include recommendations as to premium, rating and insuring conditions as well as claim reports, including details of any reserved claims incurred and incurred but not reported (IBNR) losses.

2.2.7.  The handling, to the best interest of the **Company** and in conformity with good business practice, of any insurance or reinsurance claims arising in the course of business. **The manager** shall have authority to pursue any rights of recovery available to **the Company** against reinsurers or others and to compromise, settle or reject any insurance or reinsurance claim.

2.2.8.  All supervisory loss adjustment requirements, excluding the fees of independent adjusters.

2.2.9.  The provisions for continuing advice on insurance industry customs, practices and other technical matters.

**2.3.**    <u>General administration of the Company</u>

      **2.3.1.  The Manager** shall prepare, on such terms and in such manner as may be agreed from time to time with **the Company**, statistics and other reports, including:

            (i)    Investments made for **the Company**, the current rate of return of such investments and the current status thereof.

            (ii)    All financial data, including the balance sheet and profit and loss statements. Such reports will be prepared in compliance with generally accepted accounting principles as prescribed by the accounting firm selected by **the Company**.

            (iii)    Records of any insurance and/or reinsurance accepted or ceded, including official documentation thereof in the form of policies, reinsurance agreements, and billings and receipts.

            (iv)    Claim reports, including details of any reserved claims incurred as well as incurred but not reported (IBNR) losses.

            (v)    Other reports common to the function of **the Company**.

      **2.3.2.  The Manager** shall assist with the convening of regular shareholder/board meetings and despatching board packs to the directors in advance of each such meeting.

      **2.3.3.  The Manager** shall take minutes at all board meetings and shall circulate minutes to the directors for comment within a reasonable period of each board meeting.

      **2.3.4. The Manager** shall keep confidential all information about the business of **the Company** received directly or indirectly as a result of this Agreement save in so far as it is necessary to disclose such information for the proper performance of this Agreement.

## ARTICLE 3. –    THE DUTIES OF THE COMPANY

3.1.    **The Company** shall comply promptly with any reasonable request for instructions which **the Manager** may make in order to perform its duties efficiently under this agreement.

3.2.    **The Company** shall approve or disapprove promptly all proposals for insurance or reinsurance submitted by **the Manager.**

3.3.    **The Company** shall be responsible for the opening of bank accounts. **The Manager** shall be authorised to operate such accounts in accordance with the signature regulations in force.

3.4.    **The Company** holds **the Manager** harmless for any loss, damage, expense or cost arising from **the Manager's** performance of its duties under the present Agreement, unless **the Manager** has acted with gross negligence or wilful misfeasance. **The Manager** shall receive quietus at each Shareholders Annual General Meeting for the performance of its duties hereunder, unless **the Manager** has acted with gross negligence or wilful misfeasance.

3.5.    **The Company** and its representatives shall not divulge any information regarding the procedures and systems used by **the Manager** in fulfilling its duties thereunder.

## ARTICLE 4. –    REMUNERATION

4.1.    In consideration of the services to be performed hereunder, **the Company** shall pay to **the Manager,** a minimum annual fee of EUR 60,000, payable quarterly in advance, adjustable within thirty  (30) days after the year end on the basis of actual number of hours expended. It is further agreed that the annual fee will be indexed on the

basis of the Retail Price Index in Ireland.

Commencing sixty (60) days prior to the anniversary date of each agreement year the parties reserve the right to negotiate in good faith to fix a fee for the succeeding year. For purposes of this Agreement, the first agreement year shall commence on the date hereof and expire on 19th June 2002.

4.2.    **The Company** shall reimburse **the Manager** for its itemised out of pocket expenses incurred in operating the business of **the Company**, including but not limited to the following:

(i)     Attorneys' fees, taxes, printing, photocopying, stationary, office supplies, telephone, facsimile, postage.

(ii)    Travel expenses incurred at the request and on behalf of **the Company**.

Any out of pocket expenses incurred that are greater than US$4,000, shall require the prior written approval of the company's Managing Director.

## ARTICLE 5. –       MISCELLANEOUS

5.1.    **The Manager** shall have no power to enter into contracts on behalf of **the Company** unless specifically instructed in writing by the Managing Director of the Company to do so.

5.2.    This Agreement may not be assigned in whole or in part by either party without the prior written consent of the other. However, it is hereby understood and agreed that **the Manager** may fulfil its obligations under this Agreement by subcontracting for various services with third parties to the extent it deems advisable.

5.3.    **The Manager** shall not be liable for any foreign exchange loss whatsoever realised on any transaction effected in the performance of its functions.

5.4.    **The Manager** shall not be liable of any damage caused to **the Company** by Insurers, Reinsurers, Fund Managers or any person other than those referred to in article 5.2 above.

5.5.    It is hereby understood and agreed that **the Company** retains ownership of all books, records, reports and statistics produced by **the Manager** and/or its subcontractors in rendering services to **the Company** under this Agreement.

## ARTICLE 6. –    TERMINATION

6.1.    This Agreement shall become effective upon the date hereof and subject to Clauses 6.2 and 6.3 herein, shall remain in full force and effect thereafter until terminated as provided therein.

6.2.    The Agreement may be terminated by either party as of any anniversary date by giving the other party not less than sixty (60) days notice prior to such anniversary date. Termination of this Agreement shall not relieve either party of its liability for the performance of obligations imposed upon said party during the effective period of this Agreement if such obligations have not been performed or completed at the time of termination.

6.3.    Either party hereto may terminate this Agreement forthwith by written notice to the other party if the other party (i) is seriously incapacitated from performing its obligations thereunder for any reason, or (ii) becomes insolvent or bankrupt or compounds with its creditors or if a resolution is passed or an order made for its winding up (other than for the purposes of amalgamation or reconstruction only).

6.4.    Termination shall operate without prejudice to the rights of either party which have accrued at the date of such termination.

## ARTICLE 7. –    APPLICABLE LAW

This Agreement shall in all respects be governed by and construed in accordance with the laws of Ireland. The Courts of Ireland have exclusive jurisdiction for any and all claims arising therefrom.

**IN WITNESS WHEREOF,** the parties have hereunto set their hands to duplicate originals hereof

**SIGNED by**                                      **DIRECTOR**
**For and on behalf of**
**Lincoln Re Ireland Limited**


in the presence of :


This 26ᵗʰ day of June 2001, Dublin, Ireland.


**SIGNED by**                                      **DIRECTOR**
for and on behalf of
**Aon Insurance Managers (Dublin) Limited**


in the presence of :


This 26th day of June 2001, Dublin, Ireland.


**Given effect in Ireland the 20ᵗʰ day of June 2001**

n/users/wordir/Alain/master mgt agt 2

# Schedule I

# Lincoln Re (Ireland) Limited
# Treasury Policies

## Cash Management

- Operating accounts will be maintained at Barclays Bank, Plc for Euro (EUR) and US Dollar (USD) currencies.
- The Euro account will maintain a maximum balance of 30,000 EUR. The exception to this maximum balance is in the event a payment to a reinsurance client or policyholder in excess of 30,000 EUR is required and the EUR account is to be funded to sufficiently cover the payment. This account will be funded as needed by the USD account.
- The USD account will maintain a maximum balance of 25,000 USD. Any excess balance over this maximum will be invested in a short-term investment vehicle in accordance with the investment policy approved by the board of directors. The exception to this maximum balance is in the event a payment to a reinsurance client or policyholder in excess of 25,000 USD is required and the USD account is to be funded to sufficiently cover the payment.

## Disbursement Authorizations

Authorizations for disbursements made via check, wire or electronic funds transfer (EFT) are as follows:

| Name | Title | General Expense Authorization | Reinsurance Client/Policyholder Authorization | Intercompany Transfers |
|---|---|---|---|---|
| Aon Management Company: Anne-Marie Kearns James Langton Eamon O'Brien | Account Manager Director Account Manager | 25,000 USD 30,000 EUR | 250,000 USD 300,000 EUR | 250,000 USD 300,000 EUR |
| David Dillon | Director | 25,000 USD 30,000 EUR | 750,000 USD 900,000 EUR | 750,000 USD 900,000 EUR |
| Jonathon Vickers | Managing Director | 25,000 USD 30,000 EUR | 750,000, USD 900,000,EUR | 750,000 USD 900,000 EUR |

Authorization for General Expense and Reinsurance Client/Policyholder disbursements shall require the signature of two authorized signatories, at least one of whom should be a Director. Authorization for Intercompany Transfers shall require the signature of either an Account Manager or a Director. Any disbursement exceeding the limits noted above shall require the authorization of Jonathon Vickers in addition to any one of the above noted Account Managers or Directors.

General expenses are defined as those payments for general or budgeted expenses such as travel & entertainment, office operations, advertising fees, conferences, periodicals, utilities, consulting, purchasing contracts, labor, auditing and tax services, legal and professional fees, etc.

Reinsurance client/policyholder disbursements include payments directly related to a specific Lincoln Re policyholder or reinsurance contract such as for claims, premiums, refunds, cash surrender values, etc.

Intercompany transfers are defined as the movement of funds between and among the Lincoln Re (Ireland) Ltd. USD and EUR bank and short-term investment accounts at Barclays Bank, Plc.

## Authorized Signatories

- The following individuals will be designated as authorized signers on Lincoln Re (Ireland) Ltd. bank accounts:

| Name | Title |
|---|---|
| Aon Management Company: | |
| Anne-Marie Kearns | Account Manager |
| James Langton | Director |
| Eamon O'Brien | Account Manager |
| David Dillon | Director |
| Jonathon Vickers | Managing Director |
| | |

## Treasury Controls and Reporting

- Aon Insurance Managers (Dublin) Limited (Aon) will provide to the Assistant Treasurer of Lincoln National Reinsurance Company (Barbados) Ltd. (LNBAR) copies of documentation submitted to any commercial or investment bank to establish accounts and/or services.
- Aon will provide duplicate copies of monthly bank statements to the Managing Director.
- Aon will reconcile Lincoln Re (Ireland) Ltd. bank accounts on a monthly basis. Aon will provide copies of reconciliations to the Assistant Treasurer of LNBAR. Included with the monthly reconciliations will be a copy of the check register identifying the check #, amount, payee and a description of each check issued for that month.

**Schedule 5.01(f)**
**Retrocession Transaction**

(i)　Business to be reinsured by Lincoln Ireland:

| Issuing Insurer | Effective Date |
|---|---|
| Paul Revere Life Insurance Company | July 1, 1995 |
| Paul Revere Protective Life Insurance Company | July 1, 1995 |
| Lincoln Life (IHX 91) | December 31, 1991 |
| Lincoln Life (Monarch 90) | December 31, 1990 |

(ii)　See attachment for further description.

WO 35982.1



A MILLIMAN GLOBAL FIRM

**Milliman** USA

Consultants and Actuaries

55 W. Monroe Street, 40th Floor
Chicago, IL 60603-5011
Tel +1 312 726.0677  Fax +1 312 726.5225
www.milliman.com

## MEMORANDUM

TO:        Monte Lightner
           Steve Prendergast

FROM:      Laird Zacheis

DATE:      July 25, 2001

RE:        *Lincoln Ireland – DI Roll-Forward*

The following table summarizes the projection of surplus in Lincoln Ireland, based on the Actuarial Appraisal of Individual Disability Income Business of Lincoln Re as of December 31, 2000, dated June 26, 2001 ("DI Appraisal"):

| Projection of Surplus<br>As of April 30, 2002<br>(in thousands, after tax) | | | |
|---|---|---|---|
| Item | LNL Business | LNBar Business | Total |
| Income from DI Appraisal | $(1,903) | $925 | $(978) |
| Capitalized Ceding Commission: | | | |
| • Amortization | (499) | (2,843) | (3,342) |
| • Loss of Investment Income | (433) | (2,217) | (2,650) |
| • LOC Cost | (27) | (139) | (166) |
| Total | $(2.862) | $(4,274) | $(7,136) |

The following assumptions are reflected:

1)    LNL business transferred as of July 1, 2001.  LNBar business transferred as of October 1, 2001.

2)    Ceding commission capitalized of $8.8 million LNL and $64.5 million LNBar. Investment income adjustment is based on an 8.0% yield.

3)    Earnings on $10 million of equity in Lincoln Ireland not reflected.

4)    Earnings on required capital, which is held outside of Lincoln Ireland, not reflected.

A:\Memo725.doc

OFFICES IN PRINCIPAL CITIES WORLDWIDE

 Memorandum to Monte Lightner & Steve Prendergast
July 25, 2001
Page 2


Please contact me with any questions on this analysis.


LDZ:sm

cc:    Andy Creighton
       Jon Lundy
       Jim Sjoreen
       Bruce Winterhof

A:\Memo725.doc

**Schedule 7.01(a)**
**Lincoln Barbados's Knowledge People**

Lawrence T. Rowland
William K. Tyler
Raymond L. Prosser
Monte J. Lightner
Andy R. Creighton
Kevin L. Adamson
Linda C. Fraley
Kenneth J. Clark
David A. Hopper
Jay D. Biehl
Patsy Campola
Chris L. Goeglein
James P. Sjoreen
Dennis L. Schoff
Casey J. Trumble
Stephen D. Prendergast
Barbara S. Kowalcyzk
Patrick R. Chasey

WO 35982.1

**Schedule 7.01(b)**
**Reference Balance Sheet**

tp://www.xerox.com/downloads/5POSTABS.dot

Purchaser's Schedule

# DISCLOSURE SCHEDULES OF THE PURCHASER

Related to That Certain
Put Agreement
by and between
Lincoln National Reinsurance Company (Barbados) Limited
And
Swiss Re Life & Health America Inc.

Dated July 27, 2001

These Disclosure Schedules of the Purchaser are delivered in connection with the above-referenced Put Agreement (the "Put Agreement").  Where a matter is initially set forth on these Schedules, the disclosure shall specify the representation, warranty or other Put Agreement provision to which the disclosed matter relates.  However, it is understood by Lincoln Barbados and Purchaser that a matter which is disclosed with respect to one section or provision of the Put Agreement, shall also be deemed disclosed with respect to all other sections or provisions to which it would reasonably be deemed related and applicable to such other section or provisions, notwithstanding the omission of an appropriate cross-reference thereto.  Capitalized terms used but not otherwise defined herein shall have the meanings given them in the Put Agreement.

**Schedule 3.04**
**Consents and Approvals**

Approval of Republic of Ireland insurance regulatory authorities with respect to the change of control of Lincoln Ireland if Lincoln Barbados exercises the Put Right.

sage06d teherry\PreliminaryAssetsValueReport\en0703501\spreadsheet.xls backup 6/3/01 1:18 PM

**Irish Insurance Company to be Sold**

| Assets | Form Irish Newco | See Note LNL DI | See Note LNR Barbados DI | Subtotal | Paul Revere 95 | Total Irish Newco |
|---|---|---|---|---|---|---|
| Cash | 10,000,000 | | | | | 10,000,000 |
| Estimated ceding commission on transaction | | 8,800,000 | 64,500,000 | 73,300,000 | | 73,300,000 |
| Amounts recoverable from reinsurers | | 1,559,330 | | 1,559,330 | | 1,559,330 |
| Commissions and expense allowances due | | 3,229,665 | | 3,229,665 | | 3,229,665 |
| Accident and health premiums due and paid | | 3,779,070 | 9,420,527 | 13,199,597 | | 13,199,597 |
| Funds withheld by ceding company | | 261,543,852 | 735,395,454 | 997,941,306 | 279,573,522 | 1,277,514,828 |
| **Total assets** | 10,000,000 | 278,911,117 | 810,315,981 | 1,089,227,098 | 279,573,522 | 1,378,800,620 |
| **Liabilities** | | | | | | |
| Aggregate reserve for accident and health policies | | | | | | |
| M&R AUR | | 53,511,767 | 161,747,408 | 215,259,185 | | 215,259,185 |
| M&R DLR | | 177,847,853 | 561,471,437 | 739,319,290 | | 739,319,290 |
| M&R IBNR | | 2,194,538 | 62,473,953 | 64,668,491 | | 64,668,491 |
| M&R Claim Expense Reserve | | 691,148 | 15,323,496 | 16,014,644 | | 16,014,644 |
| Claims DAU | | (14,064,715) | 14,064,715 | | | |
| ICOS | | 16,172,562 | | 16,172,562 | | 16,172,562 |
| Aggregate reserve on recaptured Paul Revere 92 | | 21,000,000 | | 21,000,000 | | 21,000,000 |
| Aggregate reserve transferred on excluded contracts | | 5,000,000 | | 5,000,000 | | 5,000,000 |
| Claims DAU on Paul Revere 92, excluded contracts | | 369,211 | | 369,211 | | 369,211 |
| Policyholders' dividends | | (144) | 144 | | | |
| Commissions and expense allowances payable on reinsura | | | | | | |
| General expenses due or accrued | | 2,285,987 | 2,171,353 | 4,457,320 | | 4,457,320 |
| Taxes, licenses and fees due or accrued, excluding federal I | | 604,875 | 123,243 | 728,118 | | 728,118 |
| Remittances and items not allocated | | 6,248,267 | | 6,248,267 | | 6,248,267 |
| Funds held under coinsurance | | | | | | |
| Investment income payable to clients | | 7,059,770 | (7,059,770) | | | |
| **Total Liabilities** | | 278,911,117 | 810,315,981 | 1,089,227,098 | 279,573,522 | 1,368,800,620 |
| Contributed capital | 10,000,000 | | | | | 10,000,000 |
| **Total Liabilities and Surplus** | 10,000,000 | 278,911,117 | 810,315,981 | 1,089,227,098 | 279,573,522 | 1,378,800,620 |

Note – Estimated ceding commissions on transaction have been calculated using the M&R appraisal of the DI business split between LNL and LNR Barbados assuming a 12% discount rate. The estimated ceding commissions further reflect a) the regulatory reserves equal US statutory, b) the ceding commission is capitalized for Irish regulatory reporting and is amortized over 30 years in proportion to premium, and c) the Irish tax basis with respect to reserves and the treatment of the ceding commission is equal to Irish regulatory reporting.