Service: Get by LEXSEE®
Citation: 2003 U.S. Dist. LEXIS 26764

*2003 U.S. Dist. LEXIS 26764, \**

ALEMAC INSURANCE SERVICES, INC., Plaintiff, v. RISK TRANSFER INC. and CHRIS RHODEN, Defendants.

03 Civ. 1162 (WHP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2003 U.S. Dist. LEXIS 26764

August 26, 2003, Decided
August 28, 2003, Filed

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff insurance consultant sued defendants, an insurance seller and one of its employees, for breach of contract, breach of fiduciary duty by the employee, and aiding and abetting a breach of fiduciary duty. Defendants moved to stay this action and compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C.S. § 1 et. seq. The consultant contested the motion.

**OVERVIEW:** The parties entered into an agreement whereby the consultant introduced the seller to a certain reinsurer, thereby generating brokerage commissions. The parties incorporated their understanding regarding division of the commissions into a business consulting contract (BCC). At the same time, they also executed a partnership agreement to create an investment holding company funded by the BCC. However, the partnership agreement was never funded and the seller terminated it. The partnership agreement provided for arbitration of "any dispute or controversy." Although the amended complaint alleged breach of the BCC and omitted a prior claim for breach of the partnership agreement, the court granted the motion. The arbitration clause was expansive, and the parties' disputes clearly "touched upon" the partnership agreement. In particular, as the BCC established the funding mechanism for the holding company created by the partnership agreement, the breach of contract claim was related to the partnership agreement. Similarly, the breach of fiduciary duty and the aiding and abetting claims were within the scope of the arbitration clause because they arose directly from both agreements.

**OUTCOME:** The court granted the motion to compel arbitration.

**CORE TERMS:** partnership, arbitration clause, arbitration, breach of fiduciary duty, collateral matter, arbitrability, counterclaim, compel arbitration, touch, breach of contract, arbitration agreements, business expenses, aiding and abetting, susceptible, assurance, encompasses, connected, brokerage, funding mechanism, work performed, failure to pay, claims asserted, claim arising, dispute arising, scope of arbitration, subject to arbitration, separate agreement, antitrust claims, administering, arbitrable

## LEXISNEXIS® HEADNOTES                                                  ⊟ **Hide**

Get a Document - by Citation - 2007 U.S. Dist. LEXIS 26764    Page 2 of 8

Case 1:07-cv-06731-GBD    Document 8-2    Filed 08/21/2007    Page 2 of 34

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability

HN1 A court must determine whether the factual allegations underlying the claims and defenses are within the scope of arbitration regardless of the legal labels given the causes of action. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act

HN2 When a contract contains a written arbitration clause and concerns a transaction involving commerce, the Federal Arbitration Act (FAA), 9 U.S.C.S. § 1 et seq., governs. The FAA establishes a liberal policy in favor of arbitration as a means to reduce the costliness and delays of litigation. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Arbitration Agreements

HN3 Section 2 of the Federal Arbitration Act states that written arbitration agreements shall be valid, irrevocable, and enforceable. 9 U.S.C.S. § 2. The United States Supreme Court has recognized a strong policy favoring arbitration, and has advised courts that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. A court should compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Stays Pending Arbitration

HN4 Section 3 of the Federal Arbitration Act provides that courts must stay any suit or proceeding until arbitration has been completed if the action concerns "any issue referable to arbitration" under a written agreement for such arbitration. 9 U.S.C.S. § 3. If all of the plaintiff's claims are subject to arbitration, no useful purpose will be served by granting a stay of the claims, and the case may be dismissed. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act
Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Stays Pending Arbitration

HN5 In reviewing the arbitrability of claims that do not involve federal statutes, a court must determine (i) whether the parties agreed to arbitrate; and (ii) whether the scope of the agreement encompasses the claims asserted. If a court concludes that some, but not all, of the claims in a case are arbitrable, the court must decide whether to stay the balance of the proceedings pending arbitration. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Arbitration Agreements

HN6 In determining whether a dispute falls within the scope of an agreement's arbitration clause, a court must initially classify the particular clause as either broad or narrow. An arbitration clause is broad if the language of the clause, taken as a whole, evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to the agreement containing the clause, whereas a narrow arbitration clause is designed to play a more limited role in any future dispute. If an arbitration clause is broad, a presumption of arbitrability arises, and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the rights and obligations under it. When parties use broad language in drafting an arbitration clause, presumably they intend all issues that "touch matters" within the main agreement to be arbitrated. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Arbitration Agreements

*HN7* Where an agreement contains a broad arbitration clause, a court must apply a strong presumption of arbitrability in determining the scope of the arbitration clause. That presumption of arbitrability is only overcome if it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation that it covers the asserted dispute. A court must consider whether claims in an amended complaint are on their face within the purview of the clause, or over some collateral issue that is somehow connected to the main agreement that contains the arbitration clause. Where there is a presumption of arbitrability created by a broad clause, arbitration of all collateral matters is appropriate.  More Like This Headnote

**COUNSEL:**  **[*1]**  For Alemac Insurance Services, Inc., Plaintiff: Michael I. Bayda, Jacobs, Persinger & Parker, New York, NY.

For Risk Transfer, Inc., Defendant: J. Timothy Schulte, Zimmerman, Shuffield, Kiser & Sutcliffe, P.A., Orlando, FL, Stuart Alan Krause, Zeichner Ellman & Krause LLP, New York, NY.

For W. Chris Rhoden, Defendant: Stuart Alan Krause, Zeichner Ellman & Krause LLP, New York, NY.

For Risk Transfer, Inc., Counter Claimant: J. Timothy Schulte, Zimmerman, Shuffield, Kiser & Sutcliffe, P.A., Orlando, FL, Stuart Alan Krause, Zeichner Ellman & Krause LLP, New York, NY.

For Alemac Insurance Services, Inc., Counter Defendant: Michael I. Bayda, Jacobs, Persinger & Parker, New York, NY.

For W. Chris Rhoden, Counter Claimant: Stuart Alan Krause, Zeichner Ellman & Krause LLP, New York, NY.

For Alemac Insurance Services, Inc., Counter Defendant: Michael I. Bayda, Jacobs, Persinger & Parker, New York, NY.

**JUDGES:** WILLIAM H. PAULEY III, U.S.D.J.

**OPINION BY:** WILLIAM H. PAULEY III

**OPINION**

*MEMORANDUM AND ORDER*

WILLIAM H. PAULEY III, District Judge:

Defendant Risk Transfer, Inc. ("Risk Transfer") moves (i) to stay this action and compel arbitration, pursuant to the Federal **[*2]** Arbitration Act, 9 U.S.C. § 1, *et. seq.,* or in the alternative (ii) to dismiss the Amended Complaint ("Am. Compl.") for improper venue pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure, or transfer this case to the United States District Court for the Middle District of Florida, pursuant to 28 U.S.C. § 1404 (a). For the reasons set forth below, Risk Transfer's motion to compel arbitration is granted.

I. *Background*

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 26764    Page 4 of 8

Case 1:07-cv-06731-GBD   Document 9-2   Filed 08/21/2007   Page 4 of 34

Plaintiff Alemac Insurance Services, Inc. ("Alemac"), New Jersey corporation with its principal place of business in New York, acts as an insurance consultant and develops underwriting platforms and alternative market products for its clients engaged in the wholesale and retail brokerage business. (Am. Compl. PP 1, 6.) Risk Transfer, a Florida corporation located in Orlando, Florida is a seller of various wholesale and retail insurance products. (Am. Compl. PP 2, 7; Declaration of Daryl B. Williams, dated July 2, 2003 ("Williams Decl.") P3.) Defendant W. Chris Rhoden ("Rhoden") is allegedly a current employee of Risk Transfer who was employed by Alemac from October 1, 2002 to January 15, 2003 at the **[*3]** bequest of Risk Transfer. (Am. Compl. PP 8, 14-18.)

In or about August 2001, Alemac and Risk Transfer entered into an agreement pursuant to which Alemac introduced Risk Transfer to a reinsurance company, now named First Commercial Insurance Company ("First Commercial"), and directed insurance business to First Commercial, thereby generating brokerage commissions to Risk Transfer. (Am. Compl. P9; Declaration of John C. Harris, dated June 17, 2003 ("Harris Decl.") P3.) Risk Transfer and Alemac initially agreed to split the commissions 60/40, respectively. (Am. Compl. P9; Harris Decl. P3.) In April 2002, at Risk Transfer and First Commercial's request, Alemac pursued excess reinsurance for First Commercial under an initiative called "The Lighthouse Program." (Am. Compl. P10; Harris Decl. P4.) In July 2002, at Risk Transfer's request, Alemac reduced its share of the brokerage commissions to 10%. (Am. Compl. P11; Harris Decl. P4.) This modified understanding was incorporated into a Business Consulting Contract (the "BCC"), dated November 5, 2002, and executed in New York on December 5, 2002. (Am. Compl. Ex. 1; Harris Decl. PP 5-6.) Also on December 5, the parties executed a Partnership **[*4]** Agreement (the "Partnership Agreement"), which was back-dated to September 9, 2002. (Williams Decl. P4; Declaration of Timothy J. Schulte, dated June 12, 2003 ("Schulte Decl.") Ex. A(2).) Both the BCC and Partnership Agreement were drafted without the assistance of counsel. (Williams Decl. P4.)

The Partnership Agreement created a partnership between Risk Transfer and Alemac called Leprechaun Holdings, which was to engage in the business of creating, funding and managing an offshore captive investment company. (Schulte Decl. Ex. A(2).) The BCC established Leprechaun Holdings' initial funding mechanism by providing that 10% of Alemac and Risk Transfer's net commissions received for work performed under the BCC would be paid into Leprechaun Holdings. (Am Compl. Ex. 1 at P5.) Further, the Partnership Agreement mandated that 49% of such initial capital be paid by Alemac, and 51% of the initial capital be paid by Risk Transfer into the partnership. (Schulte Decl. Ex. A(2) at P5.) The Partnership Agreement, however, was never funded. (Am. Compl. P15; Williams Decl. P3.) On January 6, 2003, Risk Transfer terminated the BCC and the Partnership Agreement by letter. (Harris Decl. Ex. 1.)

**[*5]**  In its Amended Complaint, Alemac alleges an action for breach of contract against Risk Transfer for (a) failure to pay Alemac the 10% of commissions it was due under paragraph 4 of the BCC; (b) terminating the BCC without proper notice pursuant to paragraph 2 of that contract; and (c) Alemac's 49% *pro rata* share of an additional 10% of commissions payable by Risk Transfer into Leprechaun Holdings, pursuant to paragraph 5 of the BCC. (Am. Compl. PP 19-23.) Alemac also brings a claim for breach of fiduciary duty against Rhoden, who worked as an intermediary between Risk Transfer and Alemac in implementing the BCC and the Partnership Agreement. Finally, Alemac appends a claim for aiding and abetting breach of fiduciary duty against Risk Transfer and Rhoden. (Am. Compl. PP 24-27.) On May 8, 2003, Rhoden also filed an amended counterclaim against Alemac for $ 2,966 in unpaid business expenses he incurred in November and December 2002 while working for Alemac.

The crux of the present dispute involves an arbitration clause in paragraph 14 of the Partnership Agreement and its applicability to Alemac's lawsuit, which stems in part from

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 26764    Page 5 of 8

Case 1:07-cv-06731-GBD    Document 9-2    Filed 08/21/2007    Page 5 of 34

Risk Transfer's breach of the BCC. Paragraph 14 **[\*6]** of the Partnership Agreement states:

> *Any dispute or controversy herein* shall be settled by arbitration in accordance with the Arbitration Act and judgment upon the award rendered maybe entered in the court having jurisdiction in the State in which the head office of the partnership is located.

(Schulte Decl. Ex. A(2) at P14) (emphasis added). Unlike the Partnership Agreement, the BCC does not contain an arbitration clause or any other remedy provision. *(Compare* Schulte Decl. Ex. A(2) at P14 *with* Am. Compl. Ex. 1.)

As a preliminary matter, Alemac filed its original complaint in this action on February 21, 2003. That complaint asserted four claims: breach of contract under the BCC, breach of contract under the Partnership Agreement, breach of fiduciary duty and aiding and abetting breach of fiduciary duty. (Schulte Decl. Ex. A.) Alemac amended its complaint on April 15, 2003, deleting its breach of the Partnership Agreement claim but otherwise asserting the same facts described in its original complaint. That Alemac omitted its breach of Partnership Agreement claim from its Amended Complaint is of no moment as *HN1* this Court must "determine whether the factual **[\*7]** allegations underlying the claims and defenses [are] within the scope of arbitration regardless of the legal labels given the causes of action." *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315, 319 (4th Cir. 1988) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 622 n.9, 87 L. Ed. 2d 444, 105 S. Ct. 3346 (1985)).

II. *Motion to Stay and Compel Arbitration*

A. *Applicable Legal Standards*

*HN2* "When a contract contains a written arbitration clause and concerns a transaction involving commerce, the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.* (2003), governs." *In re Currency Conversion Fee Antitrust Litigation,* 265 F. Supp. 2d 385, 400 (S.D.N.Y. 2003). The FAA "establishes a liberal policy in favor of arbitration as a means to reduce 'the costliness and delays of litigation.'" *Campaniello Imports, Ltd. v. Saporiti Italia S.P.A.,* 117 F.3d 655, 665 (2d Cir. 1997) (Pollack, J., by designation) (quoting *Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 844 (2d Cir. 1987)).

*HN3* Section 2 of the FAA states that written arbitration agreements **[\*8]** "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The United States Supreme Court has recognized a strong policy favoring arbitration, and has advised courts that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hosp. v. Mercury Contr. Corp.,* 460 U.S. 1, 24-25, 74 L. Ed. 2d 765, 103 S. Ct. 927 (1983); *accord ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co.,* 307 F.3d 24, 29 (2d Cir. 2002); *New York's Heath & Human Serv. Union v. NYU Hosp. Ctr.,* 2003 U.S. Dist. LEXIS 4343, 02 Civ. 9165 (WHP), 2003 WL 1475777, at *1 (S.D.N.Y. Mar. 20, 2003). A court should compel arbitration unless "it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute." *AT&T Tech., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 650, 89 L. Ed. 2d 648, 106 S. Ct. 1415 (1986); *accord Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.,* 252 F.3d 218, 223 (2d Cir. 2001).

*HN4* Section 3 of the FAA provides that courts must stay any suit or proceeding until arbitration has been completed if **[\*9]** the action concerns "any issue referable to arbitration" under a written agreement for such arbitration. 9 U.S.C. § 3; *accord Fluor Daniel Intercontinental, Inc. v. Gen. Elec. Co.,* 1999 U.S. Dist. LEXIS 12983, 98 Civ. 7181 (WHP), 1999 WL 637236, at *4 (S.D.N.Y. Aug. 20, 1999). If, however, all of the plaintiff's claims are

Get a Document - by Citation - 2009 U.S. Dist. LEXIS 26764    Page 6 of 8

Case 1:07-cv-06731-GBD    Document 8-2    Filed 08/21/2007    Page 6 of 34

subject to arbitration, "no useful purpose will be served by granting a stay of . . . [the] claims," and the case may be dismissed. *Lewis Tree Serv., Inc. v. Lucent Techs., Inc.,* 239 F. Supp. 2d 332, 336 (S.D.N.Y. 2002) (dismissing action where all of plaintiff's claims were subject to arbitration).

*HN5* In reviewing the arbitrability of claims that do not involve federal statutes, the court must determine (i) whether the parties agreed to arbitrate; and (ii) whether the scope of the agreement encompasses the claims asserted. *ACE Capital,* 307 F.3d 24 at 28; *Campaniello Imports,* 117 F.3d 655. Additionally, if the court concludes that some, but not all, of the claims in the case are arbitrable, the court must decide whether to stay the balance of the proceedings pending arbitration. *Oldroyd v. Elmira Savings Bank, FSB,* 134 F.3d 72, 76 (2d Cir. 1998). **[*10]** Here, the parties do not dispute the validity of their agreement to arbitrate, but instead spar over whether the scope of the clause encompasses the claims asserted in the Amended Complaint.

*HN6* In determining whether a dispute falls within the scope of an agreement's arbitration clause, this Court must initially classify the particular clause as either broad or narrow. *Louis Dreyfus Negoce,* 252 F.3d at 224 (citing *Mehler v. Terminix Int'l Co.,* 205 F.3d 44, 49 (2d Cir. 2000)). "An arbitration clause is broad if the language of the clause, taken as a whole, evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to the agreement containing the clause," whereas a narrow arbitration clause is "designed to play a more limited role in any future dispute." *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.,* 58 F.3d 16, 23 (2d Cir. 1995). If the arbitration clause is broad, a presumption of arbitrability arises, and "arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the rights and obligations under it." *ACE Capital,* 307 F.3d 24 at 34. **[*11]** Moreover, when parties use broad language "in drafting an arbitration clause, presumably they intend all issues that 'touch matters' within the main agreement to be arbitrated." *ACE Capital v. Central United Life Insurance Company,* 307 F.3d 24 at 24 (quoting *Collins & Aikman,* 58 F.3d at 23).

B. *Discussion*

Turning to the arbitration clause at issue, paragraph 14 of the Partnership Agreement states in relevant part: "Any dispute or controversy herein shall be settled by arbitration . . . ." This arbitration clause, and specifically the phrase "any dispute or controversy herein" is the paradigm of an expansive clause, and therefore this Court characterizes the arbitration clause as broad. Indeed, Courts routinely find that this type of language evinces a broad clause. See, e.g., *ACE Capital,* 307 F.3d 24 at 33 (finding the phrase "any dispute [that] shall arise between the parties . . . with reference to the interpretation of this Agreement or their rights with respect to any transaction involved" to be broad) (citing *Roby v. Corp. of Lloyd's,* 996 F.2d 1353, 1361 (2d Cir. 1993) (finding no substantive difference **[*12]** between the phrases "relating to," "in connection with," or "arising from," and holding that such language did not limit the scope of arbitration and forum selection clauses to allegations of contractual violations)); *Louis Dreyfus Negoce,* 252 F.3d at 225 (finding arbitration clause stating "any dispute arising from the making, performance or termination of this Charter Party" to be broad); *Oldroyd,* 134 F.3d at 76 (finding the phrase "any dispute, controversy or claim arising under or in connection with [the agreement]" to be broad); *In re Currency Conversion Fee Antitrust Litigation,* 265 F. Supp. 2d at 405-06 (finding phrase "[claims] arising out of or relating to . . . [the] Account" broad); *Fluor Daniel Intercontinental,* 1999 WL 637236, at *7 (finding arbitration clause "all disputes arising in connection with this Agreement" broad). *HN7* In light of the Partnership Agreement's broad arbitration clause, this Court must apply a strong presumption of arbitrability in determining the scope of the arbitration clause. *Oldroyd,* 134 F.3d at 76. That presumption of arbitrability is only overcome "if it **[*13]** can be said with positive assurance that the arbitration clause is not susceptible of an interpretation that it covers the asserted dispute." *Oldroyd,* 134 F.3d at 76; *accord Fluor*

*Daniel Intercontinental,* 1999 WL 637236, at *7.

Thus, this Court must consider whether the claims in the Amended Complaint are "on [their] face within the purview of the clause, or over some collateral issue that is somehow connected to the main agreement that contains the arbitration clause." *Louis Dreyfus Negoce,* 252 F.3d at 224. Given the presumption of arbitrability created by the broad clause here, arbitration of all collateral matters is appropriate. *See Collins & Aikman,* 58 F.3d at 23. The current dispute arises in part out of Risk Transfer's alleged breach of the BCC, which does not contain an arbitration clause. In its claim against Risk Transfer for breach of the BCC, however, Alemac seeks between $ 320,000 and $ 430,000 for Risk Transfer's failure to pay its share of 10% of net commissions into Leprechaun Holdings, pursuant to paragraph 5 of the BCC. (Am. Compl. P21.) Paragraph 5 of the BCC states:

> An additional 10% **[\*14]** of the Net Commissions associated with the program for work performed under this agreement shall be paid into Leprechaun Holdings. Terms of Leprechaun Holdings are spelled out under separate agreement.

(Am. Compl. Ex. 1.)

Although the BCC and Partnership Agreement are two separate, albeit related documents, Alemac's allegation in its Amended Complaint that Risk Transfer breached paragraph 5 of the BCC clearly "touches upon" the Partnership Agreement. It is undisputed that the "separate agreement" to which paragraph 5 of the BCC refers is the Partnership Agreement. In essence, the BCC established the funding mechanism for the operation of Leprechaun Holdings, which was created by the Partnership Agreement. Additionally, this Court notes that the BCC and the Partnership Agreement were signed nearly simultaneously and that the BCC does not contain any type of remedy clause. Accordingly, as the BCC "touches upon" the Partnership Agreement, Alemac's breach of contract claim is properly classified as a "collateral matter" that falls appropriately within the purview of the Partnership Agreement's broad arbitration clause. *See Campaniello Imports,* 117 F.3d at 668; **[\*15]** *see also Louis Dreyfus Negoce,* 252 F.3d at 228-29 (finding letters of indemnity within the scope of an arbitration clause in a charter party agreement and stating that a "collateral agreement" is "a separate, side agreement, connected with the principal contract which contains the arbitration clause"); *In re Currency Conversion Fee Antitrust Litigation,* 265 F. Supp. 2d at 406 (finding plaintiffs' antitrust claims "touch[ed] matters" covered by the agreement containing the arbitration clause).

Additionally, Alemac's claims for breach of fiduciary duty against Rhoden, and for aiding and abetting breach of fiduciary duty against Risk Transfer and Rhoden, as well as Rhoden's amended counterclaim for unpaid business expenses, arise directly from the parties' implementation and management of both the Partnership Agreement and the BCC. Thus, both of Alemac's breach of fiduciary duty claims and Rhoden's amended counterclaim are also collateral matters that fall within the scope of the Partnership Agreement's broad arbitration clause. *See Collins & Aikman,* 58 F.3d at 23 (stating that the presumption of arbitrability associated with a broad **[\*16]** arbitration clause asks whether collateral matters "implicate . . . issues of contract construction or the parties' rights and obligations under [the agreement with the clause]"); *Campaniello Imports,* 117 F.3d at 668 (finding plaintiff's fraud and unjust enrichment claims "touched matters" involved in the agreement containing the arbitration clause); *J.J. Ryan & Sons,* 863 F.2d at 319-22 (affirming referral of all claims to arbitration because the factual allegations of the dispute arose "in connection with" the contract containing the arbitration clause). Alemac specifically alleges that its breach of fiduciary duty claims arose from its employment of Rhoden as a liaison with Risk Transfer, and alleges that his duties entailed "overseeing Alemac's interest for both the Business Consulting Contract as well as the Leprechaun Holdings Partnership." (Am. Compl. PP 15-18, 24-27; Schulte Decl. Ex. A(2); Harris Decl. P8.) Additionally, Rhoden's disputed business

Get a Document by Citation - 2003 U.S. Dist. LEXIS 26764          Page 8 of 34

Case 1:07-cv-06731-GBD   Document 9-2   Filed 08/21/2007   Page 8 of 8

expenses occurred during his three month employment at Alemac while administering the Partnership administering the Partnership Agreement and the BCC, and acting as a liaison between Alemac and **[\*17]** Risk Transfer during their partnership. (Am. Counterclaim PP 31-33; Declaration of W. Chris Rhoden, dated July 2, 2003 ("Rhoden Decl.") P1; Am. Compl. PP 15, 24-27.) Thus, this Court cannot say with "positive assurance" that the arbitration clause at issue is "not susceptible of an interpretation" that Alemac's breach of fiduciary duty claims and Rhoden's amended counterclaim "touch matters" within the Partnership Agreement. *See Campaniello Imports, 117 F.3d at 668-69* (finding scope of arbitration agreement covered collateral matters and extending arbitration clause to disputes between the corporate parties and their employees or disclosed agents); *In re Currency Conversion Fee Antitrust Litigation, 265 F. Supp. 2d at 406* (finding plaintiffs' antitrust claims related to agreement containing arbitration clause). Accordingly, Alemac's breach of fiduciary duty claims and Rhoden's amended counterclaim are collateral matters falling within the scope of the parties' broad arbitration agreement.

*Conclusion*

Since the broad arbitration clause in the Partnership Agreement encompasses all pleadings before this Court, Risk Transfer's motion to compel arbitration **[\*18]** is granted. Further, Risk Transfer's motion to dismiss or to transfer venue is denied as moot. The Clerk of the Court is directed to close this case.

Dated: August 26, 2003

New York, New York

SO ORDERED:

WILLIAM H. PAULEY III

U.S.D.J.

Service:   **Get by LEXSEE®**
Citation:  **2003 U.S. Dist. LEXIS 26764**
View:      Full
Date/Time: Monday, August 20, 2007 - 12:56 PM EDT

 LexisNexis®    About LexisNexis | Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*Westlaw.*

Not Reported in F.Supp.2d                                          Page 1
Not Reported in F.Supp.2d, 2001 WL 547224 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Chase Mortg. Company-West
S.D.N.Y.,2001.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
CHASE MORTGAGE COMPANY-WEST f/k/a
Mellon Mortgage Company and Mellon Bank, N.A.,
Petitioners,
v.
BANKERS TRUST COMPANY, Respondent.
**No. 00 CIV. 8150(MBM).**

May 23, 2001.

Leonard D. Steinman, Esq., Matthew J. Siembieda,
Esq., Alexander D. Bono, Esq., Timothy D. Katsiff,
Esq., Blank, Rome, Comisky & McCauley, New
York, for Petitioners.
Frederick A. Brodie, Esq., Takemi Ueno, Esq.,
Pillsbury Winthrop LLP, New York, for Respondent.

OPINION AND ORDER
MUKASEY, D.J.
**\*1** In this diversity action, Chase Mortgage
Company-West and Mellon Bank, N.A. petition the
court pursuant to 9 U.S.C. § 4 (1994) for an order
compelling Bankers Trust Company to submit to
arbitration its third-party claims against petitioners in
New Jersey state court. For the reasons stated below,
the motion is granted.

I.

Petitioner Chase Mortgage Company-West was
formerly known as Mellon Mortgage Company
("Mellon Mortage"). (Pet.¶ 13) Mellon Mortgage
entered into an Asset Purchase Agreement with
Bankers Trust Company ("Bankers") in which
Mellon Mortgage agreed to acquire most of Bankers'
commercial mortgage loan servicing business. (*Id.* at
8) The parties referred to the loan servicing
agreements that Mellon Mortgage did not acquire as
Special Transactions. (*Id.* at 10) With respect to the
Special Transactions agreements, Mellon Mortgage
and Bankers entered into a separate Special
Transactions Agreement in which Mellon Mortgage
agreed to act as "Bankers' agent for the limited
purpose of performing certain activities relating to
the Special Transactions." (Id. at 11) Mellon

Mortgage's parent company, Mellon Bank, N.A.,
guaranteed Mellon Mortgage's obligations under both
the Asset Purchase and Special Transactions
Agreements. (*Id.* at 12)

The Special Transaction at issue here is one in which
Bankers agreed to collect tax liens. In 1993 and 1994,
Jersey City offered a portfolio of tax liens for sale.
(*Id.* at 23) The portfolios were purchased by private
trusts. (*Id.* at 24, 25, 28) Each of the two trusts
entered into Master Servicing Agreements ("MSAs")
with Bankers under which Bankers was responsible
for collecting the liens. (*Id.* at 29) Subsequently,
Bankers entered into a sub-servicing agreement with
Breen Capital Services under which Breen was to
fulfill Bankers' obligations under the MSAs. (*Id.* at
30) In addition, because the MSAs were subject to
the Special Transaction Agreement, Mellon
Mortgage was required to "perform certain limited
functions in connection with some of Bankers'
obligations to service" those agreements. (*Id.* at 31)
Respondent explains that Mellon Mortgage "acted as
a second sub-servicer with respect to the 1993 and
1994 deals, above Breen and below Bankers ...."
(Def. Mem. at 3)

In 1998, John Varsolona, on behalf of a class of
property owners, sued Bankers, Breen, and several
other defendants in New Jersey State court on various
claims related to the collection of the 1993 tax liens.
(Pet. at 33) In January 2000, Bankers filed a third-
party complaint against Mellon Mortgage and Mellon
Bank seeking indemnity or contribution for any
judgment in the *Varsolona* action. (*Id.* at 38) In May,
Louise Garretson, also on behalf of a class of
property owners, sued Bankers, Breen and several
other defendants on the same grounds-this time,
however, related to the collection of the 1994 tax
liens. (*Id.* at 50) Bankers filed an identical third-
party complaint against Mellon Mortgage and Mellon
Bank seeking indemnity or contribution for any
judgment in the *Garretson* action. (*Id.* at 52) Mellon
Mortgage and Mellon Bank then filed this petition to
compel arbitration.

II.

**\*2** The Asset Purchase Agreement requires that
"[a]ny controversy or claim between [Mellon
Mortgage] and [Bankers] arising out of or relating to

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2001 WL 547224 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

any Transaction Agreement ... will at the request of any party, be determined by arbitration." (Pet., Ex. A) The Transaction Agreement[s] include the Asset Purchase Agreement and the Special Transactions Agreement. (*Id.*) Accordingly, Bankers must submit its third-party claims in *Varsolona* and *Garretson* to arbitration.

### III.

Bankers argues that Mellon Bank may not request arbitration of Bankers' claims against it because the Asset Purchase Agreement's arbitration clause covers disputes only between the signatories to that agreement, Mellon Mortgage and Bankers. (Def. Mem. at 7) It is permissible, however, for a non-signatory to an arbitration agreement to compel arbitration of claims brought by a signatory to that agreement. *See Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, 198 F.3d 88, 98 (2d Cir.1999).* A signatory will be estopped to "avoid[ ] arbitration with a non-signatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Id.*

When it recognized estoppel as a basis on which a non-signatory can compel arbitration, the Second Circuit cited *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753 (11th Cir.1993).* In that case, the Eleventh Circuit explained that in one of its own prior cases, *McBro Planning and Dev. Co. v. Triangle Elec. Constr. Co., 741 F.2d 342 (11th Cir.1984),* the Court had permitted a non-signatory to compel arbitration because the claims brought by the signatory against the non-signatory were "intertwined with the underlying contract obligations." *Sunkist,* 10 F.3d at 757. The *Sunkist* Court further explained that the *McBro* Court reached that conclusion based on the "close "relationship of the alleged wrongs to the non-signatory's obligations ... in the contract ...." *Id.*

Mellon Bank, the non-signatory, has no obligations under the Special Transactions agreement. However, in *Sunkist,* the non-signatory also had no obligations. *See id.* Rather, as the *Sunkist* Court explained, the key was the nature of the claims asserted by the signatory against the non-signatory. In that case, the Court concluded that estoppel was appropriate because the signatories' claims "arise[ ] out of and relate[ ] directly to" the underlying agreement. *Id.* at 757-58. In *Smith/Enron,* the Second Circuit clarified that the test is whether the signatory's claims arise under the "subject matter" of the underlying

agreement. *Smith/Enron,* 198 F.3d at 98. Here, Bankers' third-party claims against Mellon Bank seeking indemnity or contribution are based on Mellon Mortgage's performance under the Special Transactions agreement. (Pet., Ex. F) Therefore, those claims arise under the subject matter of that agreement.

*3 The second factor in determining whether the signatory's claims were "intertwined with the underlying contract obligations" is whether there was a "close relationship" between defendant signatory and defendant non-signatory. Here, Mellon Bank was Mellon Mortgage's parent during the period of Mellon Mortgage's alleged misconduct under the Special Transactions agreement. (Pet.¶ 12) Mellon Bank has since sold all of the stock in Mellon Mortgage to the Chase Mortgage Company. (*Id.* at 13) Nevertheless, it is sufficient that the companies were closely related at the time of Mellon Mortgage's alleged misconduct under the Special Transaction agreement. As explained in *Sunkist,* the purpose of this relationship factor is to determine whether Bankers' claims against Mellon Bank are intertwined with Mellon Mortgage's contract obligations. Whether they are intertwined depends on Mellon Bank's role when the misconduct occurred.

Because under the estoppel theory Mellon Bank can invoke the Asset Purchase Agreement's arbitration clause, Bankers must submit to arbitration its third-party claims against Mellon Bank in the *Varsolona* and *Garretson* actions.

### IV.

Petitioners also seek an order enjoining Bankers' state court action. In general, the Federal Anti-Injunction Act, 28 U.S.C. § 2283, prohibits federal courts from enjoining state court actions. However, the Act creates an exception which authorizes a federal court to stay proceedings in a state court "where necessary in aid or its jurisdiction, or to protect or effectuate its judgment." *Id.* This exception authorizes a district court to stay a parallel state proceeding in favor of arbitration. *See Hunt v. Mobil Oil Corp., 557 F. Supp 368, 372 (S.D.N.Y.1983)* (Weinfeld, J .) Accordingly, the petition to enjoin the state court action is granted.

Bankers argues that the court's arbitration order should be subject to two conditions: petitioners must agree "to be bound by the results of the arbitration for purposes of apportionment in the ... state court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 3
Not Reported in F.Supp.2d, 2001 WL 547224 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

actions," and "to join in motions by [Bankers] in the ... state court actions requesting that the results of the arbitration be given binding, preclusive effect for purposes of apportionment of responsibility between [Bankers] and [petitioners.] ." (Def. Mem. at 12-16) Despite Bankers' arguments about the prejudice it might suffer without those conditions, I am without power to attach them to the injunction.

This court is permitted to enjoin the state court action for the purpose of protecting its judgment. Here, if the court could not stay Bankers' third-party claim, the court's order to compel arbitration would be undermined. There is no similar necessity, however, to ensure that the state court applies the arbitrator's apportionment of responsibility between Bankers and petitioners. Bankers' concern is that the state court will impose a higher judgment on it because petitioners are no longer a parties to that suit. Bankers would then need to ask the arbitrator to apportion that judgment between Bankers and petitioners. *See id.* at 14. However, regardless of whether the state court reduces Bankers' liability on the basis of the arbitrator's prior apportionment, or requires Bankers to seek apportionment from the arbitrator after judgment in the state court, Bankers' claim will have been decided by the arbitrator, and that decision can be enforced by this court in a judgment. Thus, Bankers' proposed conditions are not necessary to protect the court's judgment.

V.

**\*4** Petitioners ask the court to order Bankers to pay costs and attorney fees. Local Civil Rule 54.1 requires a party seeking to recover costs to file that request with the clerk within 30 days after the entry of final judgment. Fed. R. Civ. Pro. 54(d)(2)(B) requires a party seeking attorneys' fees to file a motion with the court no later than 14 days after entry of the judgment. Because the motion must, *inter alia,* "specify the judgment," (*id.*), a party generally cannot move for attorneys' fees prior to judgment. 10 James Wm. Moore, et. al., Moore's Federal Practice § 54.151 (3d ed.2000). Accordingly, this request is denied.

For the reasons stated above, the petition to compel arbitration, and the motion to stay the state court action, are granted. Settle order on 10 days' notice.

SO ORDERED:

S.D.N.Y.,2001.
Chase Mortg. Company-West v. Bankers Trust Co.
Not Reported in F.Supp.2d, 2001 WL 547224 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1
Not Reported in F.Supp.2d, 2005 WL 589400 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Israel v. Chabra
S.D.N.Y.,2005.
Only the Westlaw citation is currently available.
    United States District Court,S.D. New York.
            Michael ISRAEL, Plaintiff,
                        v.
    Surinder CHABRA and Paran Realty Corp.,
                   Defendants.
            Steven ISRAEL, Plaintiff,
                        v.
    Surinder CHABRA and Paran Realty Corp.,
                   Defendants.
        **No. 04 Civ. 4599(DC), 04 Civ. 5859(DC).**

                   March 11, 2005.

Sklover & Associates, LLC, By: Alan L. Sklover,
New York, New York, for Plaintiffs.
Brown Rudnick Berlack Israels LLP, By: Emilio A.
Galván, New York, New York, for Defendants.

            *MEMORANDUM DECISION*
CHIN, J.
*1 In these diversity actions, plaintiffs Michael and
Steven Israel sue defendant Surinder Chabra,
president of plaintiff's former employer, "AMC
Computer Corporation" (AMC), for breach of
contract .[FN1] Specifically, plaintiffs allege Chabra
failed to fulfill his obligations under guaranties he
issued for AMC's payment of plaintiffs' bonuses.
Plaintiffs seek, *inter alia*, a declaratory judgment on
the proper rate of interest on the bonus payments
required by the employment agreements and
guaranteed by Chabra.

> FN1. Plaintiffs also sue Paran Realty Corp.,
> alleging that Paran Realty is Chabra's "alter
> ego" to which Chabra made fraudulent
> conveyances to frustrate payment of monies
> due to plaintiffs. (Compl.¶ 5). Because the
> claims against Paran Realty Corp. are
> wholly derivative of those against Chabra, I
> focus the discussion here on Chabra.

The parties filed simultaneous motions. Plaintiffs
move for partial summary judgment on the proper
rate of interest and Chabra's obligation to pay
plaintiffs' court courts and attorneys' fees. Defendants

move to compel arbitration.

For the reasons that follow, defendants' motion to
compel arbitration is granted. Plaintiffs' motion for
partial summary judgment is denied as moot. The
action is dismissed without prejudice to reinstatement
following the completion of arbitration proceedings.

                   *BACKGROUND*

                   A. *The Facts*

Plaintiffs are former employees of AMC. Chabra is
the president and chief executive officer of AMC. On
May 1, 2000, plaintiffs together entered into a "Letter
of Intent" with Chabra, AMC, and AMC Investors
LLC. (Pl.Mem.Ex. A). [FN2] Also on May 1, 2000,
plaintiffs each entered into an individual
"Employment Agreement" (the "Agreements") with
AMC. (Pl.Mem.Ex. B). The Letter of Intent and the
Agreements include provisions regarding plaintiffs'
duties, conditions of employment, and salary and
bonuses. The contracts were amended on July 31,
2000. The amended contracts required, upon the
completion of a restructuring transaction, the
payment to each plaintiff of a $1.75 million bonus, to
be paid with interest in monthly installments.
(Pl.Mem.Ex. D).

> FN2. Where "Pl. Mem." is cited, reference
> is made to Plaintiffs' Memorandum of Law
> in Opposition to Defendants' Motion to
> Compel Arbitration.

On August 25, 2000, Chabra executed personal
guaranties (the "Guaranties") for those bonus
payments. (Pl.Mem.Ex. E). Plaintiffs have filed suit
based on the Guaranties, alleging that AMC has not
paid the bonuses in full and Chabra is liable for the
remainder. The gravamen of the parties' dispute is the
proper interest rate as required by the contracts, and
whether, based on that rate, plaintiffs are owed
money or in fact have been overpaid by AMC.[FN3]

> FN3. Plaintiffs contend that the contracts
> require the interest on the bonus payments to
> be calculated based on a fixed rate of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 589400 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

interest, determined on the date of the closing of the restructuring as the Prime Rate plus one percent; calculated at the fixed rate, plaintiffs are owed interest on the bonus payment. Defendants contend that the contracts provide for a variable interest rate and that, calculated at the variable rates, plaintiffs have been overpaid by AMC.

The Agreements include an arbitration provision requiring that "any claim, dispute, disagreement or controversy that arises among the parties relating to this Agreement ... be resolved by arbitration." (Pl.Mem.Ex. B). The Agreements also include a forum selection clause, subject to the arbitration provision, designating any state or federal court sitting in the City of New York and waiving objections to venue. (Id.). The Guaranties, which were signed only by Chabra and not by plaintiffs, include a forum selection clause designating state or federal courts sitting in New York, and waiving objections to venue or forum. Each Guaranty provides:
The Guarantor hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the federal and New York State courts located in the City of New York for any action, suit or proceeding instituted by Israel to enforce this Guaranty.... The Guarantor hereby irrevocably and unconditionally waives any objection the Guarantor may have at any time to the venue or forum of any such proceeding brought in such a court.

*2 (Pl.Mem.Ex. E). The Guaranties do not contain an arbitration provision.

### B. Prior History and Other Proceedings

Plaintiffs currently are in arbitration with AMC over various issues, including the proper rate of interest payable on the bonus payments. (Pl.Mem.Ex. F). Although unclear from the record when the arbitration proceedings were initiated, plaintiffs' Statement of Claims is dated May 18, 2004. (Id.).

Michael Israel filed his complaint in this Court on June 18, 2004, and Steven Israel filed his complaint on July 28, 2004. A conference was held, and defendants' motion to compel arbitration and plaintiffs' motion for partial summary judgment followed. By order dated February 9, 2005, the Court requested additional briefing on issues raised by the motion to compel arbitration.

### DISCUSSION

#### 1. Applicable Law

By this motion, defendants seek to compel plaintiffs to arbitrate this matter. "The Second Circuit has established a two-part test for determining arbitrability of claims not involving federal statutes: (1) whether the parties agreed to arbitrate disputes at all; and (2) whether the dispute at issue comes within the scope of the arbitration agreement." *ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.,* 307 F.3d 24, 28 (2d Cir.2002). Plaintiffs refuse to arbitrate based on the first step of the test, arguing that Chabra cannot rely on an arbitration agreement to which he was not a signatory, and that the forum selection clause in the Guaranties between Chabra and plaintiffs precludes arbitration.

There is a strong and "liberal federal policy favoring arbitration agreements." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 625 (1985) (internal quotations and citation omitted). Nevertheless, arbitration is contractual by nature, and generally "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Thomson-CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 776 (2d Cir.1995) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582 (1960)). In some situations, however, even a nonsignatory to an arbitration agreement has been held bound. The Second Circuit has recognized circumstances in which a signatory may bind a nonsignatory to an arbitration agreement, *Thomson-CSF,* 64 F.3d at 776, and circumstances where the Court will "estop a signatory from avoiding arbitration with a nonsignatory." *Choctaw Generation L.P. v. Am. Home Assur. Co.,* 271 F.3d 403, 406 (2d Cir.2001). Courts are more willing to require arbitration in the latter situation. *See Merrill Lynch Inv. Mgrs. v. Optibase, Ltd.,* 337 F.3d 125, 131 (2d Cir.2003).

#### 2. Application

The instant case presents the latter situation. Here, Chabra, a nonsignatory to the arbitration agreement between AMC and plaintiffs, seeks to arbitrate against signatories-plaintiffs. The Second Circuit has made clear that under principles of estoppel, "a nonsignatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2005 WL 589400 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

where a careful review of 'the relationship among the parties, the contracts they signed ..., and the issues that had arisen' among them discloses that 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." ' *JLM Inds. Inc. v. Stolt-Nielsen SA,* 387 F.3d 163, 177 (2d Cir.2004) (quoting *Choctaw Generation,* 271 F.3d 403, 406 (2d Cir.2001)). The issues in the suit between plaintiffs and defendant under the Guaranties "could hardly be more closely bound to the dispute now in arbitration" between plaintiffs and AMC under the Employment Contracts. *Choctaw Generation,* 271 F.3d at 406.

**\*3** In the arbitration against AMC, the central issue is the proper rate of interest payable on plaintiffs' bonuses. (Pl.Mem.Ex. F). Plaintiffs' Statement of Claims in arbitration explicitly asks the panel to determine the proper rate of interest on bonus payments under the Agreements, the same issue plaintiffs have asked this Court to determine in the instant actions. There is no question, and plaintiffs do not dispute, that a central issue in the arbitration is intertwined-indeed, is identical-to the central issue in the instant actions. In other words, "the merits of [the] issue between the parties [is] bound up with a contract binding one party and containing an arbitration clause." *Choctaw Generation,* 271 F.3d at 407.

The facts of the instant case are so closely aligned with those of *Choctaw Generation* that the degree of relatedness of the parties, contracts, and controversies surely is sufficient to estop plaintiffs from avoiding arbitration. *Choctaw Generation* involved a construction contract between Choctaw Generation Limited Partnership ("Choctaw") and Bechtel Power Co. ("Bechtel"), that contained an arbitration clause. The parties entered arbitration over the delay in Bechtel's performance. American Home Assurance Co. ("American Home") issued an $81 million surety bond to secure Bechtel's performance under the construction contract; the surety contract did not contain an arbitration provision. Choctaw sued American Home under the surety contract.[FN4]

FN4. To obtain payment of the liquidated damages it claimed for the delay, Choctaw drew down in full a $33 million dollar letter of credit that Bechtel had posted as required by the construction contract. In the federal action, Choctaw demanded that American Home as surety replenish the letter of credit to fund the accruing liquidated damages, up

to the full amount of the surety bond. *Choctaw Generation,* 271 F.3d at 403.

The Second Circuit held that Choctaw, as signatory, was estopped from avoiding arbitration with the non-signatory because of the "tight relatedness of the parties, contracts and controversies." *Id.* at 406. The issue of whether Choctaw could compel replenishment of the letter of credit to fund the liquidated damages turned upon many of the same provisions of the construction contract at issue in the arbitration, in which Choctaw sought liquidated damages against Bechtel. *Id.* at 407. The parties, contracts, and controversies in the instant case are bound up in the same manner as in *Choctaw Generation:* just as American Home would not be liable to Choctaw if the arbitrator believed Bechtel had not breached the contract, so would Chabra avoid liability to plaintiffs if the arbitrator determined AMC had paid plaintiffs in full. *See HG Estate, LLC v. Corporacion Durango, S.A. DE de C.V.,* 271 F.Supp.2d 587, 595 (S.D.N.Y.2003) (same analysis).

Plaintiffs make no attempt to distinguish their case from *Choctaw Generation,* nor do they deny the great extent to which the controversy between plaintiffs and AMC and plaintiffs and defendants are intertwined. They argue instead that (1) reliance and detriment are necessary elements to this theory of estoppel and are not present in the instant case, and (2) the forum selection clause precludes arbitration. I address each argument in turn.

First, plaintiffs argue that the elements of traditional estoppel, including reliance and detriment, are required in this alternative theory of estoppel. No court has so held, and I decline to do so. Traditional "equitable estoppel" applies where one party make a representation (*e.g.,* a promise or a representation of fact) to another party who reasonably relies upon it, to his detriment. 4 Richard A. Lord, Williston on Contracts § 8:3 (4th ed.2004). Plaintiffs do not make clear in what manner reliance and detriment are elements under the alternative theory of estoppel under which a signatory may be estopped from avoiding arbitration. Rather, plaintiffs broadly allege that "the requisite estoppel elements of reliance and detriment will likely be found in the vast majority of fact patterns" in which the alternative theory of estoppel is applied. (Pl. Sec. Mem. at 12).[FN5] The fact patterns of cases in which estoppel has been found, as well as the Second Circuit's enunciation of the test for estoppel, belie such an argument.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 4
Not Reported in F.Supp.2d, 2005 WL 589400 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

FN5. Where "Pl. Sec. Mem." is cited, reference is made to Plaintiffs' Second Memorandum of Law in Opposition to Defendants' Motion to Compel Arbitration.

**\*4** As discussed above, *Choctaw Generation,* one of the Second Circuit's leading cases on the issue, bears a striking resemblance to this case; in that case, there are no facts that suggest that American Home Assurance in any way relied on Choctaw's agreement to arbitrate with Bechtel, nor did the Second Circuit look to any such reliance or detriment. Rather, the Second Circuit outlined a test that focuses on the extent to which the issues are intertwined such that arbitration is appropriate.

Second, plaintiffs argue that, despite the intertwined nature of the issues raised in the instant case to those in arbitration, the parties here specifically contracted "out of the ambit of alternative estoppel," because the Guaranties contained a forum selection clause. (Pl. Sec. Mem. at 13). Judge Haight was presented with a nearly identical question in *HG Estate, LLC v. Corporacion Durango S.A. DE de C.V.,* 271 F.Supp.2d 587 (S.D.N.Y.2003), and I find his reasoning persuasive. *HG Estate* involved a contract (stock purchase agreement) that was the subject of an arbitration between HG Estate and Durango USA pursuant to the contract's arbitration provision, and an indemnity agreement between HG Estate and Durango Mexico with a forum selection clause and no arbitration clause. Judge Haight found that estoppel applied, and that Durango Mexico, the nonsignatory, could invoke against HG Estate, the signatory, the arbitration provision. He then turned to the issue of HG Estate's right to invoke against Durango Mexico the forum selection clause. Judge Haight framed the question as one of the primacy of two competing forum selection clauses: an arbitration provision, as the Second Circuit has recognized, is "merely a specialized type of forum selection clause." *Id.* at 590 (quoting *Roby v. Corporation of Lloyd's,* 996 F.2d 1353, 1363 n. 2 (2d Cir.1993)). Once estoppel applies to hold a signatory to an arbitration provision, the question is whether the arbitration provision or a competing forum selection clause "wins."

In answering this question of first impression, Judge Haight ruled, and I agree, that "primacy should go to the arbitration clause ..., for two reasons: one grounded in public policy, and the other in considerations of judicial economy." *HG Estate,* 271 F.Supp.2d at 595. While forum selection clauses are to be enforced by the courts, the federal policy favoring arbitration clauses is stronger, receiving expression in legislation. *Id.* at 595 (citing the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*). Judicial economy also favors arbitration in this situation, as the central issue of the proper rate of interest will be resolved more efficiently in the existing arbitration, and the concern for inconsistent judgments will be alleviated.

That the forum selection clause here contains a waiver of any objection to venue and forum in New York does not alter the analysis. Such language is typical of forum selection clauses, and is not inconsistent with enforcing arbitration. Litigation, where appropriate (*e.g.,* to confirm an arbitration award), must occur in the courts of New York, and the parties waived their right to insist that litigation occur in another state. It cannot be read, as plaintiffs suggest, as an "anti-arbitration forum designating clause." (Pl. Sec. Mem. at 9). A forum selection clause and waiver of objections will not overcome arbitration where estoppel applies. *See HG Estate,* 271 F.Supp.2d at 590-91 (similar forum selection clause).

**\*5** The parties apparently do not dispute whether the issues in this litigation are within the scope of the arbitration clause, the second step of the Second Circuit's test. I hold that the language of the arbitration agreement requiring arbitration of "any claim, dispute, disagreement or controversy that arises among the parties relating to this Agreement" covers the issues raised in the instant action.

*CONCLUSION*

For the reasons set forth above, defendants' motion to compel arbitration is granted. Plaintiff's motion for partial summary judgment is denied as moot. The action is dismissed, without prejudice to reinstatement within sixty days after the final conclusion of the arbitration proceedings, should further litigation be necessary. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

S.D.N.Y.,2005.
Israel v. Chabra
Not Reported in F.Supp.2d, 2005 WL 589400 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1858556 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

C

Orange Chicken, L.L.C. v. Nambe Mills, Inc.
S.D.N.Y.,2000.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
THE ORANGE CHICKEN, L.L.C., Plaintiff,
v.
NAMBÉ MILLS, INC. and Target Corporation, sued
herein as Dayton Hudson Corporation
Defendants/Third Party Plaintiffs,
v.
Eva ZEISEL, Third Party Defendant.
No. 00 Civ. 4730(AGS).

Dec. 19, 2000.

*OPINION AND ORDER*
SCHWARTZ, J.
*1 Plaintiff filed the instant action on June 26, 2000 seeking damages arising out of defendants' alleged infringement of plaintiff's rights as the exclusive licensee of certain designs, pursuant to a contract with third party defendant. Currently before the Court is defendants' motion to stay litigation and compel arbitration.[FN1] For the reasons set forth below, the motion is granted in part and denied in part. The Court declines to compel arbitration of the claims in this litigation, but stays all claims pending the outcome of the ongoing arbitration before the American Arbitration Association ("AAA").

FN1. Defendants Nambé Mills, Inc. and Target Corporation have filed one motion; Third Party Defendant Eva Zeisel has filed a separate motion in which she "adopts and incorporates by reference the arguments set forth in the memorandum of law submitted by the two defendants." (Memorandum of Law in Support of Eva Zeisel's Motion to Stay Litigation and Compel Arbitration at 1; Reply Memorandum of Law In Support of Eva Zeisel's Motion to Stay Litigation and Compel Arbitration at 1.)

I. Factual Background [FN2]

FN2. The relevant facts discussed herein are drawn from the allegations of the Complaint or Third Party Complaint, and the exhibits thereto, or are otherwise reflected in the record.

A. Parties

Plaintiff The Orange Chicken LLC ("Orange") is a New York limited liability company in the business of selling antique and high quality current production home furnishings to retail and wholesale customers. (Complaint ("Compl.") ¶¶ 4, 5.) Defendant and Third Party Plaintiff Nambé Mills, Inc. ("Nambé"), a New Mexico corporation located in Santa Fe, New Mexico, manufactures and sells cookware and dinnerware, using for the most part a special metal alloy that combines the appearance of silver with the durability of iron. (Third Party Compl. ¶ 2; Defendants' Memorandum of Law In Support of Motion to Stay Litigation and to Compel Arbitration ("Defs.' Mem.") at 3.) Defendant and Third Party Plaintiff Target Corporation, a Minnesota corporation located in Minneapolis, Minnesota, is a mass merchandiser operating through its Target discount stores, and its Dayton's, Hudson's, and Marshall Field's department stores. (Third Party Compl. ¶ 3; Defs.' Mem. at 3.) Target sells products manufactured by Nambé, including products designed by Third Party Defendant Eva Zeisel ("Zeisel"). (Third Party Compl. ¶ 14; Defs.' Mem. at 4, 6.) Zeisel, an individual residing in New York, is an industrial designer known for her dinnerware designs, candlesticks, vases, and furniture.[FN3] (Third Party Compl. ¶ 4; Defs.' Mem. at 3.)

FN3. Although they are not co-defendants, for ease of reference in this Opinion, Nambé, Target, and Zeisel are also collectively referred to as "defendants."

The issues in this action center on the business relationships linking the four parties, and on the operation of two agreements that Zeisel entered into with Nambé and Orange, respectively.

B. Nambé-Zeisel Agreement

Under the agreement between Nambé and Zeisel (the "Nambé-Zeisel Agreement"), entered into in October 1998 and still in force and effect, Zeisel granted to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 2
Not Reported in F.Supp.2d, 2000 WL 1858556 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Nambé "the exclusive right to produce and market" certain products based on Zeisel's designs. (Nambé-Zeisel Agreement ¶ 5.) Zeisel submits designs to Nambé, and where Nambé deems it appropriate, it develops such designs into products. (*Id.* ¶ 3.) Nambé has the "exclusive right for ninety (90) days from the submission of each [design] to select such [design] for development and sale." (*Id.*) Because many designs for products are similar, the parties agreed that they would identify periodically the products derived from Zeisel's designs, called "Eva Zeisel Products." (*Id.* ¶ 5.) Further, the Agreement provides that Nambé owns each design it selects for production and marketing, including the right to register a copyright in the design in Nambé's name, and all of the products based on the designs are the exclusive property of Nambé. (*Id.* ¶ 13.) Zeisel receives an advance royalty and subsequent royalty payments based on the sales of the products in question. (*Id.* ¶¶ 4, 9-11.) Finally, the Agreement contains an arbitration clause stating that "all disputes and differences of any kind whatsoever arising under th[e] Agreement ... should be determined by arbitration between the parties ... in any jurisdiction agreed upon by the parties ..." (*Id.* ¶ 15.) "The decision of the arbitral tribunal shall be final and binding and may be enforced by any court of competent jurisdiction." (*Id.*)

C. Orange-Zeisel Agreement

**\*2** In February 1999, subsequent to the execution of the Nambé-Zeisel Agreement, Zeisel entered into an agreement with Orange (the "Orange-Zeisel Agreement"). Under the terms of this Agreement, which has a five-year term, Zeisel licensed to Orange the "exclusive right to manufacture and sell" certain pre-existing Zeisel designs, which Orange refers to as Zeisel's "historic designs." (Orange-Zeisel Agreement ¶¶ 1, 12; Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Stay Litigation and Compel Arbitration ("Pl.'s Mem.") at 3.) Orange "agree[d] to assume all expenses relating to the manufacture, development, licensing and sale" of the products covered by the Agreement. (Orange-Zeisel Agreement ¶ 8.)

With respect to designs existing at the time of the Agreement, Orange has the right to select for production and sale any such design; however, if Zeisel indicates that a design "may be of interest to a third party," Orange has 30 days to select the design, failing which the design may be licensed by Zeisel to a third party. (*Id.* ¶ 5(b).) The Agreement also

specifies that any existing designs not selected by Orange could be selected by either of two other licensees, Nambé or the Museum of Modern Act. (*Id.*)

The Agreement also specifically excludes from its coverage those designs "which relate or are intended to form part of an agreement entered into by Zeisel with the Nambé Company." (*Id.* ¶ 4.) As to new designs not encompassed by the Nambé-Zeisel Agreement, Orange is entitled to a right of first refusal, and those designs that Orange declines to select revert to Zeisel. (*Id.* ¶ 5(a).) Zeisel receives a royalty of 10 percent of the wholesale price of all products sold under the Agreement. (*Id.* ¶ 9.)

Further, the Agreement contains an arbitration clause providing that "[a]ny disputes arising out of this agreement shall be submitted to Arbitration before the [AAA] in New York City before a single arbitrator ..." (*Id.* ¶ 15.) The decision of the arbitrator shall be "final and binding" and may be entered as a judgment in "the appropriate Court of law." (*Id.*)

D. Instant Action

The instant dispute originated in late March 2000, when Orange complained to Nambé that the latter had been advertising itself as the exclusive supplier of Zeisel designs in which Orange had been given an exclusive license. (Letter from Thomas V. Marino to Nambé Company dated Mar. 23, 2000, Ex. E to Compl.) Nambé and Zeisel responded that their actions were well within their rights under the Nambé-Zeisel Agreement, and that in any event, the Orange-Zeisel Agreement had been terminated. (Letter from H. Kent Howard to Thomas V. Marino dated Mar. 27, 2000; Letter from Michael J. Striker to Thomas V. Marino dated Apr. 14, 2000, Ex. E to Compl.) In late April 2000, Orange complained to Target that Target had sold products in its Marshall Field's stores, supplied to it by Nambé, in which Orange held an exclusive license, and that Target had falsely advertised itself as the exclusive source of certain products for which Orange was the exclusive licensee. (Letter from Thomas V. Marino to Linda Ahlers dated Apr. 27, 2000, Ex. F. to Compl.; Compl. ¶ 61.) Further communications between counsel for Orange and Target followed, but no agreement was reached. (Pl.'s Mem. at 5; Ex. F to Compl.) On May 3, 2000, Zeisel sent to Orange a "notice of immediate termination" of the Orange-Zeisel Agreement, on account of Orange's alleged failure to pay minimum royalties, issue timely royalty reports, or use its best

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 3
Not Reported in F.Supp.2d, 2000 WL 1858556 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

efforts to market the products subject to the Agreement. (Letter from Michael J. Striker to Thomas V. Marino dated May 3, 2000, Defendants' and Third-Party Plaintiffs' Memorandum of Law in Reply to Plaintiffs' Opposition to Defendants' Motion to Stay Litigation and Compel Arbitration ("Defs .' Rep."), Ex. 2(I).)

*3 On June 9, 2000, in light of the disputes that had surfaced, Zeisel commenced an arbitration with the Commercial Arbitration Tribunal of the AAA in New York City, pursuant to the arbitration clause contained in the Orange-Zeisel Agreement. Zeisel's amended statement of claim purportedly seeks a declaration that the Agreement has been terminated, an accounting for unpaid royalties, and damages for breach of contract and tortious interference with existing and prospective contractual relations with third parties. (Pl.'s Mem. at 8.) Orange's amended counterclaims allege, *inter alia*, that Zeisel conspired with Nambé to undermine Orange's exclusive rights under the Orange-Zeisel Agreement. (Amended Answer to Amended Statement of Claim and Counterclaims ("Amended Counterclaims") ¶ ¶ 46-60.)

On June 26, 2000, Orange filed the instant action in this Court asserting claims against Nambé and Target for false advertising and "disparagement" under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and common law claims for tortious interference with contract, unfair competition, unjust enrichment, and for an accounting.[FN4] (Compl.¶ ¶ 77-109.) On August 15, 2000, Nambé and Target filed a Third Party Complaint against Zeisel for breach of contract, and for indemnity and contribution. (Third Party Compl. ¶ ¶ 16-26.) The essence of Nambé's and Target's claims is that "[i]f, as [Orange] alleges, any of the products sold by [Nambé or Target] infringe [Orange's] rights under the [Orange-Zeisel Agreement], the liability for Plaintiff's claims must be shifted to Zeisel since Zeisel expressly or impliedly warranted, covenanted, and represented in entering into the [Nambé-Zeisel] Agreement and thereafter that she had all the necessary rights to the relevant designs ..." (*Id.* ¶ 15.)

FN4. Orange also seeks an injunction barring Nambé and Target from manufacturing, marketing, or selling Zeisel's designs in contravention of Orange's exclusive rights. (Compl.¶ 1.)

Also on August 15, 2000, Zeisel notified Nambé that it would refer the claims of the third party action to arbitration, pursuant to paragraph 15 of the Nambé-Zeisel Agreement, and Nambé thereafter consented, reserving all rights, to join in the arbitration between Orange and Zeisel currently before the AAA. [FN5] (Letter from Mia Higgins to Philip Gottfried dated August 15, 2000, Ex. 6. to Defendants' Bound Exhibits; Defs.' Mem. at 8, 19 n. 9.) The instant motion followed.

FN5. Orange states that Zeisel has added Nambé as a respondent in the ongoing arbitration, seeking a declaration that Zeisel neither breached the Nambé-Zeisel Agreement nor owes any indemnity or contribution. (Pl.'s Mem. at 8.) Accepting this as true, the breach of contract claim will presumably be determined by the arbitrator, but the indemnity and contribution claims must await the determination of this Court as to Nambé's liability, if any, to Orange.

II. Discussion

A. FAA Mandate

In enacting the Federal Arbitration Act ("FAA" or the "Act"), Congress created national substantive law governing all questions of the validity and enforceability of arbitration agreements within its scope. *See Genesco, Inc. v. T. Kakiuchi & Co., Ltd.,* 815 F.2d 840, 845 (2d Cir.1987) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626 (1985)); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U .S. 1, 24 (1983). Hence, whether Orange is bound to arbitrate its claims against Nambé and Target on the basis of the arbitration clause in either the Orange-Zeisel or Nambé-Zeisel Agreements is a matter of federal law, which incorporates generally accepted principles of contract law. *See Genesco, supra,* 815 F.2d at 845 (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404-05 (1967)).

*4 The FAA provides that written agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable," which reflects the strong federal policy favoring rigorous enforcement of arbitration agreements. 9 U.S.C. § 2; *see Perry v. James,* 482 U.S. 483, 490 (1987). The Act "mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1858556 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

been signed," *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 218 (1985), and to stay proceedings while the arbitration is pending. 9 U.S.C. § § 3, 4. The factors that courts weigh in determining whether to compel arbitration pursuant to the FAA are: (i) whether the parties agreed to arbitrate; (ii) the scope of the arbitration agreement; (iii) if federal statutory claims are at issue, whether Congress intended those claims to be nonarbitrable; and (iv) whether to stay the balance of the proceedings pending arbitration if some, but not all, of the claims in the action are arbitrable. *See Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 844 (2d Cir.1987); *Norcom Elecs. Corp. v. CIM USA Inc.,* 104 F.Supp.2d 198, 202 (S.D.N.Y.2000).

## B. Limits on Ability of Nonsignatories to Compel Arbitration

In considering whether to compel arbitration of a particular dispute, the Court must first decide whether the parties agreed to arbitrate. *See Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co.,* 189 F.3d 289, 294 (2d Cir.1999). Clearly there are agreements to arbitrate between Orange and Zeisel, and between Nambé and Zeisel. (Orange-Zeisel Agreement ¶ 15; Nambé-Zeisel Agreement ¶ 15.) However, on the instant motion, defendants ask the Court to compel arbitration between Orange and Nambé and Target based on the Orange-Zeisel Agreement, to which only Orange and Zeisel are parties. Therefore, the Court must consider whether to infer an agreement to arbitrate between Orange, a signatory, and nonsignatories Nambé and Target.

Arbitration is contractual by nature. "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Thomson-CSF, S.A. v. Am. Arbitration Assoc.,* 64 F.3d 773, 776 (2d Cir.1995) (citing *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582 (1960)). While there is a liberal federal policy favoring arbitration, arbitration agreements must not be so broadly construed as to encompass claims and parties that were not intended by the original contract. "It does not follow, however, that under the [FAA] an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision." *Id.* (citing *Fisser v. Int'l Bank,* 282 F.2d 231, 233 (2d Cir.1960)). The Second Circuit has made clear that a nonsignatory may be bound to an arbitration agreement if so dictated by the "ordinary principles of contract and agency." *Id.; see also Smith/Enron Cogeneration*

*Ltd. Partnership v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 97 (2d Cir.1999).

\*5 The Second Circuit has recognized five theories for binding nonsignatories to arbitration agreements: (i) incorporation by reference; (ii) assumption; (iii) agency; (iv) veil-piercing/alter ego; and (v) estoppel. *See Thompson, supra,* 64 F.3d at 776. Defendants contend that Orange should be obligated to arbitrate its claims against Nambé and Target, based on the estoppel and incorporation by reference theories. (Defs.' Rep. at 10-11.) The Court examines these theories in turn.

### 1. Estoppel

The Second Circuit has recognized two branches of estoppel cases. The first, "more typical" case, "arises when a signatory to an arbitration agreement seeks to bind a non-signatory to it." *Smith/Enron, supra,* 198 F.3d at 98. Under these circumstances, a "non-signatory may be compelled to arbitrate when it has derived other benefits under the agreement containing the arbitration clause." *Id.* (citing *Am. Bureau of Shipping v. Tencara Shipyard S.p.A.,* 170 F.3d 349, 353 (2d Cir.1999)). This first branch of the estoppel theory is inapplicable here because nonsignatories Nambé and Target are attempting to compel Orange, a signatory, to arbitrate. Under the second branch of the estoppel theory, the Second Circuit has "been willing to estop a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Thomson, supra,* 64 F.3d at 779 (citing *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.,* 10 F.3d 753, 757-58 (11th Cir.1993); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315, 320-21 (4th Cir.1988)). In determining whether the claims brought against the nonsignatory are sufficiently related to the underlying agreement in order to compel arbitration, courts examine (i) the relationship of the entities involved, and (ii) the relationship of the alleged wrongs to the nonsignatory's obligations and duties under the agreement at issue. *See Fluor Daniel Intercontinental, Inc. v. General Electric Co.,* No. 98 Civ. 7181, 1999 WL 637236, at \*6 (citing *Sunkist, supra,* 10 F .3d at 757-58). Where courts of this Circuit have compelled a signatory to arbitrate claims brought against a nonsignatory, the parties have been linked by "ordinary principles of contract and agency." *Thomson, supra,* 64 F.3d at 780. Specifically, the nonsignatory was either linked

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 5
Not Reported in F.Supp.2d, 2000 WL 1858556 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

contractually to the signatory it wished to compel to arbitrate and/or was engaged in a corporate relationship with the other signatory. Further, the claims against the nonsignatory clearly arose out of the agreement containing the arbitration clause. *See, e.g., Sunkist, supra,* 10 F.3d at 758 (compelling signatory plaintiff to arbitrate claims against nonsignatory parent company because (i) parent's subsidiary was other signatory, and (ii) plaintiff's claims arose out of the parent's conduct under an Agreement with its subsidiary containing an arbitration clause); *Norcom Elecs., supra,* 104 F.Supp.2d at 203-04 (compelling signatory plaintiff to arbitrate with nonsignatory defendant where (i) nonsignatory was a wholly-owned subsidiary of signatory defendant and (ii) the claims against the subsidiary were directly linked to the actions of its parent under the agreement containing the arbitration clause); *Fluor Daniel, supra,* 1999 WL 637236, at ˙6- ˙7 (compelling signatory plaintiff to arbitrate with nonsignatory suppliers where (i) there was a close corporate relationship among all defendants, (ii) suppliers were linked contractually to plaintiff through the signatory prime contractor, and (iii) plaintiff's claims against the suppliers arose out of agreements signed by the prime contractor containing an arbitration clause); *E.G.L. Gem Lab Ltd. v. Gem Quality Inst. Inc.,* No. 97 Civ. 7102, 1998 WL 314767, at ˙3 (S .D.N.Y. June 15, 1998) (compelling signatory plaintiff to arbitrate with corporate president of signatory defendant where (i) the president executed the agreement containing the arbitration clause, and (ii) the claims against the president arose directly out of his actions under the agreement in question).

**\*6** In this case, the issues that Nambé and Target seek to resolve arise out of the Nambé-Zeisel Agreement, which, in concert with the Orange-Zeisel Agreement, sets forth the parameters of Zeisel's licensing activity. As the parties point out, the Orange-Zeisel Agreement makes specific reference to the Nambé-Zeisel Agreement. (Defs.' Mem. at 5-6, 24; Pl.'s Mem. at 7, 11; Orange-Zeisel Agreement ¶ ¶ 4,5.) Nambé, but not Target, is also indirectly implicated in the ongoing arbitration, as Orange alleges that Zeisel and Nambé conspired to deprive Orange of rights and revenue with respect to certain designs for which Orange has an exclusive license. (Amended Counterclaims ¶ ¶ 46-60.) Thus, the determination of Zeisel's liability in the context of her alleged licensing and marketing of designs to Nambé are clearly relevant to, and as noted *infra,* could be dispositive of, Nambé's, and in turn Target's, liability.

However, despite the presence of interrelated issues between the instant action and the ongoing arbitration, Orange's claims against Nambé are not so "intimately founded in and intertwined with" the Orange-Zeisel Agreement in order to compel arbitration of those claims. First, Orange and Nambé have no contractual or business relationship, and Orange's claims against Nambé are grounded in trademark infringement and tort, not in contract. Nambé and Zeisel are engaged only in an arms-length business relationship. Target is not contractually linked to either Orange or Nambé. In sum, absent from this case is the type of close relationship from which an agreement to arbitrate could be implied, or imposed on Orange with respect to Nambé and/or Target. Second, Nambé's alleged wrongs stem from its rights, duties and obligations under the Nambé-Zeisel Agreement, and only indirectly relate to Zeisel's actions under the Orange-Zeisel Agreement. Target's alleged violations arise under neither Agreement. These facts distinguish this case from *Norcom, Fluor Daniel,* and *E.G.L.,* referenced *supra,* where the nonsignatory's liability is directly linked to its own conduct and/or that of a signatory defendant under the agreement containing the arbitration clause. Finally, Orange brought this suit against Nambé and Target, not against Zeisel; then Nambé and Target brought in Zeisel and Zeisel filed for arbitration. Thus, Orange has not sought to exploit the Orange-Zeisel Agreement for one purpose (e.g. this suit) and avoid it for another (e.g.arbitration), which, if true, would militate in favor of compelling arbitration. *See Norcom, supra,* 104 F.Supp.2d at 203; *Fluor Daniel, supra,* 1999 WL 637236, at ˙6- ˙7.

Because there is only a loose nexus between Orange's claims against Nambé and Target in this action and the Orange-Zeisel Agreement, the Court declines to estop Orange from pursuing its claims here. *See Thomson, supra,* 64 F.3d at 780 (reversing district court, which compelled arbitration based on the interrelatedness of issues, because a request to compel must be dictated "by some accepted theory under agency or contract law"); *Cosmotek Mumessillik Ve Ticaret Ltd. Sirkketi v. Cosmotek USA, Inc .,* 942 F.Supp. 757, 760 n. 3 (D.Conn.1996) (stating that interrelatedness of issues alone is not sufficient to compel a signatory to arbitrate with a nonsignatory).[FN6]

FN6. The fact that the Nambé-Zeisel Agreement may be construed in the arbitration increases the importance of the

Not Reported in F.Supp.2d                                                                                                    Page 6
Not Reported in F.Supp.2d, 2000 WL 1858556 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

arbitration to the outcome of this action, and supports a stay of this action, *see infra,* but does not favor compelling arbitration.

### 2. Incorporation by Reference

**\*7** Defendants contend that incorporation by reference favors compelling arbitration "either as an independent theory or as an additional factor which tightens the nexus between the arbitration clause in the [Orange-Zeisel Agreement] and the litigation claims asserted by [Orange] against the Defendants." (Defs.' Mem. at 17.) In particular, defendants argue that the Nambé-Zeisel Agreement, including its arbitration clause, was incorporated by reference into the Orange-Zeisel Agreement. (Defs.' Rep. at 11 n. 2.) In the alternative, defendants assert that the Nambé-Zeisel Agreement is "sufficiently incorporated into the [Orange-Zeisel Agreement] so that the dispute between Nambé and [Orange] as to rights to Zeisel designs easily falls under the broad arbitration clause of the [Orange-Zeisel Agreement]." (*Id.*) They state that "it must have been within the contemplation of [Orange] that disputes concerning the rights of [Orange] vis-a-vis Nambé to Zeisel's designs would be the subject of arbitration." (*Id.* at 7.)

Defendants' contentions are unavailing because they do not fall within the parameters of the incorporation by reference theory as set forth by the courts of this Circuit. Under this theory, a nonsignatory may compel arbitration against a party to an arbitration agreement when that party has entered into a separate contractual relationship with the nonsignatory which incorporates the existing arbitration clause. *See Thomson, supra,* 6 F .3d at 777 (citing *Import Export Steel Corp. v. Mississippi Valley Barge Line Co.,* 351 F.2d 503, 505-506 (2d Cir.1965) (finding that separate agreement with nonsignatory expressly "assum[ing] all the obligations and privileges of [signatory party] under the ... subcharter" constitutes grounds for enforcement of arbitration clause by nonsignatory")); *see also Upstate Shredding, LLC v. Carloss Well Supply Co.,* 84 F.Supp.2d 357, 365-67 (N.D.N.Y.2000); *Matter of Arbitration Between Keystone Shipping Co. and Texport Oil Co.,* 782 F.Supp. 28, 31 (S.D.N.Y.1992). In this case, there is no contractual agreement between Orange and Nambé and/or Target, and thus no document that may imply these parties' agreement to arbitrate. The incorporation by reference theory is therefore inapplicable here.[FN7]

FN7. Defendants' reference to *Upstate Shredding, supra,* 84 F.Supp.2d at 366-67, to support the incorporation of Nambé into the arbitration as a necessary party, and only as to certain claims, is misplaced, as this case does not support such a proposition. Moreover, such partial participation is not prescribed by any of the theories pursuant to which nonsignatories may be bound to an arbitration agreement.

Further, defendants' argument that the broad language of the Orange-Zeisel arbitration clause encompasses the instant dispute with Nambé is also unavailing because the Court must determine that the parties agreed to arbitrate before proceeding to an analysis of scope; here, as noted *supra,* defendants have not established that the parties agreed to arbitrate. *See Fluor Daniel, supra,* 1999 WL 637236, at \*7.

The Court therefore declines to find that the parties agreed to arbitrate the instant dispute, and declines to estop Orange from pursuing its claims against Nambé and Target in this forum. Accordingly, the other factors employed by courts to determine whether to compel arbitration under the FAA need not be considered. *See supra.* However, in light of the interrelated issues raised by this action and the ongoing AAA arbitration, the Court shall consider whether this litigation should be stayed pending the outcome of the arbitration.

### C. Stay of the Action

**\*8** Defendants move, in the alternative, for a stay of this action pending the outcome of the arbitration between Orange and Zeisel, which may also incorporate, at least in part, Nambé's and Target's third party claims against Zeisel. Defendants contend that a stay is justified because Orange's trademark claims against Nambé and Target "are closely connected to, and dependent upon, the rights granted by Zeisel to [Orange] under the [Orange-Zeisel Agreement]." (Defs.' Rep. at 4.)

### 1. FAA-Mandated Stay

Section 3 of the FAA, 9 U.S.C. § 3, directs district courts to "stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding." *McMahan Securities Co. L.P. v. Forum Capital Markets L.P.,* 35 F.3d 82, 85 (2d Cir.1994). However, the Second

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1858556 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Circuit has explicitly held that Section 3 relief is not available to nonparties to the agreement providing for arbitration. *See Citrus Marketing Bd. of Israel v. J. Lauritzen A.S.,* 943 F.2d 221, 224-25 (2d Cir.1991) (citing *Sierra Rutile Ltd. v. Katz,* 937 F.2d 743, 748 (2d Cir.1991),* reaffirming the holding of *Nederlanse Erts-Tankersmaatchappij v. Isbrandtsen Co.,* 339 F.2d 440, 441 (2d Cir.1964)); *cf. Downing v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 725 F.2d 192, 194 (2d Cir.1984) ("[S]ince [plaintiff] has no present right to compel arbitration, [he] is not entitled to a stay under Section 3."). The *Citrus Marketing* court discussed *McCowan v. Sears Roebuck and Co.,* 908 F.2d 1099, 1107 (2d Cir.1990), relied on by defendants, (Defs.' Rep. at 12), which reserved the question of whether a nonparty was entitled to a Section 3 stay, and overruled it to the extent that it indicated that a "commonsense reading" of Section 3 would call for a stay "if there is a federal action 'upon' an 'issue referable to arbitration," ' whether or not the movant seeking the stay was a party to the relevant arbitration agreement. *See Citrus Marketing, supra,* 943 F.2d at 224 (citing *McCowan, supra,* 908 F.2d at 1106).[FN8] Thus, the Court declines to stay the action pursuant to Section 3 of the FAA.[FN9]

> FN8. The *Citrus Marketing* court also declined to follow *Morrie Mages and Shirlee Mages Foundation v. Thrift Corp.,* 916 F.2d 402, 405-08 (7th Cir.1990), also relied on by defendants, (Defs.' Rep. at 11-12), which ruled that a nonparty is entitled to a Section 3 stay where the relevant issues are in arbitration between parties to the arbitration agreement, specifically adopting the "commonsense reading" of Section 3 articulated in *McCowan* to reach that result. *See Citrus Marketing,supra,* 943 F.2d at 224 n. 6.

> FN9. A stay would be available under Section 3 as to the third party action between Nambé and Target and Zeisel, as the claims involved there are plainly subject to arbitration. However, because the Court stays these claims pursuant to its inherent powers, this issue is irrelevant for Section 3 purposes. *See infra.*

## 2. Stay Pursuant to the Court's Inherent Powers

In rejecting a nonsignatory's ability to stay proceedings under Section 3 of the FAA, the *Citrus Marketing* court pointed out that district courts have

the inherent power to grant a stay requested by a nonsignatory to an arbitration agreement. *See Citrus Marketing, supra,* 943 F.2d at 225 (citing *Nederlanse, supra,* 339 F.2d at 441). This power follows from the "power inherent in every court to control the disposition of the cases on its docket with economy of time and effort for itself, for counsel, and for litigants." *Id.* (quoting *Landis v. North Am. Co.,* 299 U.S. 248, 254 (1936) (internal quotations omitted)). "It is appropriate ... to grant a stay 'where the pending proceeding is an arbitration in which issues involved in the case may be determined." ' *Sierra Rutile, supra,* 937 F.2d at 750 (quoting *Nederlanse, supra,* 339 F.2d at 441). The issuance of such a stay is entirely within the discretion of the Court. *See Moses H. Cone, supra,* 460 U.S. at 19-21.

\*9 The movant for a stay must first establish that "there are issues common to the arbitration and the courts, and that those issues will finally be determined by the arbitration." *Am. Shipping Line, Inc. v. Massan Shipping Indus., Inc.,* 885 F.Supp. 499, 502 (S.D.N.Y.1995) (citing *Sierra Rutile, supra,* 937 F .2d at 750). If this test is met, the moving party has the burden of showing that it will not hinder the arbitration, that the arbitration will be resolved within a reasonable time, and that such delay that may occur will not cause undue hardship to the non-moving party. *See id.* Stays are also particularly appropriate where they "promote judicial economy, avoidance of confusion and possible inconsistent results." *Acquaire v. Canada Dry Bottling,* 906 F.Supp. at 819, 838 (E.D.N.Y.1995); *see also Gen. Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.,* 891 F.Supp. 946, 954-55 (S.D.N.Y.1995).

The Court hereby stays the action as to Orange's claims against Nambé and Target pending the outcome of the arbitration between Orange and Zeisel, and Nambé and Zeisel, before the AAA. The Court also stays the prosecution of the third party claims against Zeisel, because Nambé's and Target's indemnity and contribution claims are derivative of Orange's underlying claims, and, in any event, Nambé and Zeisel have agreed to arbitrate all of the claims between them, and such determination which is equally dispositive of Target's claims.

A stay is particularly appropriate in this case. Defendants have established that the claims in the instant action and those being adjudicated in arbitration arise out of the same series of alleged acts, namely Zeisel's licensing of certain designs to Orange and to Nambé, and Nambé's and Target's subsequent marketing and sale of products derived from Nambé's

Not Reported in F.Supp.2d                                                                    Page 8
Not Reported in F.Supp.2d, 2000 WL 1858556 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

licensed designs. These acts implicate Zeisel's obligations under both the Orange-Zeisel and Nambé-Zeisel Agreements. Accordingly, binding arbitration of the claims related to the Orange-Zeisel Agreement will likely provide significant insight into, if not actually resolve, the claims asserted in this action. *See Acquaire, supra,* 906 F.Supp. at 838; *General Media, Inc. v. Shooker,* No. 97 Civ. 510, 1998 WL 401530, at *11 (S.D.N.Y. July 16, 1998); *Home Life Ins. Co. v. Kaufman,* 547 F.Supp. 833, 835-36 (S.D.N.Y.1982) (staying action where prompt arbitration of claims may clarify and simplify issues for the court proceeding); *see also Am. Home Assurance Co. v. Vecco Concrete Construction Co.,* 629 F.2d 961, 964 (4th Cir.1980) (staying entire court action where pending arbitration might resolve questions of fact common to lawsuit). First, one of the central issues in this action is the scope of rights granted by Zeisel to Orange and Nambé, respectively. By focusing on the continued validity of the Orange-Zeisel Agreement and the scope of Orange's rights thereunder, the arbitration will further clarify the rights granted to Nambé under the Nambé-Zeisel agreement. Second, Orange's counterclaims in the arbitration allege a conspiracy between Zeisel and Nambé to undermine Orange's exclusive rights to produce and sell products based on certain of Zeisel's designs. The arbitration's examination of Zeisel's licensing practices pursuant to its agreements, particularly with Nambé, and its ultimate determination of Zeisel's liability, will directly implicate Orange's claims against Nambé and Target in this action. Moreover, the direct assessment of Nambé's liability for such conduct, if that occurs, would also implicate Orange's allegations in this action, and could be dispositive thereto. Thus, a stay of the instant action is warranted in the interests of the parties and judicial economy, and in order to avoid possible inconsistent results.[FN10]

> FN10. Beyond the risk of inconsistent results, any issues determined by this Court could have collateral estoppel effect in the arbitration. *See McCowan,supra,* 908 F.2d at 1107 (citing cases).

*10 Orange argues against a stay on the grounds that (i) the "only thing that the [Orange-Zeisel and Nambé-Zeisel Agreements] have in common is that Zeisel is a signatory to both," and that "there is absolutely no linkage or relationship among Zeisel, [Orange], and Nambé except for being parties to this litigation," (ii) the damages Orange seeks in the instant action differ from those it seeks on its

counterclaims against Zeisel in arbitration, and (iii) the stay would "create undue hardship to plaintiff" because its discovery of relevant information would be hampered. (Pl.'s Mem. at 18-21.) These arguments are unavailing. First, Orange's comparison of the terms of the relevant Agreements or the abstract linkage between the parties misses the mark; as Orange itself acknowledges, the stay analysis is based on common issues. *See Sierra Rutile, supra,* 937 F.2d at 750. Moreover, as noted *supra,* the record reflects that there are significant common issues between this litigation and the ongoing arbitration. Second, the details of Orange's damages is irrelevant to the stay analysis; when a stay is issued, the two proceedings remain distinct. Orange's damages allegations will be considered by the Court in due course if and when this action goes forward.[FN11] Finally, as defendants point out, Orange's allegation of undue hardship is grounded in its inability to depose Zeisel and the urgency to preserve oral evidence because its claims "do not arise out of documentary evidence." (Defs.' Rep. at 14; Pl.'s Mem. at 20.) Orange's concerns as to Zeisel are moot, as the Court has authorized Orange to depose Zeisel. (Orders dated Sept. 19, 2000 and Nov. 9, 2000.) The Court's stay order does not supersede the Court's previous orders regarding Zeisel's deposition, and the Court directs that the deposition of Ms. Zeisel go forward as scheduled.[FN12]

> FN11. Orange's reference to *Wren Distribs., Inc. v. Phonemate,* 600 F.Supp. 1576, 1582 (E.D.N.Y.1985) for the proposition that differing damage requests would militate against a stay is misplaced. In *Wren,* the court's denial of a stay was based in part on the fact that one plaintiff distributor's claim for damages arose out of different facts than the other plaintiff's claim. The court's analysis was based on the lack of common facts between the claims, rather than the nature of the requested damages themselves. *See id.*

> FN12. In this respect, Orange's request to "preserve Zeisel's testimony in a deposition" in the event of a stay is granted. (Pl.'s Mem. at 2-3, 21.) The Court has been informed that Zeisel's deposition has been partially completed. By separate order also issued today, the Court has set a schedule governing the completion of questioning.

Orange's concern about preserving evidence is, in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1858556 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 9

essence, a concern about the prospect of undue delay, which is a central consideration in granting a stay. *See Nederlanse, supra,* 339 F.2d at 442; *Chang v. Lin,* 824 F.2d 219, 222 (2d Cir.1987). Given Zeisel's initiation of the arbitration and defendants' representation that those proceedings are in progress and will timely conclude, (Defs.' Rep. at 14),[FN13] the Court finds that hindrance of the arbitration is unlikely and that no prejudicial delay will be caused to Orange. Defendants' vigorous pursuit of their motion to compel also indicates they will make every effort necessary to reach a speedy disposition of this dispute. Moreover, because many, if not all, of the issues in the action will be touched on in the arbitration, there is little risk that the evidence supporting Orange's case "may grow stale, become unavailable, or be lost." (Pl.'s Mem. at 20, quoting *Cosmotek, supra,* 942 F.Supp. at 760 n. 4); *cf. Chang, supra,* 824 F.2d at 222 (noting that such hardship is particularly acute in disputes of an international nature). However, Orange may seek leave of the Court to vacate the stay if the arbitration is not completed within six months of the date of this Opinion. *See Nederlanse, supra,* 339 F.2d at 442; *Cosmotek, supra,* 942 F.Supp. at 760; *Home Life, supra,* 547 F.Supp. at 836; *Société Nationale v. General Tire & Rubber Co.,* 430 F.Supp. 1332, 1335 (S.D.N.Y.1977).

FN13. Defendants have advised the Court that a meeting with an AAA arbitrator was held on December 15, 2000, at which hearing dates were set for March, 2000. (Letter of Mia Higgins to the Court dated Dec. 18, 2000 at 1 n. 1).

### III. Conclusion

**\*11** For the foregoing reasons, the Court denies the portion of defendants' motion seeking to compel arbitration of the claims in this litigation, but grants the portion of their motion requesting a stay of all claims pending the outcome of the ongoing arbitration before the AAA. It also orders that the deposition of Zeisel be completed according to the schedule set by the Court. The Clerk of the Court is ordered to place the action on the suspense docket.[FN14]

FN14. Defendants' request to stay litigation pending a decision on this motion is denied as moot. (Defs.' Mem. at 9 n. 6).

SO ORDERED.

S.D.N.Y.,2000.
Orange Chicken, L.L.C. v. Nambe Mills, Inc.
Not Reported in F.Supp.2d, 2000 WL 1858556 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

Slip Copy                                                                                          Page 1
Slip Copy, 2007 WL 521295 (S.D.N.Y.)
**(Cite as: Slip Copy)**

**H**
Spencer-Franklin v. Citigroup/Citibank N.A.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Henrietta B. SPENCER-FRANKLIN, Plaintiff,
v.
CITIGROUP/CITIBANK N.A.; Charles Prince;
Maura Markus; Gary Kimmelman; Donna Griffin;
Nicholas Decesare; John E. Gunther., Defendants.
No. 06 Civ. 3475(GBD)(GWG).

Feb. 21, 2007.

*REPORT AND RECOMMENDATION*
GABRIEL W. GORENSTEIN, United States
Magistrate Judge.
**\*1** Plaintiff Henrietta Spencer-Franklin ("Spencer-
Franklin") filed the instant action against her current
employer Citibank. N.A., its corporate parent
Citigroup, and various individual defendants alleging
violations of the Americans with Disabilities Act of
1990 ("ADA"), 42 U.S.C. § § 12112-12117.
Defendants have now moved to compel arbitration
and dismiss this proceeding pursuant to Federal Rules
of Civil Procedure 12(b)(1) and 12(b)(6) as well as
the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et*
*seq.*

I. *BACKGROUND*

A. *The Arbitration Policy*

Citibank's U.S. Consumer Group hired Spencer-
Franklin in 1989 to work as an Administrative
Assistant in its Legal Department. *See* Declaration of
Ruth Pollock ("Pollock Decl.") (attached to Notice of
Motion to Compel Arbitration and to Dismiss Action,
filed Sept. 1, 2006 (Docket # 7) ("Notice of
Motion")), ¶ 2. On or about September 1, 2001, the
U.S. Consumer Group adopted an Employment
Arbitration Policy. *Id.* ¶ 3. At the time of its
adoption, all employees received a copy of the policy
with a cover memo attached which stated the
following:
Pursuant to the Arbitration Policy, you and the
Company agree to make arbitration the required and
exclusive forum for resolution of all employment-

related disputes that are based on legally protected
rights. Arbitration is an essential element of your
employment relationship and a condition of
employment .... *Your continued employment will*
*constitute acceptance of the Arbitration Policy.*

*See* Cover Letter, dated Sept. 1, 2001 (reproduced in
Ex. A. to Pollock Decl.) (emphasis in original); *see*
*also* Pollock Decl. ¶ ¶ 3-4. Specifically, the
Arbitration Policy states:U.S. Consumer Group
believes that the resolution of such disagreements
will be best accomplished by internal dispute
resolution and, where that fails, by arbitration
conducted under the auspices of the American
Arbitration Association. For these reasons, U.S.
Consumer Group has adopted this Employment
Arbitration Policy ("Policy"). Except as provided
below, the Policy applies to all persons employed by
U.S. Consumer Group as of September 1, 2001 and
all employees joining U.S. Consumer Group after
that date ....
The Policy makes arbitration the required and
exclusive forum for the resolution of all employment
disputes based on legally protected rights ... that may
arise between an employee or former employee and
U.S. Consumer Group or its current and former
parents, subsidiaries and affiliates and its and their
current and former officers, directors, employees and
agents ....

*See* Arbitration Agreement (reproduced in Ex. A to
Pollock Decl .); Pollock Decl. ¶ 5. A copy of the
Arbitration Policy subsequently appeared in
Citigroup's Employee Handbook as distributed in
2002, 2004 and most recently, on March 3, 2006.
Pollock Decl. ¶ 6. With this latest distribution of the
Handbook, Spencer-Franklin signed a written
acknowledgment form which stated, "I understand
that this *Handbook* contains a policy that requires me
to submit employment-related disputes to binding
arbitration (see page 37)." Receipt Form, dated Mar.
3, 2006 (reproduced as Ex. B to Pollock Decl.); *see*
*also* Pollock Decl. ¶ 6.

B. *The Current Claim*

**\*2** Spencer-Franklin filed her complaint in this action
on May 8, 2006. *See* Complaint, (Docket # 1)
(reproduced in Ex. A to Declaration of Daniel
Halem) ("Halem Decl.") (attached to Notice of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                      Page 2
Slip Copy, 2007 WL 521295 (S.D.N.Y.)
(Cite as: Slip Copy)

Motion), after first receiving a right to sue letter from the Equal Employment Opportunity Commission. *See* Right to Sue Letter, dated Feb. 21, 2006 (reproduced in Ex. A of Halem Decl.). In her complaint, she alleges that Citibank violated the ADA by failing to provide her with reasonable accommodations upon her return to work after a period of disability leave from April through August 2002. Compl. ¶ 4; *see also* Letter, dated Feb. 17, 2006 from Nicolas De Cesare (reproduced in Ex. A to Halem Decl.), at 2.

On September 1, 2006, Citibank filed the instant motion to compel arbitration and dismiss this action. *See* Notice of Motion; Memorandum of Law in Support of Defendants' Motion to Compel Arbitration and to Dismiss this Action (Docket # 5); Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment, filed Sept. 1, 2006 (Docket # 6). In response, Spencer-Franklin filed an "Answer to Notice to Dismiss" on September 27, 2006 (Docket # 8).

## II. DISCUSSION

### A. Motion to Compel Arbitration

As the Second Circuit has noted, "[t]he Federal Arbitration Act, 9 U.S.C. § § 1 *et seq.* (1988), requires the federal courts to enforce arbitration agreements, reflecting Congress' recognition that arbitration is to be encouraged as a means of reducing the costs and delays associated with litigation." *Vera v. Saks & Co.,* 335 F.3d 109, 116 (2d Cir.2003) (quoting *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, United States,* 9 F.3d 1060, 1063 (2d Cir.1993)). Title 9 U.S.C. § 4 specifically contemplates that a party may obtain an order "directing that [an] arbitration proceed in the manner provided for in [an arbitration] agreement." Where a motion is brought to compel arbitration, a court "applies a standard similar to that applicable for a motion for summary judgment" in that it must determine whether there is "an issue of fact as to the making of the agreement for arbitration." *Bensadoun v. Jobe-Riat,* 316 F.3d 171, 175 (2d Cir.2003).

In this Circuit, a court conducts a four-pronged analysis to determine whether an action is governed by an arbitration agreement:
[F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration.

*JLM Indus., Inc. v. Stolt-Nielsen SA,* 387 F.3d 163, 169 (2d Cir.2004) (citations omitted) (alteration in original); *see also Thomas James Assocs. v. Jameson,* 102 F.3d 60, 65 (2d Cir.1996) ("unless it may be said with *positive assurance* that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute," arbitration is to be compelled) (citations omitted) (emphasis in original). We now examine each of the four factors.

*3 On the question of whether the parties agreed to arbitrate, defendants have presented undisputed facts that Citibank's U.S. Consumer Group had an arbitration policy applicable to ADA suits and that Spencer-Franklin received and/or acknowledged the policy on at least four occasions prior to the institution of this lawsuit-most recently on March 3, 2006. Spencer-Franklin indicated in writing that she "underst[ood] that [the Arbitration Policy] ... requires me to submit employment-related disputes to binding arbitration .... " *See* Receipt Form. "Courts in this district routinely uphold arbitration agreements contained in employee handbooks where, as here, the employee has signed an acknowledgment form." *Beletsis v. Credit Suisse First Boston, Corp.,* 2002 WL 2031610, at *3 (S.D.N.Y. Sept. 4, 2002). Also, "[t]he mere fact that an agreement to arbitrate was required as a condition of ... continued employment ... is insufficient to invalidate the provision." *Ciago v. Ameriquest Mortgage Co.,* 295 F.Supp.2d 324, 329 (S.D.N.Y.2003) (citing cases); *accord Arakawa v. Japan Network Group,* 56 F.Supp.2d 349, 352 (S.D.N.Y.1999).

Spencer-Franklin's opposition papers do not address any of the relevant facts or legal principles regarding arbitrability. Instead, she characterizes the defendants' request for a dismissal as "unfair" and "Justice Denied." *See* Summary, Ex. 19, Answer to Notice to Dismiss. She states:
It is incomprehensible that Citibank would hold me to these policies when its own officers have not followed its policies and procedures. The policies and procedures as set forth in the Code of Conduct, Employee Handbook, etc., and are not necessarily provided because it is stated in these manuals. It is a fact that these policies have not been followed in this case.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Id.*

These allegations do not support a finding that there was no agreement to arbitrate. As the Second Circuit has noted:

[I]t is not sufficient for the party opposing arbitration to utter general denials of the facts on which the right to arbitration depends. If the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried.

*Oppenheimer & Co., Inc. v. Neidhardt,* 56 F.3d 352, 358 (2d Cir.1995). Spencer-Franklin was obviously aware of her right to submit evidentiary materials in opposing the defendants' motion inasmuch as she submitted numerous exhibits as part of her opposition papers. Nothing she has submitted, however, relates in any way to the arbitration policy. Thus, the evidence is uncontroverted that there was an agreement to arbitrate.[FN1]

> FN1. To the extent that Spencer-Franklin's statements may be understood as an argument that Citibank waived its right to compel arbitration by not following its policies in other instances, this argument must fail. "Any examination of whether the right to compel arbitration has been waived must be conducted in light of the strong federal policy favoring arbitration for dispute resolution .... Clearly, the policies underlying the federal arbitration act favor enforcement of agreements to arbitrate disputes." *Rush v. Oppenheimer & Co.,* 779 F.2d 885, 887 (2d Cir.1985). Given the federal policy favoring arbitration, Spencer-Franklin's conclusory allegations cannot support a finding that Citibank waived its right to compel arbitration.

As to the question of the scope of that agreement, the policy states specifically that it applies to "claims, demands or actions under [*inter alia* ] ... the Americans with Disabilities Act of 1990." *See* Arbitration Policy.

*4 On the issue of whether Congress intended ADA claims to be arbitrable, the text of the ADA states that "[w]here appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including ... arbitration, is encouraged to

resolve disputes." 42 U.S.C. § 12212. Thus, courts have upheld arbitration agreements in ADA cases. *See, e.g., Santos v. GE Capital,* 397 F.Supp.2d 350, 356 (D.Conn.2005); *Topf v. Warnaco, Inc.,* 942 F.Supp. 762, 771 (D.Conn.1996).

Finally, Spencer-Franklin's complaint asserts only an ADA claim and thus there are no nonarbitrable claims included in her lawsuit.

In sum, the application of four-factor test for arbitrability requires the conclusion that Spencer-Franklin's ADA claim must be arbitrated.

### B. *Dismissal or Stay*

The remaining issue is whether to grant defendants' motion to dismiss the case in favor of arbitration or whether the case should merely be stayed-a remedy that is specifically contemplated by 9 U.S.C. § 3. All courts of which we are aware have followed the rule that, "[w]here all of the issues raised in the Complaint must be submitted to arbitration, the Court may dismiss an action rather than stay proceedings." *Rubin v. Sona Int'l Corp.,* 457 F.Supp.2d 191, 198 (S.D.N.Y.2006) (citing *Alford v. Dean Witter Reynolds, Inc.,* 957 F.2d 1161, 1164 (5th Cir.1992) (citing cases)); *accord Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.,* 252 F.3d 707, 709-10 (4th Cir.2001) ( "Notwithstanding the terms of § 3, ... dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable."); *Green v. Ameritech Corp.,* 200 F.3d 967, 972-73 (6th Cir.2000); *Bercovitch v. Baldwin Sch., Inc.,* 133 F.3d 141, 156 n. 21 (1st Cir.1998), *aff'd,* 191 F.3d 8 (1999); *Sparling v. Hoffman Const. Co.,* 864 F.2d 635, 636 (9th Cir.1988). [FN2] Thus, where defendants have sought dismissal rather than a stay, courts in this district have granted dismissal. *See, e.g., Titan Pharm. & Nutrition, Inc. v. Med. Shoppe Int'l, Inc.,* 2006 WL 626051, at *6 (S.D.N.Y. Mar. 13, 2006); *Najib v. Arnold,* 2005 WL 221429, at *4 (S.D.N.Y. Jan. 31, 2005); *Perry v. New York Law Sch.,* 2004 WL 1698622, at *4 (S.D.N.Y. July 28, 2004). Accordingly, this case should be dismissed.

> FN2. While it does not appear that the Second Circuit has ruled directly on the question of whether dismissal is an available remedy under the FAA, the case of *Salim Oleochemicals v. M/V Shropshire,* 278 F.3d 90 (2d Cir.2002), made clear that the court expected that a dismissal in such

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                  Page 4
Slip Copy, 2007 WL 521295 (S.D.N.Y.)
**(Cite as: Slip Copy)**

circumstances was permissible. *See id.* at 93 (noting that where courts dismiss an action under the FAA rather than staying it, the order of dismissal is appealable).

### Conclusion

For the foregoing reasons, defendants' motion to compel arbitration and dismiss the action (Docket # 7) should be granted.

### PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. George B. Daniels, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Daniels. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985).

S.D.N.Y.,2007.
Spencer-Franklin v. Citigroup/Citibank N.A.
Slip Copy, 2007 WL 521295 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                          Page 1
Slip Copy, 2007 WL 1052451 (S.D.N.Y.)
**(Cite as: Slip Copy)**

**H**
Spencer-Franklin v. Citigroup/Citibank N.A.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Henrietta B. SPENCER-FRANKLIN, Plaintiff,
v.
CITIGROUP/CITIBANK N.A., Charles Prince,
Maura Markus, Gary Kimmelman, Donna Griffin,
Nicholas Decesare, and John E. Gunther, Defendants.
**No. 06 Civ. 3475(GBD).**

April 5, 2007.

*MEMORANDUM DECISION AND ORDER*
DANIELS, J.
**\*1** Plaintiff Henrietta Spencer-Franklin brought suit
against her employer, Citibank N.A., its parent
company, Citigroup, and various individuals, alleging
violations of the Americans with Disabilities Act of
1990 ("ADA"), <u>42 U.S.C. § § 12112</u>-<u>12117</u>.
Defendants moved to dismiss and to compel
arbitration, pursuant to <u>Fed.R.Civ.P. 12(b)(1)</u> and
<u>12(b)(6)</u>, as well as the Federal Arbitration Act
("FAA"), <u>9 U.S.C. § 1</u> *et seq.* The motion was
referred to Magistrate Judge Gabriel W. Gorenstein
for a Report and Recommendation ("Report").

Magistrate Judge Gorenstein recommended that the
motion to dismiss and to compel arbitration be
granted because the parties agreed to arbitrate all
employment related claims, including claims under
the ADA. Magistrate Judge Gorenstein advised the
parties that failure to file timely objections to the
Report would result in a waiver of those objections
and preclusion of appellate review. Neither party
filed objections and the time to do so has expired.

The Court may accept, reject or modify, in whole or
in part, the findings and recommendations set forth
within the Report. <u>28 U.S.C. § 636(b)(1)</u>. When
there are objections to the Report, the Court must
make a *de novo* determination of those portions of the
Report to which objections are made. *Id.; Rivera v.
Barnhart,* 432 F.Supp.2d 271, 273 (S.D.N.Y.2006).
When no objections to a Report are made, the Court
may adopt the Report if "there is no clear error on the
face of the record." <u>*Adee Motor Cars, LLC v. Amato,*
388 F.Supp.2d 250, 253 (S.D.N.Y.2005)</u> (citation
omitted).

The FAA represents a "strong federal policy in favor
of arbitration," and it is a policy that the Second
Circuit "ha[s] often and emphatically applied."
<u>*Arciniaga v. General Motors Corp .,* 460 F.3d 231,
234 (2d Cir.2006)</u> (citations omitted). According to
the FAA, an agreement to arbitrate "shall be valid,
irrevocable, and enforceable, save upon such grounds
as exist at law or in equity for the revocation of any
contract." <u>9 U.S.C. § 2</u>. Once a party enters into an
agreement to arbitrate, "the party should be held to it
unless Congress itself has evinced an intention to
preclude a waiver of judicial remedies for the
statutory rights at issue." <u>*Arciniaga,* 460 F.3d at 235</u>
(citation omitted). With respect to claims under the
ADA, Congress has evinced its intention to
*encourage,* rather than preclude, the use of arbitration
to resolve such disputes. *See* <u>42 U.S.C. § 12212</u>
("Where appropriate and to the extent authorized by
law, the use of alternative means of dispute
resolution, including ... arbitration, is encouraged to
resolve disputes arising under this chapter.").

Here, when defendant Citibank's arbitration policy
was adopted, plaintiff received a copy of the policy
with a memo attached. The memo clearly stated:
"you and the Company agree to make arbitration the
required and exclusive forum for resolution of all
employment-related disputes based on legally
protected rights.... Your continued employment will
constitute acceptance of the Arbitration Policy."
Plaintiff continued to be employed by Citibank,
evidencing her acceptance of the policy. In addition,
a copy of the policy was included in Citibank's
employee handbook. The handbook came with an
acknowledgment form stating that "I understand that
this Handbook contains a policy that requires me to
submit employment-related disputes to binding
arbitration (see page 37)." Plaintiff signed the
acknowledgment form, acknowledging her
understanding and acceptance of the policy.

**\*2** Therefore, Magistrate Judge Gorenstein's
recommendation that this case be dismissed because
plaintiff knowingly entered into an agreement to
submit her employment-related claims to arbitration
is not clearly erroneous.

Defendants' motion to compel arbitration and to
dismiss is GRANTED. This case is DISMISSED.
SO ORDERED:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 2
Slip Copy, 2007 WL 1052451 (S.D.N.Y.)
**(Cite as: Slip Copy)**


S.D.N.Y.,2007.
Spencer-Franklin v. Citigroup/Citibank N.A.
Slip Copy, 2007 WL 1052451 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                          Page 1
Slip Copy, 2006 WL 1329753 (E.D.N.Y.), 179 L.R.R.M. (BNA) 3188, 11 Wage & Hour Cas.2d (BNA) 1369
**(Cite as: Slip Copy)**

**C**
Tyler v. City of New York
E.D.N.Y.,2006.

United States District Court,E.D. New York.
Valerie TYLER et al., Plaintiffs,
v.
CITY OF NEW YORK, et al., Defendants.
**No. 05CV3620(SLT)(JO).**

May 16, 2006.

William J. Sipser, Tuckner, Sipser, Weinstock & Sipser, New York, NY, for Plaintiffs.
Felice B. Ekelman, Jackson Lewis, LLP, New York, NY, for Defendants.

MEMORANDUM & ORDER
TOWNES, U.S.D.J.
*1 Defendants' motion to dismiss is granted. This memorandum briefly address Defendants' claims.

*I. Facts and Procedural History*

For the purpose of resolving the motion before the Court, all factual allegations in the Complaint are presumed to be true. *See Ferran v. Town of Nassau, 11 F.3d 21, 22 (2d Cir.1993).*

Plaintiffs Valerie Taylor, Yolanda Moss, Vernell Hudson, Donna A. Coles, Cherylin Watson, Janet Harmon, Valerie Britt, Theresa Smith-Paw, Halloveen Brightley, Elizabeth Gallman-Mapp, and Barbara Morris (collectively "Plaintiffs") are Police Communication Technicians ("PCTs") for defendant New York City Police Department ("NYPD" or "Police Department"). (Complaint at 1.) Plaintiff Cynthia Hill is a Supervising Police Communication Technician ("SPCT") for NYPD. *(Id.)*

PCTs and SPCTs are assigned to NYPD's Communication Division primarily as radio dispatchers and supervisors of radio dispatchers, respectively. (Complaint ¶ 18.) Plaintiffs' jobs require the use of a headset, which must be stored in a locker when not in use. (Complaint ¶ 19.) The process by which Plaintiffs obtain their headsets prior to commencement of their respective shifts (as well as the one by which Plaintiffs return the headsets at

the close of their shifts) takes approximately 15-20 minutes. (Complaint ¶ 20-21.) Plaintiffs are not compensated for this time. (Complaint ¶ 20-21.)

Plaintiffs are not permitted to leave their respective workstations until their replacements arrive and they are not compensated for any time spent waiting. (Complaint ¶ 22.) Indeed, Plaintiffs are not compensated for any overtime until they have worked "longer than one hour and one minute." (Complaint ¶ 23.) This practice, Plaintiffs allege, have resulted in Defendants receiving thousands of hours of unpaid labor, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b). *(Id.)*

Plaintiff brings this putative class action on behalf of all individuals residing in the City of New York who work for NYPD as PCTs or SPCTs. Plaintiffs name NYPD, the City of New York (the "City"), Mayor Michael R. Bloomberg ("Bloomberg"), Police Commissioner Raymond W. Kelly ("Kelly"), the New York City Department of the Citywide Administrative Services, and Martha K. Hirst ("Hirst"), Commissioner of DCAS, as defendants (collectively, the "Defendants"), and allege that Defendants failure to pay them overtime in the above-described situations constitutes a violation of the Fair Labor Standards Act (collectively "Defendants").[FN1] (Complaint at 1.)

FN1. Plaintiffs name Bloomberg, Kelly and Hirst only in their official capacities.

Plaintiffs are subject to a collective bargaining agreement [FN2] ("CBA") between the City and various unions that represent civil servants. (Hudson Aff. Ex. A.) Article XV, Section 10 ("Section 10") of the CBA, entitled "Adjustment of Disputes" contains a subsection entitled "FLSA Dispute Procedure" and provides as follows:

FN2. Though the CBA was not attached to (or incorporated by reference in) the Complaint, the Court is permitted to consider matters outside of the pleadings when evaluating a motion under Rule 12(b)(1). *Zappia Middle East Constr. Co. v. Emirate of Abu-Dhabi, 215 F.3d 247, 253 (2d Cir.2000).*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 2
Slip Copy, 2006 WL 1329753 (E.D.N.Y.), 179 L.R.R.M. (BNA) 3188, 11 Wage & Hour Cas.2d (BNA) 1369
(Cite as: Slip Copy)

The Court may also consider the CBA on the alternative 12(b)(6) motion because the complaint "relies heavily upon its terms and effect," rendering it "integral" to the Complaint. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152-3 (2d Cir.2002); *see also Munno v. Town of Orangetown,* 391 F.Supp.2d 263, (S.D.N.Y.2005) (considering CBA on 12(b)(6) motion because it was integral to police officers' claim that he was wrongfully discharged and because he had actual notice of same).

a. Any dispute, controversy or claim concerning or arising out of the application or interpretation of the Fair Labor Standards Act ("FLSA Controversy") shall be submitted by a claimant in accordance with this section.
**\*2** b. Any FLSA Controversy must be presented in writing and in the form prescribed by the FLSA Panel no later than sixty days after the date on which such FLSA Controversy arose.
c. i. Any FLSA Controversy arising out of a claimed wrongful computation of benefits shall be submitted by an employee in writing to the applicable agency head or designee for review and resolution.
[ ... ]
ii. If the matter is not satisfactorily resolved at the agency level, the claimant may, within two weeks after receipt of the agency determination, appeal the matter to the FLSA Panel in writing.
[ ... ]
f. Notwithstanding the provisions of this Section 10, the submission of a dispute by an employee under this provision shall not constitute a waiver of the employee's rights until the FLSA.

(Hudson Aff. Ex. A at 42-45.)

Defendants move to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), arguing that, pursuant to the CBA, this Court must compel the parties to arbitrate the instant dispute.

## II. *Discussion*

In Defendants' request for a Pre-Motion Conference, they stated an intention to file "a motion to dismiss Plaintiffs' Complaint, or in the alternative, to stay the instant action and compel arbitration pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6)." (Letter from Ekelman to Court of 11/28/05.) Defendants referred to their memorandum

of law as one "[i]n Support of Defendants' Motion to Dismiss *and* Compel Dispute Resolution." (emphasis added). Defendants alternatively requested a dismissal and a stay throughout their initial brief. *(See* Def. Mem. of Law at 2 (referring to "Motion to Dismiss *and* Compel Dispute Resolution") (emphasis added): *id.* at 3 ("the Court should ... stay the instant proceedings"); *id.* at 10 ("The Court should compel mandatory dispute resolution ... and dismiss or stay this Action."); *id.* at 12 (stating, in their conclusion that "this proceeding should be stayed in the event that certain of the claims are not resolved to the Plaintiff's satisfaction").) In their reply, defendants ask the court to compel use of the dispute resolution process, stay the action and dismiss the claims of those whose FLSA claims are resolved through the procedure. (Def. Reply Mem. at 1.)

The inconsistencies throughout Defendants' motion papers reflect the lack of clarity in the case law of this Circuit (and others) as to what procedural mechanism must be employed by courts to dismiss actions in which the parties are bound to resolve (or attempt resolution of) their claims in accordance with a contractual grievance procedure, such as an agreement to arbitrate. *See, e.g., Tand v. Solomon Schechter Day Sch. of Nassau County,* 324 F.Supp.2d 379 (E.D.N.Y.2004) (Spatt, J.) (dismissing claim under Labor Management Relations Act under 12(b)(6) for failure to exhaust mandatory grievance procedures). *Sinnet v. Friendly Ice Cream Corp .,* 319 F.Supp.2d 429 (S.D.N.Y.2004) (dismissing FLSA action and compelling arbitration but specifying neither Rule 12(b)(1) nor 12(b)(6)); *Martin v. SCI Mgmt. L.P.,* 296 F.Supp.2d 462 (S.D.N.Y.2003) (granting motion to compel arbitration under Federal Arbitration Act [FN3] ("FAA") without reference to Federal Rules of Civil Procedure); *Russell Country Sch. Bd. v. Conseco Life Ins. Co.,* 2001 WL 1593233 (W.D.Va. Dec. 12, 2001) (motion to compel arbitration decided under FAA without comment on applicability of Rule 12(b)(1)); *see also Citicorp Admin. Servs., Inc. v. Mail Sort, Inc.,* 2004 WL 962832, at \*1 (N.D.Tx. May 4, 2004) (declining to answer "enigmatic question" of whether motion to dismiss in pursuit of arbitration is proper under Rule 12(b)(1), 12(b)(3) or 12(b)(6)); *Geelan v. Mark Travel, Inc.,* 319 F.Supp. 950 (D.Minn .2004) (court lacked subject matter jurisdiction over dispute due to both collective bargaining agreement and application of Railway Labor Act); *DeGroff v. MascoTech Forming Tech. Fort Wayne, Inc.,* 179 F.Supp.2d 896, 899 n. 2 (N.D.Ill.2001) (motion to compel arbitration can be brought under 12(b)(1)); *Strick Corp. v. Cravens Homalloy (Sheffield) Ltd.,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                      Page 3
Slip Copy, 2006 WL 1329753 (E.D.N.Y.), 179 L.R.R.M. (BNA) 3188, 11 Wage & Hour Cas.2d (BNA) 1369
(Cite as: Slip Copy)

352 F.Supp. 844, 847-8 (E.D.Pa .1972) (contract clause requiring arbitration does not strip court of jurisdiction); 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDREAL PRACTICE AND PROCEDURE § 1350 (3d ed.1998) (comparing inconsistent grounds for dismissal of actions containing arbitration clauses).

FN3. While the Federal Arbitration Act sets forth standards and procedures enabling the district courts to stay proceedings pending arbitration, compel arbitration, and/or dismiss federal actions pending arbitration, 9 U.S.C. § 201, et seq., the FAA is applicable only to certain arbitration agreements affecting interstate commerce. However, the parties to the instant dispute are all domiciled in the State of New York, rendering the FAA irrelevant. (Complaint ¶ 10.)

A. *Rule 12(b)(1)*

*3 "When considering a motion to dismiss for lack of subject matter jurisdiction ... a court must accept as true all material factual allegations in the complaint." *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998) (citation omitted). However, when ruling upon questions of subject matter jurisdiction, the Court cannot draw inferences in favor of Plaintiffs. *Newsom-Lang v. Warren Int'l,* 129 F.Supp.2d 662, 663 (S.D.N.Y.2001).

It is undisputed that this Court has the power to adjudicate claims under the FLSA, and that the instant case falls under the FLSA. 29 U.S.C. § 201 *et seq; Mascol v. E & L Transp., Inc.,* 398 F.Supp.2d 87, 93 (E.D.N.Y.2005) ( "Under the [FLSA], employers must pay employees time-and-a-half for all hours worked over 40 hours per week.") (*citing* 29 U.S.C. § 207(a)(1)). The CBA does not purport to waive Plaintiff's rights under the FLSA, nor do Defendants argue such a waiver. Indeed, the CBA cannot be held to waive Plaintiff's FLSA rights, as a matter of law. *See Barrentine v. Arkansas-Best Freight Sys.,* 450 U.S. 728, 744 (1981) (FLSA rights unwaivable).

Because (1) it is undisputed that the federal courts have the power to adjudicate claims under the FLSA; and (2) the CBA expressly leaves Plaintiff's FLSA remedies in tact notwithstanding its grievance procedures, subject matter jurisdiction is proper. *See NYP Holdings, Inc. v. Newspaper and Mail*

*Deliverers' Union of New York and Vicinity,* 2002 WL 1603145 (S.D.N.Y. Jul. 18, 2002) ("A court properly dismisses a case for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it," which cannot be said in this instance); *but see, e.g., Urena v. American Airlines, Inc.,* 2004 WL 2212095, at *3 (E.D.N.Y. Sept. 16, 2004) (Rule 12(b)(1) motion granted where dispute falling under Railway Labor Act found to be "within the exclusive jurisdiction of the grievance and arbitration procedures of the CBA"); *Morrison v. Coloarado Permanente Med. Group., P. C.,* 983 F.Supp. 937 (D.Colo.1997) (dismissing, under Rule 12(b)(1) those claims governed by arbitration clause).

B. *Arbitrability of Dispute*

Without resolving whether Defendants' motion is properly brought under Rule 12(b)(6), this court dismisses the instant action because Section 10 of the CBA requires Plaintiffs to exhaust their administrative remedies prior to filing suit. *See, e.g., See Alphonse Hotel Corp. v. New York Hotel & Motel Trades Council, AFL-CIO,* 2004 WL 414836, at *4-6 (S.D.N.Y. Mar. 5, 2004) (finding subject matter jurisdiction proper and dismissing for failure to arbitrate).

Section 10 of the CBA, entitled, "FLSA Dispute Procedure," clearly requires Plaintiffs to submit any claim arising under the FLSA to the "FLSA Panel" for resolution. (Hudson Aff. Ex. A at 44 .) Though Plaintiffs argue that the FLSA does not require exhaustion of administrative remedies prior to filing suit, Plaintiffs make this argument without citation to relevant case law. Plaintiffs' cite *Barrentine v. Arkansas-Best Freight Sys.,* 450 U.S. 728, 740 (1981), for the proposition that "an aggrieved employee [may] bring his statutory wage claim 'in any Federal or State court of competent jurisdiction.' " (Pl. Mem. of Law at 7 (quoting Barrentine).) However, prior to filing an action in the district court, the *Barrentine* plaintiffs "unsuccessfully submitted a wage claim based on the same underlying facts to a joint grievance committee" pursuant to a collective bargaining agreement, and their grievances were rejected without explanation in a "final and binding" decision. *Id.* at 730-731. As they have yet to submit their FLSA dispute to FLSA panel, as required by the CBA (or even attempt to do so), the instant Plaintiffs are not aided by the holding in *Barrentine,* or its progeny. *See Alexander v. Gardner-Denver,* 415 U.S. 36, 39 (1974) (petitioner filed Title VII action after

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                        Page 4
Slip Copy, 2006 WL 1329753 (E.D.N.Y.), 179 L.R.R.M. (BNA) 3188, 11 Wage & Hour Cas.2d (BNA) 1369
(Cite as: Slip Copy)

unsuccessfully seeking redress for discrimination through grievance procedure of collective bargaining agreement); *cf. Tran v. Tran*, 54 F.3d 115, 115 (2d Cir.1995) (remanding FLSA action after union refused to pursue claim on plaintiff's behalf).

**\*4** Furthermore, the CBA contains no waiver of Plaintiffs' right to seek redress in court following the conclusion of the procedures set forth in Section 10. On the contrary, the CBA expressly preserves Plaintiffs' rights under the FLSA. (Hudson Aff. Ex. A at 45.) Plaintiffs have apparently mistaken a *precursor* to litigation for a *waiver* of statutory rights.

Defendants do not argue that the CBA constitutes a waiver, making inapposite those cases cited by Plaintiffs where courts struck down purported waiver provisions. *See, e.g., Wright v. Universal Mar. Serv. Corp.,* 525 U.S. 70 (1998) (finding that employee's collective bargaining agreement did not contain clear and unmistakable language constituting a waiver of his right to file a claim under the Americans with Disabilities Act); *Rogers v. New York Univ.,* 220 F.3d 73, 75 (2d Cir.2000) (collective bargaining agreement did not unmistakably waive employees' rights under ADA and Family and Medical Leave Act); *Beljakovic v. Melohn Props. Inc.,* 2005 WL 2709174, at *1 (S.D.N.Y. Oct. 17, 2005) (collective bargaining agreement purporting to mandate arbitration as the "sole and exclusive" remedy for plaintiff's claim under the Age Discrimination in Employment Act cannot preclude court's subject matter jurisdiction over same).

Because the CBA contains unambiguous language delineating a procedure for the redress of Plaintiffs' FLSA-related rights and because Plaintiffs are free to return to the courts at the end of that procedure, this Court hereby compels Plaintiffs to comply with Section 10 of the CBA and dismisses this action, without prejudice. To ensure that Plaintiffs are not prejudiced, the Court dismisses this action with the understanding that Defendants have waived their right to assert a statute of limitations affirmative defense should this action be re-filed by any of the Plaintiffs following exhaustion of the CBA-required FLSA dispute resolution procedures.

### III. *Conclusion*

Because the CBA explicitly requires the parties to engage in a grievance procedure, and that grievance procedure does not abridge Plaintiffs' rights under the FLSA, the instant action is dismissed without prejudice.

SO ORDERED.

E.D.N.Y.,2006.
Tyler v. City of New York
Slip Copy, 2006 WL 1329753 (E.D.N.Y.), 179 L.R.R.M. (BNA) 3188, 11 Wage & Hour Cas.2d (BNA) 1369

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.